24 CV 06407

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION AND NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED,<br><br>*Plaintiffs*,<br><br>v.<br><br>DRAFTKINGS INC. and DK CROWN HOLDINGS INC.,<br><br>*Defendants*. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiffs National Football League Players Association ("NFLPA") and National Football League Players Incorporated ("NFL Players Inc." and, collectively with the NFLPA, the "NFLPA Licensors"), by their undersigned attorneys for its Complaint, allege as follows:

## NATURE OF THE ACTION

1. Defendants DraftKings Inc. and DK Crown Holdings Inc. (together herein, "DraftKings") are a leading sports gambling company that generates billions of dollars in revenue based on a simple premise: if a DraftKings' customer places a losing bet, that customer must still pay up.

2. In its dealings with Plaintiffs, however, DraftKings has refused to play by its own rules. DraftKings placed a large bet on the future of non-fungible tokens ("NFTs") by creating digital sports-themed NFTs that could be used in the company's fantasy sports contests, and a marketplace where consumers can purchase them. To build its products, DraftKings needed the right to use the name, image and likeness ("NIL") of NFL players. It committed substantial guaranteed payments to Plaintiffs for a license to do so. But DraftKings no longer thinks investing

in these collectibles is a good bet. On July 29, 2024, DraftKings abruptly announced that it had decided to shut down its products on July 30 and told Plaintiffs that DraftKings would no longer abide by its payment obligations.

3. The impetus for DraftKings' decision to repudiate its license agreement with Plaintiffs is simple: the once white-hot market for NFTs has cooled down. DraftKings is also facing a civil lawsuit and regulatory inquiries into its product. Buyers' remorse, however, is not a basis to terminate a contract. Here, DraftKings—a sophisticated and amply-resourced gaming behemoth—assumed the risks inherent in its product save for carefully negotiated and narrow termination grounds. Conversely, the NFLPA Licensors protected themselves against the risks associated with DraftKings' novel product by securing minimum *guaranteed* payments.

4. DraftKings has nonetheless conjured up a number of pretextual justifications for its stated intention to stop paying the minimum guarantees. Chief amongst these is the clause in the agreement which allows DraftKings to terminate if a government, regulatory or adjudicatory body "determines" that the "Licensed Products" constitute "securities." According to DraftKings, a recent district court decision declining to dismiss (under Federal Rule of Civil Procedure 12(b)(6)) a lawsuit challenging DraftKings' products as unregistered securities constitutes "a determin[ation] that the NFTs sold on [*sic*] Marketplace are securities." Needless to say, the court's pleadings ruling did not "determine" anything about the merits of the securities laws claims.

5. At the end of the day, and despite DraftKings' best efforts to muddy the waters, this case is extraordinarily simple. DraftKings' inability to profitably commercialize the intellectual property it licensed does not excuse performance, and DraftKings must pay what is due. By affirmatively stating that it will not do so, DraftKings has anticipatorily breached its agreement with the NFLPA Licensors—which at all times lived up to their part of the bargain—and is thus

2

liable for all remaining guaranteed minimum payments specified by the contract. New York law permits non-repudiating parties—*e.g.*, Plaintiffs—to immediately claim damages for a total breach while relieving them of future performance.

6.   Accordingly, Plaintiffs bring this suit to hold DraftKings accountable for its contractual obligations and recover the present value of all guaranteed amounts due over the life of the parties' license agreement, as well as any applicable interest, costs, and fees.

## JURISDICTION AND VENUE

7.   This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interests and costs. Plaintiff NFLPA is a non-profit corporation organized under the laws of the State of Virginia with its principal place of business in Washington, D.C. Plaintiff NFL Players Inc. is a corporation organized under the laws of the State of Virginia with its principal place of business in Washington, D.C. Defendant DraftKings Inc. is a corporation organized under the laws of the State of Nevada with its principal place of business in Boston, Massachusetts. Defendant DK Crown Holdings Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business in Boston, Massachusetts.

8.   Venue in this District is proper pursuant to the forum selection clause of the parties' governing amended license agreement, which states that "[a]ny action arising out of or related to this Agreement shall be initiated and maintained in a forum of competent jurisdiction within New York County, New York, and the Parties irrevocably agree to the exclusive jurisdiction of the federal and state courts located in the State of New York."

3

9. This Court has personal jurisdiction over DraftKings Inc. and DK Crown Holdings Inc. because they regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and/or services provided to persons in this District.

## PARTIES

### A. Plaintiff National Football League Players Association

10. Founded in 1967, the NFLPA serves as the duly recognized labor union for professional football players in the NFL—and its over 2,000-plus player members.

### B. Plaintiff National Football League Players Incorporated

11. Established in 1994 as the for-profit licensing and marketing arm of the NFLPA, NFL Players Inc., among other things, markets and sells licenses to consumer-product manufacturers to use the NIL of NFL players.

12. Today, NFL Players Inc. is party to dozens of license agreements for a variety of consumer products including trading cards, collectibles, video games, and other retail products and services. Royalty revenues from these agreements are distributed to the individual players involved in the deals, as well as shared with the NFLPA to help fund union operations.

13. Under the parties' Amended and Restated License Agreement, effective December 19, 2023 (the "Amended License Agreement") NFL Players Inc. "retains all Intellectual Property Rights in the Licensed Materials" and "[a]ll rights relating to the rights licensed hereunder are specifically reserved by [NFL Players Inc.]." Ex. A, § 5(A).

### C. Defendant DraftKings Inc.

14. Defendant DraftKings Inc. is a publicly traded NASDAQ corporation (DKNG) organized under the laws of the State of Nevada with its principal place of business in Boston, Massachusetts.

15. DraftKings Inc. is a digital sports entertainment and gaming company, providing, among other things, online sports betting, online casino, daily fantasy sports, and other consumer products.

16. DraftKings Inc. is a party to the license agreement, effective November 19, 2021, between DraftKings as "DraftKings Inc.", the NFLPA Licensors, and OneTeam. Ex. B (the "License Agreement").

17. Additionally, DraftKings Inc. remits payments owed to the NFLPA Licensors under the Amended License Agreement, to which DraftKings Inc.'s wholly owned subsidiary, DK Crown Holdings Inc., is a party. *See* Ex. A.

18. According to publicly reported financial information, DraftKings Inc. generated over $3.6 billion in revenues in 2023,[1] and as of August 20, 2024, DraftKings Inc. boasted a market capitalization of roughly $16.9 billion.[2]

19. Jason D. Robins, DraftKings Inc.'s Chief Executive Officer, received over $20 million in total compensation during DraftKings Inc.'s Fiscal Year 2023.[3] Since 2021, Mr. Robins has received over $82.1 million in total compensation.[4]

20. Matthew Kalish, President of DraftKings North America, and Paul Liberman, DraftKings Inc.'s President, Global Technology and Product, respectively, received roughly $11 million and $10.5 million in total compensation in Fiscal Year 2023, and roughly $62.5 million each in total compensation since 2021.[5]

---

[1] DraftKings Inc., Annual Report for the Fiscal Year ended December 31, 2023 (Form 10-K) at 57 (Feb. 16, 2024).

[2] YCHARTS, https://ycharts.com/companies/DKNG/market_cap (last visited Aug. 20, 2024).

[3] DraftKings Inc., 2024 Proxy Statement (Schedule 14A) at 35 (Mar. 22, 2024).

[4] *Id.*

[5] *Id.*

21. R. Stanton Dodge, DraftKings Inc.'s Chief Legal Officer, and Jason K. Park, DraftKings Inc.'s Chief Financial Officer, respectively, received over $6.5 million and $7.3 in total compensation in Fiscal Year 2023, and over $27 million each in total compensation since 2021.[6]

22. All told, the total compensation of just these five aforementioned officers since 2021 is approximately quadruple of what DraftKings owes to the NFLPA Licensors.

**D. Defendant DK Crown Holdings Inc.**

23. Defendant DK Crown Holdings Inc.[7] is a wholly owned subsidiary of DraftKings Inc. DK Crown Holdings Inc. is organized under the laws of the State of Delaware with a principal place of business in Boston, Massachusetts.

24. On information and belief, DK Crown Holdings Inc. offers Sportsbook and Daily Fantasy Sports services to support DraftKings' broader entertainment and gaming operations.

25. DK Crown Holdings Inc. is a party to the Amended License Agreement.

## FACTUAL ALLEGATIONS

**A. The Rise of "Alternative Assets" and DraftKings NFTs**

26. In July 2021, a piece of cardboard no larger than one's hand made national headlines. That item was a rookie trading card of Stephen Curry, a prominent professional basketball player. And the attention it garnered was driven by the jaw-dropping price it fetched in a private sale: $5.9 million, a figure more akin to the value of a Cezanne than that of a sports card.

---

[6] *Id.*

[7] Plaintiffs note that DraftKings Inc. and DK Crown Holdings Inc. are inconsistent in both public filings and non-public correspondence as to whether DK Crown Holdings Inc. is a separate entity from DraftKings Inc. *Compare* DraftKings Inc., Quarterly Report for the Quarterly Period ended June 30, 2024 (Form 10-Q) at 39 (Aug. 2, 2024) (describing DK Crown Holdings Inc. as a "wholly-owned subsidiar[y] of DraftKings Inc.) *with* Joint Mot. to Modify the Official Caption, *AG 18, LLC v. DK Crown Holdings Inc.*, No. 2024–1821, at 9 (Fed. Cir. June 18, 2024), ECF No. 12 (noting that DraftKings Inc. "recently registered with a new corporate name of DK Crown Holdings Inc."). Given this inconsistency and in an abundance of caution, Plaintiffs have named both DraftKings Inc. and DK Crown Holdings Inc. as Defendants.

27.     The price of this card, though remarkable, was no anomaly. A number of so-called "alternative" assets (those that are not stocks, bonds, or cash), such as trading cards, collectibles, and cryptocurrencies, saw their value begin to dramatically increase in 2021. NFTs comprised one particularly important (and lucrative) category of these alternative assets.

28.     Essentially, an NFT is a unique digital identifier which represents and encompasses a non-physical asset such as a digital image, a musical recording, or a video. Each resides on a digital ledger (or blockchain, which is a system of recording information in a way that makes it nearly impossible to hack or cheat the system). These items have value, in part, because it is so difficult to reproduce their digital "signature." They cannot be copied, substituted, or subdivided, so the NFT is innately protected from the most significant threats to any type of digital product: duplication and piracy. While the ability to copy a file containing a digital product or art can be as simple as a click of a button, the technology behind NFTs prevents this type of duplication, thus ensuring the scarcity—and, ideally, the value—of the underlying asset.

29.     By the middle of 2021, DraftKings saw a way to leverage the public's newfound appetite for NFTs: digital sports-themed collectibles. As one of the leading online fantasy sports and betting companies in the United States—home to legions of devoted fans with an appetite for risk and money to spend—DraftKings was in a unique position to capitalize on this opportunity. Tens of billions of dollars were being wagered on the DraftKings website every year, and the company recognized that it could further bolster its revenue by incorporating sports-themed alternative assets into its slate of offerings.

30.     Accordingly, on July 21, 2021, DraftKings announced that it would be entering the NFT marketplace, acting as both seller and broker of NFTs featuring the likenesses of a discrete group of prominent athletes.

31. Specifically, DraftKings partnered with Autograph, a well-known NFT company owned in part by Tom Brady and which had acquired the rights to utilize the NIL of a small group of athletes, to sell digital player portraits of those athletes in the form of NFTs. At the same time, DraftKings launched the "NFT Marketplace" (the "Marketplace") to serve as the exclusive platform for purchasing and selling those NFTs with respect to both the initial sale by DraftKings and any ensuing secondary market transactions.

32. On August 11, 2021, DraftKings released its first NFTs—featuring portraits of Tom Brady—on the Marketplace. They were an instant sensation. In less than 15 minutes, DraftKings' entire NFT collection had sold out, and trading volume in the secondary market—from which DraftKings took a 10% transaction fee—exceeded a million dollars on the first day.

33. Over the next several months, DraftKings released additional portrait NFTs to continued success. But there was still plenty of room to grow. Of the millions of customers that wagered in DraftKings' fantasy sports contests, only a fraction participated in the Marketplace. So DraftKings sought to expand beyond this niche customer base by incorporating NFTs into the contests which made up the core of its business.

34. To bring that idea to fruition, however, DraftKings wanted to acquire intellectual property rights to the NIL of all NFL players, and not just the select group of athletes that had been the subject of the DraftKings-Autograph collaboration.

35. DraftKings intended to then use these rights to create "NFLPA Collectibles"—digital sports-themed NFTs of NFL players—that could be bought and sold exclusively on the DraftKings website. These NFLPA Collectibles were designed to be used in DraftKings' fantasy sports competitions, where a player would compile a "team" of NFLPA Collectibles and compete against the teams of other DraftKings users in paid contests.

**B. The 2021 License Agreement**

36. DraftKings soon entered discussions with the NFLPA Licensors, owners of those intellectual property rights, and OneTeam Partners LLC ("OneTeam"), the NFLPA Licensors' agent. Negotiations were successful and ultimately resulted in the execution of the License Agreement. Thereunder, the NFLPA Licensors granted DraftKings the right to use their valuable intellectual property rights—including the NIL of NFL players and the NFL Players Inc.'s logos—in the creation, advertising, marketing, and promotion of NFLPA Collectibles and the fantasy sports contests in which these products could be used. DraftKings was afforded these intellectual property rights—as well as the exclusive right to use this intellectual property in connection with fantasy sports contests —until the date of the License Agreement's expiration, February 28, 2027, "unless terminated in accordance with the provisions [t]hereof." *Id.* § 1(K).

37. In return, DraftKings agreed to pay the NFLPA Licensors a ▮ revenue royalty on sales in both the initial and secondary markets. The NFLPA Licensors also negotiated for and obtained a minimum guaranteed payment of $▮ (the "Minimum Guarantee") to be apportioned over five license periods. Critically, DraftKings was required to pay the Minimum Guarantee "regardless of how many sales occur or how much revenue is generated." *Id.* § 2(A).

38. Such minimum guarantees are a common feature of license agreements and function as a mechanism for allocating risk. Since a licensor typically lacks control over the commercialization of the products bearing its intellectual property—and in the case of an exclusive agreement, cannot relicense that property should the licensee's efforts be unsuccessful—a minimum guarantee ensures a "floor" payment for the licensor.

39. Here, the plain terms of the parties' agreement reflect a mutual understanding that the underlying intellectual property rights were extraordinarily valuable, that DraftKings secured the exclusive right to use the NFLPA Licensors' rights in connection with NFT-based fantasy

9

sports contests, and that the NFLPA Collectibles themselves presented a high-risk, high-reward use case. The License Agreement also reflects DraftKings' decision to bet on itself: it was DraftKings that assumed the commercial and regulatory risk except for a narrow and specific set of circumstances.

40.     The Minimum Guarantee was to be paid in the following installments to cover the corresponding license periods (the "License Periods"):

- <u>First License Period (November 19, 2021 – February 28, 2023)</u>: $ ███
- <u>Second License Period (March 1, 2023 – February 29, 2024)</u>: $ ███
- <u>Third License Period (March 1, 2024 – February 28, 2025)</u>: $ ███
- <u>Fourth License Period (March 1, 2025 – February 28, 2026)</u>: $ ███
- <u>Fifth License Period (March 1, 2026 – February 28, 2027)</u>: $ ███

41.     As part of the Minimum Guarantee, DraftKings also agreed to remit a $ ███ "True Up" payment by April 29, 2023 (that is, "within 60 days following the end of the [First] License Period"). *Id.*

### C. The Release of NFLPA Collectibles and Reignmakers Contests

42.     Having inked the License Agreement in the midst of the 2021-2022 NFL season, DraftKings wasted no time in attempting to monetize it. Just days after the 2022 Super Bowl, DraftKings announced its plans to launch "gamified NFT collections"; three months later, on May 17, 2022, it issued the first NFLPA Collectibles for the upcoming 2022-2023 NFL season.

43.     NFLPA Collectibles were released in five so-called "rarities," as were the packs in which they could be purchased. As the rarity level increased, so too did the cost: packs of "lower-rare" (meaning more common) NFLPA Collectibles were priced at tens or hundreds of dollars,

10

while "rarer" NFLPA Collectibles were sold by DraftKings through an auction process and often fetched over $10,000.

44. Once purchased, NFLPA Collectibles could be used to enter DraftKings' "Reignmakers" contests. Touted as "the next great fantasy football experience," participation in Reignmakers contests was dictated by the actual NFL games played that week and the rarities of the NFLPA Collectibles the consumer owned. By way of example, DraftKings would host a Thanksgiving-weekend tournament that required participants to own five NFLPA Collectibles of a specific rarity. Those rare NFLPA Collectibles could only be found by purchasing a certain pack for $199.99, and each pack only contained one eligible NFLPA Collectible. As with a traditional fantasy sports contest, the in-game performances of the players depicted on the NFLPA Collectibles determined the winner of a Reignmakers competition.

45. This structure effectively functioned as *de facto* entry fees for nominally "free" Reignmakers contests, as interested users were required to first purchase hundreds, if not thousands, of dollars' worth of NFLPA Collectibles to meet DraftKings' participation requirements. But customers flocked to the new product anyway: in its first year, the Marketplace saw more than 2 million NFLPA Collectible transactions (from each of which DraftKings took a 10% cut), and DraftKings generated tens of millions of dollars through its Reignmakers offerings in the 2022 fiscal year.

46. By the end of the NFL season in February 2023, however, warning signs began to appear, and NFT prices and trading volume dropped across the board.

### D. DraftKings Circumvents Its Payment Obligations Under the License Agreement and Attempts to Manufacture Grounds for Termination

47. The broader downturn in the NFT market had no bearing on the Minimum Guarantee payments owed to the NFLPA Licensors, including the April 29, 2023, "True-Up"

11

payment of $███████. However, as that date drew near and the NFT market continued to struggle, DraftKings was stricken with buyer's remorse. It repeatedly expressed concerns about the economics of the License Agreement and, even after the NFLPA Licensors expressed a willingness to help their business partner by renegotiating certain terms, refused to provide any assurances that it would make the payments owed.

48. Sure enough, the April 29 deadline came and went without the True-Up payment being made. Instead, DraftKings threatened to voluntarily shutter Reignmakers and the Marketplace, ostensibly because it claimed it could then terminate the License Agreement under Section 9(A)(iii) (the "Termination Provision") and avoid making any further royalty payments.

49. DraftKings' assertion was nonsensical: by its plain language, the Termination Provision contemplates the shuttering of either party's business (thus rendering it incapable of making any additional payments),[8] not a highly profitable company's decision to stop selling a single product. Nevertheless, the NFLPA Licensors were forced to raise the specter of legal action before DraftKings tendered the $███████ owed under the License.

### E. In an Effort to Accommodate DraftKings, the Parties Enter Into the Amended License Agreement

50. Despite DraftKings' gamesmanship with respect to the True-Up payment, the NFLPA Licensors remained committed to making their partnership work. Despite having no contractual obligation to do so, Plaintiffs agreed to restructure the License Agreement, entering into the Amended License Agreement. It is that agreement which governs the parties' present dispute.

---

[8] License Agmt. § 9(A) (permitting termination "if a petition in bankruptcy is filed against any such Party or if such Party becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy laws, or if such Party discontinues its business . . .").

51. In relevant part, the Amended License Agreement expanded DraftKings' right to use the subject intellectual property from NFT fantasy sports offerings to other (non-NFT-related) fantasy sports offerings. Although it left intact the NFLPA Licensors' rights—including their right to the balance of the $■■■■■ Minimum Guarantee—it restructured the payment schedule so that DraftKings would now make four quarterly payments rather than one annual payment for each License Period. Am. License Agmt. § 2(A).

52. The Amended License Agreement also retained the same grounds for termination as the License Agreement, except that—as part of the renegotiations—DraftKings expressly reiterated that it could only terminate on the basis of a "discontinu[ation] [of] its business" if its business became insolvent and it was forced to shut its doors. In addition, and again in relevant part, the Amended License Agreement allowed either party to terminate:

- if "any governmental, administrative, or adjudicatory body (e.g., the Securities and Exchange Commission or state regulatory authorities) determines that the Licensed Product is a security" (*id.* § 8(A)(i)(3)); or

- "immediately, in the event that the performance of such other Party's obligations under th[e] Agreement would be in violation of any law, rule, regulation, or order applicable to such other Party (whether now known or hereafter adopted) and the failure to comply with such law, rule, regulation, or order would have a material adverse effect on the terminating Party" (*id.* § 8(A)(i)(2)).

53. Finally, DraftKings was also given termination rights "■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■" *Id.* § 8(A)(iv).

54. To date, none of these developments has occurred.

13

### F. *Dufoe v. DraftKings*

55. In March 2023, a putative class action was brought against DraftKings Inc. concerning its NFT products. This complaint, filed in the United States District Court for the District of Massachusetts, alleges that these NFT products—including NFLPA Collectibles—constitute "securities" within the meaning of the Securities and Exchange Acts and that by failing to treat its products as such, DraftKings Inc. illegally denied "investors" information that they needed "to evaluate the risks associated with their investment in DraftKings NFTs."[9]

56. DraftKings Inc. moved to dismiss the lawsuit in September 2023, arguing that plaintiffs' claims rested "on the incorrect premise that Marketplace NFTs are securities."[10] This characterization, in DraftKings' own words, was a "bald assertion, and . . . demonstrably untrue."[11]

57. The Court issued its motion-to-dismiss ruling on July 2, 2024. As a matter of law, the Court reached no decision on the merits. Rather, the Court simply held that, accepting all Dufoe's factual allegations as true—as it was required to do—he had "plausibly alleged that DraftKings NFTs in the context of the Marketplace are securities." The Court further emphasized that DraftKings "will have the opportunity to present evidence" to rebut the assertion that the NFTs are securities "at a later stage of litigation."[12]

### G. DraftKings Purports to Terminate the License Agreement

58. In the months after it entered into the Amended License Agreement, DraftKings adhered to its new terms without incident. Specifically, it satisfied its Minimum Guarantee

---

[9] *See* Am. Compl. ¶ 8, *Dufoe v. DraftKings Inc. et al.*, No. 1:23-cv-10524-DJC (D. Mass. Aug. 4, 2023), ECF No. 38 ("Am. Compl."); *see also* Compl., *Dufoe*, No. 1:23-cv-10524-DJC (D. Mass. Mar. 9, 2023), ECF No. 1.

[10] Mot. to Dismiss at 3, *Dufoe*, No. 1:23-cv-10524-DJC (D. Mass. Sept. 25, 2023), ECF No. 47.

[11] *Id.* at 7.

[12] Order Den. Mot. to Dismiss at 13, *Dufoe*, No. 1:23-cv-10524-DJC (D. Mass. July 2, 2024), ECF No. 60.

14

payment obligations for the Second License Period (which ended February 29, 2024) and remitted the first $[REDACTED] installment owed in connection with the Third License Period.

59.     Then, on July 29, 2024, several weeks after the pleading decision in *Dufoe*, DraftKings sent a letter to the NFLPA Licensors, announcing its decision "to discontinue the Marketplace business (including [its] Reignmakers product) effective as of July 30, 2024" and "to invoke [its] termination rights under Section 8 of the [Amended License] Agreement." As justification, it pointed to *Dufoe*, claiming that on a Rule 12(b)(6) motion the court had "determined that the NFTs sold on Marketplace are securities subject to federal and state registration requirements." Ex. C (the "July 29 Letter"), at 1–2.

60.     According to DraftKings, the *Dufoe* motion-to-dismiss decision permitted it to terminate the Amended License Agreement pursuant to each of the following provisions:

- "Section 8.A(iv), which provides that Licensee shall have the right to terminate the Agreement [REDACTED]";

- Section 8.A(i)(3), which provides that either Party may terminate the Agreement if 'any governmental, administrative, or adjudicatory body . . . determines that the Licensed Product is a security';

- Section 8.A(i)(2), which provides that either Party may terminate the Agreement 'in the event that the performance of such other Party's obligations under this Agreement would be in violation of any law, rule, regulation, or order applicable to such other Party (whether now known or hereafter adopted) and the failure to comply with such law, rule, regulation, or order would have a material adverse effect on the terminating Party'; and

- Section 8.A(iii), which provides that any party may terminate this Agreement upon written notice in the event 'such party discontinues its business.'"

*Id.* at 2.

61.     DraftKings' attempt to use the *Dufoe* preliminary ruling as a basis for termination under any of the provisions delineated in its July 29 Letter is meritless and brazenly pretextual. For example:

15

62. *First*, no "adjudicatory body . . . [has] determine[d] that the Licensed Product is a security," as required for termination under Section 8(A)(i)(3). The district court's decision did not "determine" anything on the merits. It is black-letter law that an order denying a motion to dismiss "is not a decision on the merits that ends the litigation." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989).

63. DraftKings itself has repeatedly recognized this fact and has done so even after issuing the July 29 Letter. In its latest filing 10-Q filing with the Securities and Exchange Commission, submitted in the wake of the Court's order on the motion to dismiss in *Dufoe*, DraftKings publicly affirmed its intent to continue to "vigorously defend" against these claims (that is, the assertion by Dufoe that the NFTs sold on its Marketplace are securities).[13] And DraftKings has lived up to that commitment: in its recent answer to the *Dufoe* complaint, DraftKings categorically and universally denied plaintiffs' numerous allegations that its NFT products, including NFLPA Collectibles, are securities.[14]

64. *Second*, the district court's ruling on the motion to dismiss does not comprise "█████████████████████████████████████████████████████████████████████████████" as required for termination under Section 8(A)(iv). Court rulings are not "█████████████████████." Moreover, the *Dufoe* pleadings decision has no impact at all—material or otherwise—on DraftKings' ability to benefit from the Amended License Agreement.

---

[13] DraftKings Inc., Quarterly Report for the Quarterly Period ended June 30, 2024 (Form 10-Q) at 45 (Aug. 2, 2024).

[14] *Compare* Am. Compl. ¶ 92 ("DraftKings NFTs are securities because they constitute investment contracts under the definition set out in *Howey*. . . ."), *with* Answer ¶ 92, *Dufoe*, No. 1:23-cv-10524-DJC (D. Mass. July 2, 2024), ECF No. 74 ("Defendants deny the allegations of Paragraph 92.").

65. *Third*, the district court's motion-to-dismiss decision does not render "the performance of such other party's [that is, the NFLPA Licensors'] obligations" in violation of any "law, rule, regulation, or order applicable to the [NFLPA Licensors]," as required by Section 8(A)(i)(2). As an initial matter, the order in *Dufoe* does not even apply to the NFLPA Licensors. And even if that provision could somehow be read to apply to DraftKings, its performance of its obligations under the Amended License Agreement—that is, its payment of royalties to the NFLPA Licensors—is not precluded by the order in *Dufoe* or any other "law, rule, regulation or order." Again, DraftKings is on record as saying exactly that, having represented in both the License Agreement and the Amended License Agreement that it "shall comply with all applicable laws" concerning the licensed intellectual property.

66. *Fourth*, DraftKings has not filed for bankruptcy, been placed into receivership, or "discontinued its business," as required under Section 8(A)(iii). Although DraftKings did shut down Reignmakers and the Marketplace on July 30, 2024, the Company as a whole continues to operate (very) profitably. Once again, DraftKings admitted as much in the *Dufoe* proceedings when it "emphasize[d] . . . that the NFT marketplace is not DraftKings's entire business" and claimed that its "revenue exceeded $2.24 billion in 2022."[15]

67. Ultimately, DraftKings' choice to walk away from the NFT market has no bearing on its obligations to continue making payments—including the Minimum Guarantee—under the Amended License Agreement. Not only is any such argument expressly contradicted by the language of the contract, but it utterly ignores the fact that the Agreement (since the amendment) covers *non-NFT related uses* of the NFLPA Licensors' intellectual property.

---

[15] Order Den. Mot. to Dismiss at 11, *Dufoe*, No. 1:23-cv-10524-DJC (D. Mass. July 2, 2024), ECF No. 60.

17

68.     The NFLPA Licensors understood DraftKings' July 29, 2024 Letter as an unequivocal statement that DraftKings would not perform its remaining obligations under the Amended License Agreement. Consistent with that understanding, DraftKings has neglected to pay the second of four $[REDACTED] installment payments owed under the Third License Period, which was due on August 1, 2024, and has made clear that it will make no Minimum Guarantee payments going forward. Under the terms of the Amended License Agreement, DraftKings still owes the NFLPA Licensors guaranteed payments totaling $[REDACTED].

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Anticipatory Breach of Contract)

69.     NFLPA Licensors incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

70.     The Amended License Agreement constitutes a valid and enforceable contract between the NFLPA Licensors and DraftKings.

71.     The NFLPA Licensors performed all obligations required of it under the Amended License Agreement and provided prompt notice of payments owed under the Minimum Guarantee.

72.     DraftKings' statement that it intended to terminate the Amended License Agreement, on grounds not permitted under the governing Termination Provision, was a positive and unequivocal expression that DraftKings would not perform its obligations under the Minimum Guarantee.

73.     Since August 1, 2024, DraftKings has not paid any amounts owed to the NFLPA Licensors under the Minimum Guarantee, and the NFLPA Licensors have reasonable belief that DraftKings will not pay them the full amount DraftKings is required to pay.

74. As a direct and proximate result of DraftKings' anticipated breach of contract, the NFLPA Licensors will suffer at least $ ███ in losses, and are entitled to recover from DraftKings that amount, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

### (ALTERNATIVE) SECOND CAUSE OF ACTION
### (Breach of Contract)

75. NFLPA Licensors incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

76. Alternatively, should DraftKings not be found not to have committed an anticipatory breach of contract, DraftKings has breached the Amended License Agreement by failing to make payments due under the Minimum Guarantee.

77. The Amended License Agreement constitutes a valid and enforceable contract between the NFLPA Licensors and DraftKings.

78. The NFLPA Licensors performed all obligations required of it under the Amended License Agreement and provided prompt notice of payments owed under the Minimum Guarantee.

79. Since August 1, 2024, DraftKings has not paid any amounts owed to the NFLPA Licensors under the Minimum Guarantee. DraftKings has expressed its intention to make no further payments under the Amended License Agreement.

80. DraftKings' failure to pay amounts owed to the NFLPA Licensors under the Minimum Guarantee constitutes a breach of the Amended License Agreement.

81. As a direct and proximate result of DraftKings' breach of contract, the NFLPA Licensors will suffer at least $ ███ in losses, and are entitled to recover that amount, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

**PRAYER FOR RELIEF**

Accordingly, the NFLPA Licensors pray for judgment with respect to its Complaint as follows:

A. That the Court find that DraftKings' July 29, 2024, termination of the Amended License Agreement constituted an anticipatory breach of the Amended License Agreement or, in the alternative, a breach of the Amended License Agreement;

B. That the Court award the NFLPA Licensors all guaranteed unpaid sums due under the Amended License Agreement, including the Minimum Guarantee, in the amount of $[REDACTED], discounted to present value;

C. That the Court award the NFLPA Licensors the pre-judgment and post-judgment interest at the maximum rate permitted by law;

D. That the Court award the NFLPA Licensors the costs, expenses, and reasonable attorneys' fees in this action; and

E. That the Court award such other relief as it may deem just and proper.

Dated: August 23, 2024         By: _____

Jeffrey L. Kessler
David L. Greenspan
George E. Mastoris
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Tel.: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
gmastoris@winston.com

*Counsel for the NFLPA Licensors*