# EXHIBIT A

*Redacted version of document*

## AMENDED AND RESTATED LICENSE AGREEMENT

This Amended and Restated License Agreement ("**Agreement**") is made, entered into, and effective as of this 19th day of December 2023 (the "**Amendment Effective Date**"), by and among, on the one hand, DK Crown Holdings Inc. with offices at 222 Berkeley Street, Boston, MA 02116 ("**Licensee**" or the "**Company**"), and on the other hand, NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, with offices at 1133 20th Street NW, Washington, D.C. 20036 ("**NFLPA**"), NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, with offices at 1133 20th Street NW, Washington, D.C. 20036 ("**NFLPI**") and ONETEAM PARTNERS, LLC, with offices at c/o Winston and Strawn 1901 L Street, NW, Washington, DC 20036 ("**OneTeam**" and, together with NFLPI, "**Licensor**"). This Agreement serves to amend and restate in its entirety that certain License Agreement dated November 19, 2021 (such date, the "**Original Effective Date**") (such agreement the "**Original Agreement**") previously entered into between Licensee, NFLPA, NFLPI, and OneTeam.  Each of OneTeam, NFLPI, NFLPA, and Licensee is a "**Party**" and collectively, the "**Parties**".

1.  **GRANT OF RIGHTS.**

    A.  <u>License</u>.  Upon the terms and conditions hereinafter set forth, NFLPI grants to Licensee and its affiliates the right, license, and privilege of utilizing the Licensed Materials (as defined below) on, and/or in connection with the Licensed Product(s), the creation of Licensed Product(s), and the advertising, marketing, and promotion of Licensed Product(s) (the "**License**"). "**Licensed Product(s)**" means (i) NFLPA Collectibles; (ii) NFT Based Game; and (iii) Non-NFT Based Game. "**NFLPA Collectible**" means a non-fungible digital token (an "**NFT**") in the form of a NFL player-identified fantasy football digital collectible for use within the NFT Based Game. The NFLPA Collectibles will only be distributed solely on the Company's digital collectible marketplace or distributed as otherwise mutually agreed to by the Parties. For clarity, Licensee may create NFTs to be used in connection with the NFT Based Game, including, without limitation, missions, crafting/fusion, achievements, collectibles/collections, upgrades/'level ups', and leaderboards, provided such NFTs do not include any Licensed Materials. "**NFT Based Game**" means Fantasy Style Games that utilize the NFLPA Collectibles. "**Non-NFT Based Game**" means Fantasy Style Games which utilize the Licensed Materials but do not utilize NFTs.

        (i)     The NFT Based Game(s) will include standard game mechanics underlying gameplay on Licensee's or its affiliates' website(s)/platform(s) or other website(s)/platform(s) approved by Licensor. NFLPA Collectibles may be integrated into Licensee's or its affiliates' loyalty program, such affiliates subject to Licensor's approval, such approval not to be unreasonably withheld, conditioned, or delayed; provided the Parties agree Licensee's Dynasty program existing as of the Amendment Effective Date, or any materially similar future version of the Dynasty program, shall have been approved. Neither Licensee nor any of its affiliates may use the Licensed Materials to market, promote, or advertise Licensee's loyalty program, unless approved by Licensor in writing (e-mail being sufficient).

        (ii)    NFLPA Collectibles will be made available to the consumer individually, in packs, and/or (subject to Licensor's approval) through pack unboxing (i.e., packs of NFLPA Collectibles are opened and distributed to participants in the pack unboxing), and shall be created solely for inclusion, and shall only be capable of being used, in the NFT Based Game and/or on a digital collectible marketplace on the Approved Distribution Channel. In the event Licensor, in its reasonable discretion, does not approve Licensee distributing NFLPA Collectibles through pack unboxing, Licensor will provide Licensee notice (e-mail being sufficient) as soon as reasonably practicable, but not less than sixty (60) days prior to Licensee

ceasing distribution of NFLPA Collectibles through pack unboxing.

(iii)    Each NFLPA Collectible (a) will be an NFT, (b) will include an NFLPI-approved NFL player image, may include NFT Based Game statistics (e.g., number of NFT Based Game contests played in, prizing won), and rarity level (e.g., common, rare, legendary), and (c) shall be useable within the NFT Based Game and may be useable to create or be used in connection with missions, crafting/fusion, achievements, collectibles/collections, upgrades/'level ups', and/or leaderboards. The NFLPA Collectibles shall be implemented on a blockchain using a smart contract, such as, by way of example, but not limitation, ERC-721 or ERC-1155, and each NFLPA collectible will have a unique version or edition number. The NFLPA Collectibles will not, in any event, (1) include any NFL-licensed game footage, nor (2) be marketed as digital trading cards, in Licensor's reasonable discretion; provided Licensee will not be in breach of (2) for marketing approved by NFLPI. Visual formats of the assets comprising each NFLPA Collectible shall be approved in accordance with Section 6. The content, artwork, and designs used for the NFLPA Collectibles shall be designed by Licensee or by a third-party on behalf of Licensee. To create the content, artwork, and designs used for the NFLPA Collectibles, Licensee, or a third-party on behalf of Licensee, may edit, modify, alter, delete, or otherwise change the Licensed Materials and/or any images or videos obtained by Licensee containing the Licensed Materials, including, without limitation, any images or videos obtained by Licensee through Licensor's licensing partner (as of the Original Effective Date, Associated Press), for use in the NFLPA Collectibles; provided all content, artwork, and designs used for the NFLPA Collectibles shall be subject to NFLPI approval as contemplated in accordance with Section 6, and Licensee shall secure from the appropriate rights holder all necessary rights to edit, modify, alter, delete, or otherwise change any materials obtained by Licensee.

(iv)    For clarity, in no event may Licensee, or may Licensee instruct any NFL Player, or a third party, to promote, tout, market, publicly describe, or otherwise publicly refer to the NFLPA Collectibles hereunder: (a) as an "investment", "investable asset"; (b) providing an expectation that the NFLPA Collectibles will increase in value; or (c) in a manner that would violate any applicable laws or regulations, including, without limitation any applicable securities and/or investment laws or regulations. A failure to comply with this provision shall be a material breach of this Agreement. Notwithstanding the preceding two (2) sentences, Licensor may not seek to terminate this Agreement for material breach (including following its approval of applicable materials) or claim breach of this Agreement unless and until a third party (including any governmental, administrative, or adjudicatory body) shall have claimed such approved materials promoted, touted, marketed, publicly described, or otherwise publicly referred to the NFLPA Collectibles as providing an expectation that the NFLPA Collectibles will increase in value or otherwise are in violation of applicable securities and/or investment laws or regulations; provided Licensee shall not be in breach of Section 1(A)(iv)(b), unless such promotion, description, or reference has been determined to be in violation of applicable law.

B.  In-Market Date. Licensee agrees to introduce and sell the NFLPA Collectibles and NFT Based Game on or before October 1, 2022 (the "**In-Market Date**").

C.  Exclusivity. The License shall allow the Licensee and its affiliates to use the Licensed Materials to the full extent as set forth in Section 1(A). The License shall be exclusive only for the NFT-Based Games, but solely to the extent (a) utilizing the NFLPA Collectibles and (b) Licensed

Materials in the Fantasy Style Game category. "**Exclusive**" means that neither the NFLPA, the NFLPI nor OneTeam will during the Term release, or cause or authorize to be released, or license or grant any rights to any Licensed Materials for use with any NFT-Based Game. For clarity, nothing herein shall prevent Licensor from licensing a third party to produce, promote, and/or release a non-NFT based game, NFT collectibles that are not used in a Fantasy Style Game, or NFT based games outside of the Fantasy Style Game category.

D.  <u>Sports Betting Utility and Narrative Games</u>.

   (i)  Licensor will work with Licensee in good faith on developing strategies and plans to create revenue generating opportunities relating to NFTs connected to or associated with sportsbook or sports betting, including, but not limited to, providing Licensee with notice of any negotiations between Licensor and a third party related to NFTs connected to or associated with sportsbook or sports betting no later than five (5) business days after such negotiations are first initiated with the third party. Licensor will use good faith efforts to include Licensee as a participant in all Licensor requests for proposals or other similar evaluation processes related to NFTs connected to or associated with sportsbook or sports betting. In the event the Parties desire to jointly pursue opportunities related to NFTs connected to or associated with sportsbook or sports betting, the respective rights and obligations of each Party, related to such opportunity, including economic terms, shall be set forth in a mutually agreed to separate agreement(s) or amendment(s) to this Agreement. Notwithstanding the foregoing, and for purposes of clarity, nothing herein shall be construed in a manner that obligates any Party to enter into an agreement related to NFTs connected to or associated with a sportsbook or sports betting.

   (ii)  Licensor will work with Licensee in good faith on developing strategies and plans to create revenue generating opportunities relating to Narrative Games. As used in this Agreement "**Narrative Game**" means games played with NFLPA Collectibles where two (2) or more users compete against each other by taking turns performing actions based on and utilizing NFLPA Collectibles in accordance with a formal, standard set of game rules. Licensor will use good faith efforts to include Licensee as a participant in all Licensor requests for proposals or other similar evaluation processes related to Narrative Games. In the event the Parties desire to jointly pursue opportunities related to Narrative Games, the respective rights and obligations of each Party related to such opportunity, including economic terms, shall be set forth in a mutually agreed to separate agreement(s) or amendment(s) to this Agreement. Notwithstanding the foregoing, and for clarity, nothing herein shall be construed in a manner that obligates any Party to enter into an agreement related to Narrative Games.

E.  <u>Metaverse</u>. Licensor will work with Licensee in good faith on developing strategies and plans to create revenue generating opportunities relating to NFTs connected to or associated with Metaverse. For purposes of clarity, as used in this Agreement, "**Metaverse**" means concepts related to 'Gamified NFTs such as 'create, train and trade' product (user-generated avatars can be accessorized, trained, 'bred' — power ups, achievements, collections, micro-transactions and competition) when used in connection with a virtual and/or interactive environment. Licensor will use good faith efforts to include Licensee as a participant in all Licensor requests for proposals or other similar evaluation processes related to NFTs connected to or associated with Metaverse. In the event the Parties desire to jointly pursue opportunities related to NFTs connected to or associated with Metaverse, the respective rights and obligations of each Party related to such opportunity, including economic terms, shall be set forth in a mutually agreed to separate agreement(s) or amendment(s) to this Agreement. Notwithstanding the foregoing, and for purposes of clarity, nothing herein shall be construed in a manner that obligates any Party to enter into an agreement related to NFTs connected to or associated with Metaverse.

Confidential and Proprietary

F.  <u>Definitions</u>:

"**Fantasy Style Games**" means free to play and paid entry football themed gaming contests offered by Licensee or its affiliates that (i) are games of skill that require entrants to create lineups of real-world/actual football players to compete against fellow entrants, and (ii) the results may be determined on a points basis and reflect the statistical performance of the real world/actual players in the actual performance of these players on real sports teams and in real sports events, may be historic, or simulated (provided such simulation games are not action simulation games involving interactive gameplay during the simulation that effects or controls the actual performance of the football players). Entrants can compete in a variety of game modes, including but not limited to, one (1) game or portion of a game, daily, weekly, monthly, season, or postseason long or portion of a season or portion of postseason long, head-to-head, salary cap, best ball, knockout, seasonal keeper, snake draft, custom draft, and other modes in which rosters are set, statistical selections made, and scores tabulated in different ways. Fantasy Style Games are not (i) action simulation games that involve interactive gameplay during the simulation that effects or controls the actual performance of the football players; (ii) gambling or sports betting as defined under applicable law or regulation; or (iii) prohibited by any NFL policy, including but not limited to the NFL Gambling Policy, unless and until such use is approved by NFLPI and is not prohibited under the NFL's policies. Licensor represents and warrants that: (i) the NFT Based Game offered as of the Amendment Effective Date is not an action simulation game involving interactive gameplay during the simulation; and (ii) as of the Amendment Effective Date the NFT Based Game offered by Licensee as of the Amendment Effective Date is approved by the Licensor and to Licensor's knowledge does not violate any NFL policies. In the event a court of competent jurisdiction or other governmental authority determines that the NFT Based Game is gambling or betting, Licensee shall within a reasonable period of time, unless a shorter period of time is required by applicable law, stop offering the NFT Based Game in the jurisdiction(s) governed by such determination. For clarity, and not withstanding anything to the contrary, including, without limitation, sub-Section (ii) of this <u>Section 1(F)</u>, in the event a court of competent jurisdiction or other governmental authority determines that the NFT Based Game is gambling or betting, and Licensee stops offering the NFT Based Game in such jurisdiction governed by such determination, Licensee shall not be in breach of this Agreement and the NFT Based Game shall be considered a Fantasy Style Game in every other jurisdiction not governed by such determination. In the event after the Amendment Effective Date additional jurisdictions and/or the NFL prohibit the NFT Based Game as offered by Licensee on the Amendment Effective Date, the Parties shall enter into good faith discussions related to a modification of the game mechanics to address the relevant prohibitions and, to the extent such modifications are unduly burdensome, the Parties shall discuss in good faith an equitable adjustment or other appropriate make goods.

G.  <u>End User License</u>. For clarity, upon purchase of the NFLPA Collectibles and/or Licensed Products, end users and third parties will be granted, by NFLPI, a limited, perpetual and irrevocable license to the Licensed Materials in the Licensed Products and/or NFLPA Collectibles and shall have no ability to alter, transform, extract, or make any deviations to the Licensed Materials.

H.  Reserved.

I.  <u>Term</u>. The term of this Agreement shall extend from the Original Effective Date to February 28, 2027 (the "**Term**") unless terminated in accordance with the provisions hereof. The period of time commencing at the Original Effective Date and ending February 28, 2023 shall be referred to as the "**First License Period**." The period of time commencing March 1, 2023 and ending February 29, 2024 shall be referred to as the "**Second License Period**." The period of time commencing March 1, 2024 and ending February 28, 2025 shall be referred to as the

"**Third License Period**." The period of time commencing March 1, 2025 and ending February 28, 2026 shall be referred to as the "**Fourth License Period**." The period of time commencing March 1, 2026 and ending February 28, 2027 shall be referred to as the "**Fifth License Period**." The First License Period, Second License Period, Third License Period, Fourth License Period and Fifth License Period may each be referred to herein as a "**License Period**". Licensee acknowledges and agrees that Licensee has and shall have no right to extend or renew this Agreement beyond the Term. No conduct by either Licensor or Licensee (including without limitation, any approvals granted pursuant to <u>Section 6</u>) shall create, imply or infer a new license agreement or an extension of the Term, unless the same is specifically set forth in a written agreement signed by both Licensor and Licensee. The provisions of <u>Section 12(F)</u> (Force Majeure; Governing Law; Binding Effect) may not be utilized to extend the Term.

The grant of the License as it relates to NFLPA Collectibles and the NFT Based Game shall be for the Term, and the grant of the License as it relates to the Non-NFT Based Game shall be from the Amendment Effective Date until February 28, 2025 (the "**Non-NFT Based Game License Term**"). For clarity, any references hereunder to the "Term" that apply solely to the Non-NFT Based Game shall mean only the period contemplated by the "Non-NFT Based License Term."

J.  <u>Territory and Distribution</u>. Licensee has the right to distribute the Licensed Product(s) worldwide (the "**Territory**"), and Licensee has the right to distribute the NFLPA Collectibles and NFT Based Game via the following channels (each an "**Approved Distribution Channel**"):

    i.  <u>Online:</u> <u>www.draftkings.com</u> and such other approved domains, owned or controlled by Licensee, that Licensee may determine to be appropriate for purposes of facilitating the purchasing, selling, and use of the NFLPA Collectibles and NFT Based Game (including via mobile devices). The proposed domains owned or controlled by Licensee that will be used for purposes of facilitating the purchasing, selling, and use of the NFLPA Collectibles and NFT Based Game shall be subject to Licensor approval, not to be unreasonably withheld. Prior to the In-Market Date, Licensee and Licensor will mutually agree to an approved list of domains and sub- domains to be used as Approved Distribution Channels. Licensee shall not be required to obtain Licensor's approval of any further sub-domains that are based off or extensions of a domain or sub domain that has already been approved by Licensor. The Parties acknowledge that the mutual intention of the Parties is to allow for broad distribution of the NFLPA Collectibles and NFT Based Game beyond the domains owned or controlled by Licensee. Additionally, the Parties will use commercially reasonable efforts to implement whitelist and/or blacklist domains, subject to technological feasibility.

    ii.  <u>Mobile:</u> iOS, Android (Google Play) or direct app download

K.  <u>NFL/Third Party Marks</u>. Licensor makes no representation that it has the authority to grant, nor does it grant herein, the right to utilize any symbols, insignias, logos, or other identifying names or marks of the National Football League ("**NFL**"), any of its member clubs, or any other third party (other than the NFL Players). Accordingly, Licensor hereby disclaims any liability arising out of Licensee's use of the symbols, insignia, logos, or other identifying names or marks of the NFL, any of its member clubs, or any third party (other than NFL Players) in the exercise of the License granted hereunder. For clarity, it shall be the sole responsibility of Licensee, and Licensee agrees, to obtain such permission as may be necessary for the use of such symbols, insignia, logos, or other identifying names or marks of the NFL, any of its member clubs, or any third party (other than NFL Players) from the appropriate rights holder. In the event the NFL asserts unauthorized use of any NFL marks, including club colors and/or city designations

within the NFLPA Collectibles and such assertion materially and negatively impacts or affects the NFLPA's contractual relationship with the NFL (in NFLPA's reasonable discretion), upon written request from Licensor (e-mail being sufficient) a member of Licensee's senior leadership shall work in good faith with the NFL and NFLPA to resolve the concern.

L.  <u>No Endorsement</u>. The rights, licenses and privileges granted by NFLPI hereunder shall not constitute or be used by Licensee as a testimonial or an endorsement of any product, service, or event by all or any of the NFL Players, NFLPI, the NFLPA, or OneTeam. In the event Licensee is interested in securing an individual NFL Player's personal endorsement, Licensee agrees and acknowledges that such endorsement will require the personal approval of the individual NFL Player, approval of NFLPI, separate payment to NFLPI, and is subject to the terms and conditions contained in <u>Section 3</u>.

M.  <u>Excluded Players</u>. Any NFL Player who is committed individually by contract for products or services competitive with those of Licensee may be required to cease from further inclusion in this Agreement; <u>provided</u>, <u>however</u>, that the exclusion of such NFL Player shall be on an individual basis and such Player shall not be combined with the use of five (5) or more other NFL Players in a similar product which is not licensed by the NFLPA. Notwithstanding the foregoing, to the extent that ████████████ of NFL Players (or each of the top ████ ████ NFL Players by revenue production as ranked by the NFLPA from sales revenue from the prior season, to the extent such NFL Players are actually on an opening day roster) on opening day rosters in any given License Period are either (i) not a party to the NFLPA group license, or (ii) excluded from this Agreement pursuant to this <u>Section 1(M)</u> or any other section of the Agreement, the Parties agree to meet and confer to agree upon an applicable equitable adjustment in the consideration owed to Licensor pursuant to this Agreement. In the event the Parties cannot agree to an equitable adjustment, Licensee may terminate this Agreement upon written notice to Licensor.

N.  <u>Premium Giveaway Restriction</u>. Licensee shall not use or authorize use of NFLPA Collectibles as "premium items" to be included with non-Licensed Product, services or events to promote the sale of such non-Licensed Product, services or events. Any such promotion using the NFLPA Collectibles as premium items shall require the prior written approval of Licensor. For purposes of clarity, Licensee shall take no willful or intentional action, in bad faith, where the intention is to reduce the Royalty paid to Licensor hereunder.

O.  <u>Tokenomics</u>. Licensee shall, upon good faith consultation with Licensor, have the sole right to determine the price, quantity, distribution method (e.g., fixed price, auction, individual sale, packs, give aways for promotional purposes) and release schedule for the NFLPA Collectibles. Licensee may give away or use as contest or promotion prizing a reasonable number of NFLPA Collectibles to promote the Licensed Products; provided that Licensee will not give away Licensed Products with the intention to either reduce the Royalty paid to Licensor hereunder or reduce sales of a particular NFL Players' NFLPA Collectible. Licensee shall provide and/or present (with a written copy to be provided after the presentation upon written request) to Licensor, on at least a semi-annual basis, Licensee's strategic planning with respect to giveaways of NFLPA Collectibles. Licensee shall have the sole right to determine whether to charge entry fees for NFT Based Games and Non-NFT Based Games and the amount of such entry fees.

2.  **CONSIDERATION.**

A.  <u>Minimum Guarantee Payments</u>. Licensee agrees to pay the guaranteed amounts specified below for the use of the License within the Territory for the specified time period, regardless of how many sales occur or how much revenue is generated (the "**Minimum Guarantee**").

Confidential and Proprietary

| License Period | Minimum Guarantee | Due Date |
|---|---|---|
| First License Period | $█████ | The Parties acknowledge and agree that all payments for the First License Period have already been satisfied. |
| Second License Period | $█████ | $█████ of the Minimum Guarantee for the Second License Period shall be invoiceable on or after the Amendment Effective Date and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; and $█████ of the Minimum Guarantee for the Second License Period shall be invoiceable on or after February 1, 2024 and payable by Licensee within ten (10) days of receipt of an accurate and undisputed invoice. |
| Third License Period | $█████ | $█████ of the Minimum Guarantee for the Third License Period shall be invoiceable on or after May 1, 2024 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; $█████ of the Minimum Guarantee for the Third License Period shall be invoiceable on or after August 1, 2024 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; $█████ of the Minimum Guarantee for the Third License Period shall be invoiceable on or after November 1, 2024 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; and $█████ of the Minimum Guarantee for the Third License Period shall be invoiceable on or after February 1, 2025 and payable by Licensee within ten (10) days of receipt of an accurate and undisputed invoice. |
| Fourth License Period | $█████ | $█████ of the Minimum Guarantee for the Fourth License Period shall be invoiceable on or after May 1, 2025 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; $█████ of the Minimum Guarantee for the Fourth License Period shall be invoiceable on or after August 1, 2025 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; $█████ of the Minimum Guarantee for the Fourth License Period shall be invoiceable on or after November 1, 2025 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; and $█████ of the Minimum Guarantee for the Fourth License Period shall be invoiceable on or after February 1, 2026 and payable by Licensee within ten (10) days of receipt of an accurate and undisputed invoice. |
| Fifth License Period | $█████ | $█████ of the Minimum Guarantee for the Fifth License Period shall be invoiceable on or after May 1, 2026 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; $█████ of the Minimum Guarantee for the Fifth License Period shall be invoiceable on or after August 1, 2026 and payable by Licensee within thirty (30) days of |

Confidential and Proprietary

DocuSign Envelope ID: E54CC556-DAE6-47A8-A6DD-955DADD8EE21

|  |  | receipt of an accurate and undisputed invoice; $▮▮▮▮ of the Minimum Guarantee for the Fifth License Period shall be invoiceable on or after November 1, 2026 and payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice; and $▮▮▮▮ of the Minimum Guarantee for the Fifth License Period shall be invoiceable on or after February 1, 2027 and payable by Licensee within ten (10) days of receipt of an accurate and undisputed invoice. |
|---|---|---|

B. <u>Royalty Share</u>. In addition to the obligations set forth in <u>Section 2(A)</u>, in the event the sum of First Net Revenue and Second Net Revenue for a particular License Period exceeds ▮▮ times the Minimum Guarantee set forth in the table in <u>Section 2(A)</u> for that License Period (the "**Royalty Trigger**"), Licensee shall pay Licensor ▮▮▮ percent (▮▮%) of any First Net Revenue and Second Net Revenue for that License Period in excess of the Royalty Trigger (the "**Royalty Share**", or "**Royalty**"). Any Royalty due to Licensor shall be invoiceable at the end of the applicable License Period such Royalty payment is payable in. Attached hereto as Exhibit E (Example Royalty Trigger and Royalty Share Calculations) is a sample document created by the Parties setting forth example calculations used to reflect the calculations of the Royalty Trigger and Royalty Share. The Parties hereby agree that to the extent there are any ambiguities with respect to the Royalty Trigger and payment of Royalties, such ambiguity shall be interpreted by the Parties in a manner consistent with the methodology used in Exhibit E (Example Royalty Trigger and Royalty Share Calculations).

For the avoidance of doubt, Licensee's obligation to pay to Licensor the Royalty Share on NFLPA Collectibles and NFT-Based Game shall require Licensee to (i) enable (in or through its own marketplace or another access method) Secondary Sales during the Term and beyond the Term as contemplated herein (such Secondary Sales after the Term, the "**Post-Term Sales**"); and (ii) collect a Transaction Fee (defined below) on all such Secondary Sales and Post-Term Sales, where actually possible. A "**Transaction Fee**" means the fee actually received by Licensee in connection with sales of a NFLPA Collectible by a consumer to another consumer, whether in Licensee's marketplace or otherwise. For clarity, Licensee shall not be required to enable and/or facilitate Post-Term Sales through its owned or controlled digital marketplace, provided that in the event Licensee continues to enable Post-Term Sales as contemplated herein, Licensee shall continue to collect a Transaction Fee on all such Post-Term Sales, where actually possible.

After expiration or termination of this Agreement, Licensee shall use good faith efforts to automate the payment of Royalties on Post-Term Sales on a perpetual basis (e.g., through the use of a "royalty-splitter" within the NFLPA Collectible's smart contract or through such other industry standard process or software) ("**Automated Post-Term Royalty Payment**"). For clarity, in the event any Royalties on Post-Term Sales are remitted to Licensor through the Automated Post-Term Royalty Payment, Licensee's payment obligations with respect to such Royalties shall be satisfied. In the event, despite Licensee's good faith efforts, the Parties are not able to achieve the Automated Post-Term Royalty Payment, then Licensee will continue to pay Licensor the Royalty on Post-Term Sales on a quarterly basis ending five (5) years after the termination or expiration of this Agreement. After such five (5) year period, Licensee will pay any Royalties on Post-Term Sales to the extent any Secondary Sales occur, such amount to be payable by Licensee within thirty (30) days of receipt of an accurate and undisputed invoice. After such five (5) year period, Licensor may invoice Licensee not more than twice per calendar year.

Beginning on March 1, 2025 through and including December 31, 2025 ("**Exclusive

**Negotiation Period**"), the Parties shall exclusively negotiate in good faith with respect to extending the Agreement in connection with the Exclusive rights granted under this Agreement. At no time (i) before the Exclusive Negotiation Period will Licensor actively negotiate terms with any third party with respect to such third party's exploitation of the Licensed Materials in the NFT Based Games category, or (ii) during the Exclusive Negotiation Period will Licensor engage in any discussions or negotiations with any third party with respect to such third party's exploitation of the Licensed Materials in the NFT Based Games category. In the event the Parties have not entered into an agreement in writing before the expiration of the Exclusive Negotiation Period, then Licensor may engage any third party with respect to such third party's exploitation of any of the Licensed Materials in the NFT Based Games category; provided, however, that, notwithstanding the foregoing, to the extent Licensor desires to enter into an agreement with a third party with respect to the NFT Based Game category, then Licensor shall provide Licensee with written notice thereof, which notice shall include (subject to confidentiality) the key terms of the proposed business arrangement with such third party (each, an "**Offer to Match**"), and Licensee shall have the first opportunity (i.e., prior to such third party) to accept the Offer to Match within fifteen (15) business days of Licensee's receipt of such Offer to Match ("**Licensee Acceptance Notice**"), in which case the Parties shall promptly and in good faith exclusively negotiate all remaining deal points. In the event (a) Licensee rejects such Offer to Match or (b) Licensee fails to respond to Licensor regarding such Offer to Match within fifteen (15) business days of Licensee's receipt thereof, then, in each case, Licensor may enter into an agreement with the applicable third party regarding the NFT Based Game category. The Offer to Match shall be void to the extent (i) NFL policies prohibit Licensor from licensing the Licensed Materials in connection with gambling-related entities; (ii) Licensee or any of its controlled affiliates has engaged in public behavior or made public statements reasonably determined by the NFLPA to be (a) anti-union or anti-player or (b) damaging to the reputation, commercial value, or goodwill of the NFLPA or NFL Players or Identities. In the event (i) Licensor is aware that Licensee or any of its controlled affiliates has engaged in any behavior or made any statements in sub-sections (a) or (b) of the preceding sentence and (ii) Licensor decides to void the Offer to Match, Licensor shall provide written notification to Licensee specifying the behavior or statements in violation of in sub-sections (a) and/or (b) of the preceding sentence at least five (5) business days prior to Licensor signing an agreement with a third party that is subject to the Offer to Match.

The Parties mutually agree to the terms and conditions set forth in the transition plan which is attached hereto as Exhibit C and incorporated herein by this reference (the "**Transition Plan**") that enables Licensee to provide necessary and appropriate services and rights to owners of the NFLPA Collectibles as well as rights of Licensor and Licensee as they relate to the NFLPA Collectibles and NFT Based Game, as part of a reasonable wind down following expiration or termination of this Agreement. Notwithstanding anything else to the contrary in this Agreement, upon and after termination or expiration of this Agreement (i) owners of NFLPA Collectibles may continue to hold their NFLPA Collectibles in non-custodial wallets, provided NFLPA has approved the ability for owners of NFLPA Collectibles to hold the NFLPA Collectibles in non-custodial wallets; (ii) owners of NFLPA Collectibles may continue to hold their NFLPA Collectibles in DraftKings controlled custodial wallets; and (iii) subject to Section 2(B), Licensee may continue to enable and facilitate Secondary Sales of NFLPA Collectibles through a DraftKings owned or controlled digital marketplace and such other approved domains in accordance with the Transition Plan; and (iii) Licensee shall in no event be permitted to market or promote the NFLPA Collectibles and NFT Based Game, provided; however, Licensee may list the NFLPA Collectibles for Secondary Sale on a Licensee owned or controlled digital marketplace. For clarity, except as otherwise expressly provided for in this Agreement, upon and after termination or expiration of this Agreement, Licensee shall cease all use of the Licensed Materials granted hereunder in connection with NFLPA Collectibles and NFT Based Games.

Confidential and Proprietary

Nothing herein shall affect the ability of Licensor to assert the need for a license for a Non-NFT Based Game, or oppose the ability of Licensee to offer the Non-NFT Based Game after termination or expiration of the Non-NFT Based Game License Term. ███████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████

C. Definition of First Net Revenue. "**Gross Sales**" shall be defined as (i) any fees or other amounts actually received by Licensee with respect to the NFLPA Collectibles in connection with a first sale (a "**First Sale**") to unaffiliated third parties at the invoice price and any fees or other amounts actually received by Licensee with respect to a First Sale, including revenue received in connection with downloads, licenses (including licensing to end users), subscriptions, sale of products (including digital goods), and any other commercialization directly or indirectly by Licensee, in each case, of or in connection with the NFLPA Collectibles and (ii) contest entry fees or and other amounts actually received by Licensee from end users to participate in and play the NFT Based Game. "**First Net Revenue**" shall be defined as Gross Sales, less only verifiable (i) adjustments, returns or chargebacks actually credited, (ii) a flat ███ percent (█%) processing fee (to cover credit card fees, and other third- party electronic transactions processing fees), (iii) sales taxes to government authorities actually paid and associated with Licensee's sale or distribution of the NFT Based Game and NFLPA Collectibles, but expressly excluding taxes based on Licensee's net income, (iv) Prizing (provided that such deduction shall not exceed ██████ percent (█%) of the Gross Sales received during the applicable License Period without Licensor's written consent (e-mail being sufficient)), (v) ███████ ██████████████ to the extent such ███████ are related to a transaction involving the NFT Based Game or NFLPA Collectibles, including, but not limited to, minting, for NFLPA Collectibles and associated with a blockchain, (vi) any amounts charged, retained or deducted by applicable unaffiliated distributors or platforms (including, for example, Apple Store, Google Play and opensea.io) in connection with downloads of, subscriptions for and in-game transactions and other micro- transactions in the NFLPA Collectibles and/or NFT Based Game, and (vii) payouts made by Licensee to end users participating in such NFT Based Game; provided, however, that, except to the extent approved in advance, deductions pursuant to (vi) above during any License Period shall not exceed ██████ percent (█%) of the Gross Sales received during the applicable License Period. For the avoidance of doubt, Licensee shall not deduct from Gross Sales any amounts, other than the amounts contemplated in (i) and (iii) above, in connection with websites, portals and/or distribution platforms owned and/or operated by or on behalf of Licensee or any of its affiliates. The Parties acknowledge that no such deduction pursuant to (iv) above shall apply with respect to any (a) Post-Term Sales or (b) Automated Post-Term Royalty Payments.

"**Prizing**" means all reasonable prizing and promotional incentives distributed by Licensee in connection with the Licensed Products, including, without limitation, cash and non-cash prizing for NFT Based Games and/or contests that award Licensed Products as prizes, prizing or incentives for completing missions or achievements related to the NFT Based Games and/or Licensed Products (e.g. Reignmakers Franchise Score where end users receive points based on the number and type of NFLPA Collectibles the end user holds), and/or giveaways and promotional incentives (including, without limitation, free plays and DK dollars). The intent of Prizing must be to increase the consumer base for, and/or sales with respect to, the NFLPA Collectibles and NFT Based Game.

D. Definition of Second Net Revenue. "**Second Net Revenue**" shall be defined as any fees or other amounts actually received by Licensee with respect to the NFLPA Collectibles in connection with a Secondary Sale (which, for clarity, shall mean and include any transaction after the First Sale (such as by a consumer to another consumer or third party after the First Sale) (each, a "**Secondary Sale**") for which Licensee receives a Transaction Fee or other

DocuSign Envelope ID: E54CC556-DAE5-47A8-A8DD-955DADD8EE21

payment), less only verifiable (i) adjustments, returns or chargebacks actually credited, (ii) a flat ▓▓ percent (▓%) processing fee (to cover credit card fees, and other electronic transactions processing fees), (iii) sales taxes actually paid to government authorities and associated with Licensee's sale or distribution of the NFT Based Game or NFLPA Collectible, or associated with the Secondary Sale, but expressly excluding taxes based on Licensee's net income, and (iv) any amounts charged, retained or deducted by third-party applicable unaffiliated distributors or platforms (including, for example, Apple Store, Google Play and opensea.io) in connection with downloads of, subscriptions for and in-game transactions and other micro-transactions in the NFLPA Collectibles and NFT based Game; provided, however, that, except to the extent approved in advance, deductions pursuant to (iv) above during any License Period shall not exceed ▓▓ percent (▓%) of the Secondary Sales received during the applicable License Period. None of the foregoing permitted deductions for Second Net Revenue contemplate "gas" fees related to the blockchain network, or other similar operational costs or charges. For each Secondary Sale, Licensee may, as a "marketplace fee", collect and retain or charge the purchaser and/or seller of NFLPA Collectibles a percentage of the gross transaction price of such Secondary Sale, the exact percentage to be determined in Licensee's sole discretion; provided however that such percentage is applied generally consistently across other Licensee NFT fantasy offerings ("**Marketplace Fees**"). For clarity, Licensee shall be solely entitled to the Marketplace Fees, and Marketplace Fees shall not be considered Second Net Revenue or part of the Transaction Fee.

E.  <u>No Precedent</u>.  The Parties agree the terms of this Agreement, including, without limitation, <u>Sections 2(B)</u>, <u>2(C)</u>, and <u>2(D)</u> will not establish any precedent, nor will any of such provisions be used as a basis to seek or justify similar terms in any subsequent agreement involving the Licensed Materials.

F.  Reporting and Invoices. Any Royalties that are in excess of the Minimum Guarantee for any such License Period shall be invoiceable upon the end of the applicable License Period and due and payable by Licensee to Licensor within sixty (60) days following Licensee's receipt of an accurate and undisputed invoice for the same.

G.  <u>NFL Royalty</u>. In any License Period, unless otherwise agreed in advance and in writing, the total royalty amount paid by Licensee to Licensor under this Agreement (the "**Total Royalty Amount**") shall not be less than the total amounts paid by Licensee (or any of its affiliates) to the NFL (including together with any of such licensor's affiliates and/or related parties) in connection with any equivalent licensing royalties associated with First Sales or Secondary Sales of NFLPA Collectibles and the NFT Based Game. For clarity, any amounts paid by Licensee to the NFL or any of its affiliates that are attributed to marketing, promotional or advertising spend shall not be counted for purposes of determining the Total Royalty Amount.

H.  <u>Marketing Commitment</u>. Licensee agrees to pay to Licensor a minimum marketing commitment of ▓▓▓▓▓▓▓▓▓▓▓▓ Dollars ($▓▓▓▓▓▓) during the Term (the "**Marketing Commitment**") in exchange for marketing Activations approved by Licensee (including the payments for such Activations) and subject to all terms and conditions set forth in <u>Section 3</u> below. Licensee may use (i) ▓▓▓▓▓▓▓ dollars ($▓▓▓▓▓) of the Marketing Commitment each License Period for customer promotions and prizing and (ii) ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓ ($▓▓▓▓▓) of the Marketing Commitment each License Period for Content Activations as contemplated in <u>Section 3(B)</u>. Following the Amendment Effective Date, during the Second License Period Licensee shall spend ▓▓▓▓▓▓▓▓▓▓ dollars ($▓▓▓▓▓) of the Marketing Commitment on Content Activations through OneTeam, such amount to count towards Licensee's fulfillment of the Marketing Commitment, provided that to the extent all or a portion of such amount is not utilized by Licensee in the Second License Period, the Parties agree Licensee shall be permitted to use such unused amounts in

Confidential and Proprietary

the Third License Period. In the event Licensee has paid for Content Activations through OneTeam during the Second License Period, using the Marketing Commitment as set forth in the preceding sentence, but has not allocated all or a portion of such amounts to Content Activations prior to the end of the Second License Period, License may, during the Third License Period, allocate such unallocated amounts to Content Activations. For clarity, all Marketing Commitments must be paid in the License Period in which they are due and, except as set forth in the preceding two (2) sentences, allocated for Activations, customer promotions and prizing, and/or Content Activations during the License Period in which they are due. A portion of the Marketing Commitment shall be paid by Licensee each License Period as set forth in the table below (the "**Marketing Spend**"). In the event Licensee has not paid and allocated the Marketing Spend for a License Period by the due date set forth in the table below, Licensor may invoice Licensee for the difference between the paid and allocated portion of the Marketing Spend for the applicable License Period and the total Marketing Spend due in the applicable License Period (the "**Unallocated Marketing Spend**"), and Licensee will pay such invoice within thirty (30) days of receipt of an accurate and undisputed invoice. For clarity: (i) Activations, customer promotions and prizing, and/or Content Activations in a License Period may occur/be performed after the Due Date specified in the table below, and (ii) Licensee can allocate any Unallocated Marketing Spend towards Activations, customer promotions and prizing, and/or Content Activations after the Due Date set forth in the table below, provided such Activations, customer promotions and prizing, and/or Content Activations occur in the License Period the Unallocated Marketing Spend was paid in. Further for clarity, in the event Licensee allocates any of the Marketing Spend in any License Period prior to the due dates set forth below, Licensee shall pay such allocated amounts within thirty (30) days of receipt of an accurate and undisputed invoice.

| License Period | Marketing Spend | Due Date |
|---|---|---|
| First License Period | $ ▮ | The Parties acknowledge and agree that Licensee has paid the full Marketing Spend for the First License Period but Licensee may use four hundred thirty dollars ($ ▮ ) of the Marketing Spend from the First License Period to pay for Marketing Activation in the Second License Period. |
| Second License Period | $ ▮ | January 1, 2024 |
| Third License Period | $ ▮ | January 1, 2025 |
| Fourth License Period | $ ▮ | January 1, 2026 |
| Fifth License Period | $ ▮ | January 1, 2027 |

I.  Annual Merchandise Credit. Licensee and Licensor will work together in good faith to explore a protocol for the provision to Licensor of complimentary NFLPA Collectibles in mutually agreed upon quantities that would not be material to the expected revenues under this Agreement.

3.  **MARKETING ACTIVATIONS.**

A.  Activations. Licensee may spend the Marketing Commitment on activities that promote the

Licensed Product, including but not limited to, NFL Player public appearances, fan engagements, digital marketing (*e.g.*, social media posts – subject to all applicable FTC guidelines, and other applicable laws, including securities laws), autographs, and Content Activations (as defined herein) ("**Activations**"). For clarity, Licensee may utilize the Marketing Commitment to promote its Non-NFT Based Games. During the Term, all contact with NFL Players in connection with Activations and/or other promotional activity shall be through NFLPI. All Activations are subject to NFLPI approval. Within thirty (30) days of the Amendment Effective Date, the Parties will mutually agree to a template agreement for Activations that the NFLPI, OneTeam, Licensee, and the applicable NFL Player will be a party to. In the event the Parties are unable to agree to such template within thirty (30) days, the Parties will continue to negotiate such template in good faith, provided that until such time that the Parties agree to a template agreement for Activations, the Activations shall be executed consistent with the practices of the Parties during the Term prior to the Amendment Effective Date. All Marketing Payment amounts shall be paid to OneTeam and then to NFL Players through NFLPI. In the event the cost of an Activation will result in Licensee spending above the Marketing Commitment pursuant to Section 2(H), Licensee agrees to pay any such excess amount to OneTeam upon the earlier of execution of the Player Activation Agreement or performance of Activation by the player; provided that Licensee has approved the payments under such Player Activation Agreement that resulted in such excess amount. For clarity, expenditures on marketing efforts that do not include fees paid under a Player Activation Agreement shall not count toward the Marketing Commitment unless after good faith discussion between Licensee and Licensor, Licensee obtains Licensor's prior written approval of such marketing efforts.

B. <u>Content Activations</u>. Licensee may engage OneTeam Media, OneTeam's production/content affiliate ("**OTM**") to create and/or collaborate on promotional content featuring NFL Players to promote Licensee and the Licensed Product. By way of example only and without limiting the content opportunities hereunder, such content may include production of live video content (*e.g.*, for commercials, promotional videos, etc.), voiceover recordings and/or social media activations ("**Content Activation(s)**"). All amounts up to ███████████ Dollars ($███████) spent by Licensee with OTM shall be credited against the Marketing Commitment. All Content Activations are subject to NFLPI approval and may be subject to additional terms and conditions to be mutually agreed upon by the Parties and/or OTM.

C. <u>Restrictions</u>. Players who are employed by NFL clubs (e.g., work) and/or live in a jurisdiction in which the Licensed Product is considered "gambling" or "betting" may not be available to provide services for Licensee in connection with this Agreement and Licensee agrees not to include such players in its requests for approval for Activations, unless otherwise approved in advance by Licensor following discussion between Licensor and Licensee. All Player Activation Agreements shall terminate on or before the termination or expiration of this Agreement, and each NFL Player shall have, at minimum, the termination rights consistent with that of Licensor as set forth in this Agreement.

**4. STATEMENTS; PAYMENTS.**

A. <u>Statements</u>. Commencing after the In-Market Date and for the five (5) years after expiration or termination of the Agreement, Licensee shall furnish to Licensor, via a mutually agreed upon communication tool,  the information set forth in <u>Exhibit A</u> as it relates to the NFLPA Collectibles and NFT Based Game, within five (5) business days of the end of each quarter of each License Period (i.e., five (5) business days after the last day of each May, August, November, and February during the Term), as well as at least once every three (3) month period for the five (5) year period following the expiration or termination of the Agreement (each, a "**Reporting Statement**"). The Parties acknowledge that BrandComply shall be a mutually agreed upon communication tool. After the five (5) year period after expiration or termination

13

of this Agreement, Licensee shall provide Licensor a Reporting Statement at least twice per year (including once at the end of each calendar year) covering any Royalties on Post Term Sales in such year. In the event Licensor stops enabling and facilitating Secondary Sales of NFLPA Collectibles through a Licensee owned or controlled digital marketplace after the Term, Licensee shall not be obligated to provide Reporting Statements. Except as provided for in the preceding sentence, such Reporting Statements shall be furnished to Licensor whether or not any of the NFLPA Collectibles have been purchased during the reporting period for which such statement is due. Licensee shall notify Licensor in the event Licensee stops enabling and facilitating Secondary Sales of NFLPA Collectibles through a Licensee owned or controlled digital marketplace after the Term. For clarity, during each License Period and for at least the five (5) years after expiration or termination of this Agreement when Licensee is paying Licensor a Royalty on Post-Term Sales, Licensee shall be obligated to report on any and all Royalties on Secondary Sales, in each case, when such Secondary Sale occurs on or through any approved third-party platforms. For purposes of clarity, to the extent payment is made directly to Licensor pursuant to the applicable smart contract, Licensee's reporting obligations herein shall be deemed satisfied by reporting only on revenue actually received by Licensee. The Parties will work together in good faith to mutually agree upon post termination and/or expiration reporting obligations. The receipt or acceptance by Licensor of any statement or of any Royalty paid (or the cashing of any Royalty check paid) shall not preclude Licensor from questioning the correctness of the Royalties paid at any time. In the event any inconsistencies or mistakes are discovered in connection with the Royalties paid, such mistakes or inconsistencies shall promptly be rectified and the appropriate payment made by the appropriate Party.

B. <u>Records</u>. Licensee shall keep complete and accurate books of account, in accordance with generally accepted accounting practice, and supporting records containing information reasonably necessary for determining the Royalty payable to Licensor hereunder. Additionally, Licensor shall have the right once in every twelve (12) month period during the Term to direct an independent, third party accredited audit firm to inspect and audit Licensee's, or Licensee's affiliates', books of account and supporting records to verify the Royalty payable to Licensor hereunder for the twenty four (24) month period preceding the initiation of the audit, upon reasonable prior written notice, but in no event less than thirty (30) days prior written notice. The audit shall be conducted during Licensee's regular business hours, at Licensee's place of business (or wherever the relevant books and records are held), and in such a manner as not to interfere with Licensee's normal business activities. The independent third-party auditor must agree to be bound by Licensee's reasonable, market standard non-disclosure agreement. In the event any such audit reveals an inconsistency or error in the Royalty paid to Licensor under this Agreement, the deficiency shall promptly be rectified. The cost of such audit, including the fees and expenses associated with the third party accredited audit firm shall be paid by Licensor, provided that in the event such audit reveals a deficiency in the Royalty in excess of ██ percent (█%) of the Royalty paid to Licensor for the audited time period, Licensee shall pay, in addition to the deficiency, the reasonable, documented, fees and expenses of the third party accredited audit firm.

C. <u>Payments</u>. All payments owed to Licensor hereunder shall be delivered or made payable in the name of "OneTeam Partners, LLC c/o Winston and Strawn", 1901 L Street, NW, Washington, D.C. 20036, or its assignee where applicable, as directed by OneTeam. Without limiting the foregoing, if any undisputed payment is not made when due, which shall be sixty (60) days from the date of receipt of an accurate and undisputed invoice, Licensor shall be entitled to charge and recover interest thereon at the rate of ███████ percent (█%) monthly, or the maximum interest permitted by law if less, on all payments not timely made by Licensee. Such interest shall be calculated from the date payment was due until the date payment is finally received. OneTeam will submit invoices for payments hereunder to ████████ .

Confidential and Proprietary

Any invoice delivered to the aforementioned contact will be deemed received by Licensee. Licensee shall promptly notify Licensor in writing of any change to the contact information provided in this <u>Section 4(C)</u> via email to ████████████████████. Upon issuing any payment to OneTeam hereunder, Licensee shall simultaneously submit to NFLPI a record of same at ████████████ confirming that Licensee has issued such payment. In addition, Licensee shall simultaneously provide Reporting Statements to OneTeam and NFLPI (for NFLPI to ████████████).

D. <u>Regulators</u>. Licensor acknowledges that Licensee and/or its affiliates are licensed by or are otherwise subject to the authority of various gaming regulatory agencies ("**Regulators**"). Licensor further acknowledges that Licensee's gaming licenses are of vital importance to its business. Licensee has adopted regulatory compliance policies, and Licensor agrees to provide Licensee, upon Licensee's reasonable request, with reasonable documentation, information, and assurances regarding itself, any principal employees, directors, officers, brokers, agents, assigns, or others as may be reasonably necessary in order for Licensee to comply with its regulatory compliance policy; provided that Licensor shall provide Licensee with all such reasonable documentation, information, and assurances in compliance with the requests or requirements of the Regulators. Licensor shall use good faith efforts to promptly notify Licensee of any material, non-public, change regarding Licensor, including, but not limited to, material ownership change, or material change in the nature of the business conducted by Licensor, which should reasonably be known to affect Licensee's ability to conduct business or the business of any of its affiliates, as qualified, licensed, or regulated by the applicable Regulators; provided, for clarity, that Licensee acknowledges and agrees that Licensor does not regularly engage in any commercial activity subject to Regulators, and thus shall not and cannot be expected to be aware of how any particular change in Licensor's business may be relevant to Licensee or any Regulators. In the event Licensor fails to promptly comply with information requests described in this <u>Section 4(D)</u> or in the event Licensee determines, in good faith and after consultation with outside counsel, that Licensor is, or may be engaged in, or is about to be engaged in, any activity or activities that will materially and negatively impact or affect Licensee's ability to conduct business or the business of any of its affiliates, as qualified, licensed, or regulated by the applicable Regulators or any gaming licenses or permits held by those entities, or that the relationship between Licensor and Licensee could have a material adverse effect thereon or prevent Licensee from obtaining any additional gaming licenses, then Licensee shall have the right to terminate this Agreement immediately, upon written notice, and without penalty or prejudice; provided that in the event such activities or change to relationship is susceptible to cure, termination shall be as provided in <u>Section 8(A)</u>. In the event Licensor determines, in good faith and after consultation with outside counsel, that Licensee is, or may be engaged in, or is about to be engaged in, any activity or activities that will materially and negatively impact or affect Licensor's ability to conduct business or the business of any of its affiliates, including as qualified or regulated by the United States Department of Labor, or that the relationship between Licensor and Licensee could have a material adverse effect thereon, then Licensor shall have the right to terminate this Agreement immediately, upon written notice, and without penalty or prejudice, provided that in the event such activities or change to relationship is susceptible to cure, termination shall be as provided in <u>Section 8(A)</u>.

5. **INTELLECTUAL PROPERTY.**

A. <u>Intellectual Property Rights</u>. Licensee recognizes the great value of the goodwill associated with the Licensed Materials licensed pursuant to this Agreement and acknowledges that such goodwill belongs exclusively to NFLPI and that said Licensed Materials have acquired secondary meaning in the mind of the public. Licensee further recognizes that NFLPI retains all Intellectual Property Rights in the Licensed Materials, including, without limitation, all modifications and derivative works. Licensee agrees that the goodwill accruing from every use

Confidential and Proprietary

DocuSign Envelope ID: E54CC556-DAE5-47A8-A8DD-955DADD8EE21

of the rights licensed hereunder by Licensee shall inure to the benefit of NFLPI and that Licensee shall not at any time acquire any title or interest in such rights by virtue of any use Licensee may make of such rights hereunder. All rights relating to the rights licensed hereunder are specifically reserved by NFLPI except for the License herein granted to Licensee to use the rights as specifically and expressly provided in this Agreement. Licensee hereby irrevocably assigns to NFLPI all Intellectual Property Rights it may now or hereafter possess in the Licensed Materials, and all derivative works thereof and agrees (i) to take, at any actions (including reasonable execution and delivery of affidavits and other documents), reasonably requested by Licensor to effect, perfect or confirm such rights, and (ii) to retain all proprietary marks, legends and patent and copyright notices that appear on the Licensed Materials, Licensed Products and documentation delivered to Licensee by Licensor and all whole or partial copies thereof. Licensee shall cause each third party who makes or contributes to the creation of the Licensed Materials to agree that all rights, including the copyrights, in his or her work shall be owned by NFLPI and to execute necessary documents. Licensee agrees, upon request (e-mail being sufficient), to provide NFLPI with copies and/or duplicates of all Licensed Materials, and derivative works thereof in a reasonable digital format to be set by NFLPI. Notwithstanding the contrary, each Party will exclusively own and control its respective intellectual property. All goodwill that accrues from the licensed use of a Party's intellectual property hereunder will inure exclusively to the Party that owns the intellectual property.

B. <u>Trademarks and Trade Names; Press Releases</u>. During the Term and within the Territory, and subject to the other terms of this Agreement (including approval), Licensee shall have the right to indicate to the public that it is an authorized manufacturer and distributor of Licensed Products or similar designations mutually agreed to by the Parties. Notwithstanding the foregoing, no Party shall make any public announcement or issue any press release concerning the existence or terms of, or transactions contemplated by, this Agreement without the other Parties' prior written consent. At no time during or after the Term shall any Party challenge or assist others to challenge the Intellectual Property Rights in any other Party's trademarks or the registration thereof or attempt to register any trademarks or other proprietary indicia confusingly similar to the other Party's trademarks.

C. <u>Logos</u>. Licensee shall prominently place or cause to be placed the Licensor's "NFL Players Association (and design)" logo (hereinafter "**Logo**") on the NFLPA Collectibles and NFT Based Game and in advertising for the Licensed Products (regardless of medium including, without limitation, print, broadcast, Internet, trade show booths, catalogues and other sales), and any other sales/marketing materials for the Licensed Products used in connection with Licensed Materials that are publicly distributed, provided, solely for advertising and sale/marketing materials related to the Non-NFT Based Game, Licensee shall only be required to include the Logo in the event the advertising or sales/marketing materials that feature both Licensed Materials and NFL logos, in which case Licensee shall only be required to include the Logo in material parity to any NFL logos contained in such advertising and sale/marketing materials. In the event an NFL logo is not featured or required in connection with the foregoing, the Parties will discuss in good faith the inclusion of the Logo. Licensee shall comply with the Style Guide at <u>Exhibit B</u>, at all times and in all respects, in relation to Licensed Materials, including with respect to the Logo.

**"Officially Licensed Partner of the National Football League Players Association©
[Year]"**

The foregoing text (Officially Licensed Partner of the National Football League Players Association© [Year]) may be amended from time to time upon notice to Licensee. If Licensee maintains a website, Licensee shall also prominently place the Logo on a page no more than

16

two clicks from the homepage, and on any other web page within the website promoting or utilizing the rights licensed hereunder. The Logo and the content boxes on the home page shall contain the NFLPI URL as follows: NFLPA.COM/PLAYERS and shall serve as a hyperlink to the NFLPI website at www.nflpa.com/players.

D.  <u>Notification of Unauthorized Use</u>. Licensee shall promptly notify Licensor in writing upon its discovery of any unauthorized use or infringement of the Licensed Materials, or Licensor's Intellectual Property Rights related thereto. Licensee shall notify Licensor in writing of any infringement by others of the rights covered by this Agreement which may come to Licensee's attention, and NFLPI shall have the sole right to determine whether or not any action shall be taken on account of any such infringement. Licensee shall not institute any suit or take any action on account of any such infringement without first obtaining the written consent of Licensor to do so, which consent Licensor may grant or deny in its sole reasonable discretion. Licensee further agrees to reasonably assist Licensor to the extent reasonably necessary in the procurement of any protection or to protect any of the rights conveyed hereunder, and Licensor, if it so desires, may commence or prosecute at its own expense any claims or suits in its own name related to the protection of any of the rights conveyed hereunder. NFLPI will receive the full amount of any settlement made or damages awarded in connection with any action taken against such infringement. Nothing in this <u>Section 5(D)</u> shall prevent Licensee from protecting its rights in the Licensed Product(s) separate and apart from the Licensed Materials.

E.  <u>Licensee Property</u>. Licensor acknowledges and agrees that Licensee retains all right, title and interest that it may have in and to the Licensee Property. As used in this Agreement, "**Licensee Property**" shall mean (i) Licensee's name-brand designations, marks, and logos and the related trademarks and copyrights of such; (ii) all Intellectual Property Rights in products made by License, excluding Licensed Materials; and (iii) the trademarks, copyrights and other proprietary materials (including, without limitation, trade secrets, tools, utilities, engines, subroutines, source and object codes, program logic, interactive program structures, etc.) and Intellectual Property Rights developed by or for Licensee except to the extent such rights constitute the Licensed Materials.

6.  **APPROVALS.**

A.  <u>Required Approvals</u>. The Parties recognize their mutual intent and desire to develop a streamlined process for Licensor approvals of marketing, promotional, and other materials, to the extent such approval is required pursuant to this Agreement. The specific manner in which the Licensed Materials granted under the License are to be used hereunder, including with respect to the Licensed Product, shall, as provided herein, receive the prior written approval of Licensor. Notwithstanding the preceding sentence or anything else to the contrary, but subject to each Party's full reservation of rights under the last sentence of this <u>Section 6(A)</u> and the last paragraph of <u>Section 2(B)</u>, ██████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████.

B.  <u>Artwork and Sample Products</u>.  Licensee shall submit to NFLPI for its written approval (in a form reasonably acceptable to NFLPI, which may include NFLPI's electronic submission system), such approval not to be unreasonably withheld, conditioned, or delayed (i) an electronic rendering of Artwork, plans, and Photographs, in each case, incorporating the Licensed Materials granted under the License, and any other representations of Licensed

Confidential and Proprietary

Materials granted under the License produced by or for Licensee to be used in the Licensed Products; (ii) marketing materials, proposed commercials and/or advertisements for the Licensed Products in any medium incorporating the Licensed Materials granted under the License; and (iii) all scripts and story boards for marketing materials, proposed commercials and/or advertisements for the Licensed Products in any medium incorporating the Licensed Materials granted under the License. Licensor shall, within five (5) business days of receipt of any such materials for approval, either approve such materials or reject such materials and provide Licensee with a description of the reasons for such rejection that is sufficient to permit Licensee to revise such materials. Such samples shall adhere to the NFLPA Standard Terms and Style Guide. Licensee shall use good faith efforts to submit such materials in a timely fashion that allows Licensor more than five (5) business days to review such materials prior to the date of their proposed use by Licensee. Licensor shall use good faith efforts to promptly evaluate all such submissions as soon as reasonably practicable. Once samples have been approved, Licensee will use and distribute such materials in accordance with the approved samples and will not make any changes without NFLPI's prior written approval (e-mail being sufficient). No NFLPA Collectibles and, except as set forth in the second to last sentence of this Section 6(B), no marketing materials, proposed commercials and/or advertisements for the Licensed Products utilizing the Licensed Materials granted under the License shall be utilized, sold or distributed by the Licensee without such prior written approval. All samples of Licensed Products and/or Licensed Materials submitted to NFLPI shall be provided at Licensee's sole expense. Notwithstanding anything to the contrary contained herein, Licensee is solely responsible for payment of any royalties, fees, fines, or penalties arising out of the use of the Intellectual Property Rights of any third party used in connection with the Licensed Materials. Licensee shall not be required to submit to NFLPI for written approval, any electronic rendering of Artwork, plans, Photographs, or any other representations of Licensed Materials produced by or for Licensee to the extent that such final form of the Licensed Materials are solely created using, and only contain, electronic rendering of Artwork, plans, Photographs, or any other representations of Licensed Materials that were previously approved by NFLPI ("**Subsequent Approved Uses**"). Licensee shall provide Licensor notice of all Subsequent Approved Uses not less than five (5) business days prior to such use, regardless of any prior approval; provided the Parties agree to confer to the extent Licensor has a reasonable business justification to revoke any prior approval. The Parties will work in good faith to develop an expedited approvals process of less than twenty four (24) hours for periods reasonably identified by Licensee as high value throughout the NFL season (e.g. week one (1) of the NFL season, select prime time games, major matchups, playoffs, Super Bowl) as well as unspecified emergent opportunities throughout the season in connection with corresponding "moment-based" NFLPA Collectibles. The Parties will discuss and agree upon the best process for ensuring the use of current images. Notwithstanding anything to the contrary, but subject to each Party's full reservation of rights under the last sentence of this Section 6(B) and the last paragraph of Section 2(B), ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████.

C.  Smart Contract. The smart contracts to be used for the NFLPA Collectibles, shall be subject to reasonable approval by Licensor as they relate to any and all material terms and obligation under this Agreement. The end user terms and conditions (i.e., as linked to the applicable smart contracts) shall be subject to regular review with Licensor. Additionally, the Licensee shall continuously review with the Licensor any relevant and/or material changes to these end user terms and conditions. The Parties shall work together in good faith, and Licensee shall in good faith review any feedback Licensor has on the user terms and conditions (i.e., as linked to the

18

Confidential and Proprietary

applicable smart contracts), to ensure these user terms and conditions as relevant to the applicable smart contracts are reflective of both Parties' mutual business interests.

D.  <u>Product Development</u>. Licensee will consult in good faith with Licensor and keep Licensor reasonably appraised as to the development and any modification of all elements of the Licensed Products, including, but not limited to, product and NFT Based Game mechanics, product appearance (components other than the Licensed Materials subject to Licensor's approval in accordance with <u>Section 6(B)</u>), and Licensee will consider any and all feedback provided by Licensor regarding Licensee's plans for development of the NFLPA Collectibles and NFT Based Game. Licensee's failure to comply with the foregoing shall be deemed a material breach of this Agreement, for which Licensor may terminate this Agreement if Licensee fails to timely cure such failure within ten (10) business days of receipt of written notice from Licensor. In addition to the preceding sentence, at least once per quarter, or more frequently as mutually agreed to by the Parties, the Parties shall meet (in person or telephonically) to discuss the development of NFLPA Collectibles and NFT Based Game. Such quarterly meeting shall be conducted at times and in a manner that is mutually acceptable to all Parties. During such quarterly meetings, Licensor may provide feedback regarding Licensee's plans for development of the NFLPA Collectibles and NFT Based Game, which Licensee shall consider, in good faith. The Parties may also discuss feedback on the Non-NFT Based Games, which Licensee shall consider, in good faith. For clarity, Licensee's obligations under this <u>Section 6(D)</u> as they relate to the Non-NFT Based Game shall cease upon termination or expiration of the Non-NFT Based Game License Term. Any information, documents, or other materials provided or discussed in such meetings or as part of feedback provided by Licensor shall be deemed Confidential Information of Licensee. For clarity, Licensee's good faith refusal to implement any feedback or consultation provided by Licensor shall not be a breach of this Agreement, provided such refusal is (i) limited to NFT Based Game mechanics, (ii) does not reflect poorly on NFL Players and/or (iii) is not reasonably expected to materially and negatively impact revenue received by Licensor under this Agreement. For clarity, Licensee shall have no obligation to implement any feedback or consultation provided by Licensor related to the Non-NFT Based Game unless related to approvals of the Licensed Materials as contemplated under <u>Section 6(B)</u>. Licensee shall implement feedback related to the Licensed Materials granted under the License and subject to approval as contemplated under <u>Section 6(B)</u> within the Non-NFT Based Game under the then-current product development cycle if reasonably practicable, or otherwise as part of Licensee's next product development cycle. While Licensee is working to implement any feedback provided by Licensor related to the Licensed Materials within the Non-NFT Based Game, Licensor may not withhold approvals under this Agreement due to Licensee's incomplete implementation of such feedback, except to the extent a decision on approval is an ordinary course approval decision unrelated to the applicable feedback.

E.  <u>NFL Players</u>. The list of players for whom NFLPI has group licensing authorization (the "**Player Agreement Report**") is available to Licensee via the Internet at https://nflpa.com/players/resources with Licensee's "user name" and "password" to be provided by NFLPI. In addition, NFLPI may secure authorization from players not listed on the Player Agreement Report, including but not limited to retired players who have authorized NFLPI to represent such players as their exclusive license agent for inclusion in NFLPI licensing programs. Notwithstanding the foregoing, during the Term, Licensee shall submit to NFLPI a proposed list of players' names for inclusion in the NFLPA Collectibles and NFT-Based Game for the upcoming football season. Licensee shall cross-reference its player list against the current Player Agreement Report. After cross-referencing the lists, Licensee must submit its proposed final player list to NFLPI for approval. With regard to jersey numbers for active NFL Players, it is Licensee's sole responsibility to cross-reference its player list against player rosters posted on www.nfl.com. If applicable, jersey numbers for retired NFL Players

must be submitted to NFLPI for approval. NFLPI shall respond to such submissions in writing to Licensee, signifying approval or disapproval in the case of each requested player's name, such approval not to be unreasonably withheld or delayed. Licensee may submit requests in writing to NFLPI for additions, deletions, or substitutions of players' names and NFLPI shall respond to such requests within a reasonable period of time, such approval not to be unreasonably withheld conditioned or delayed.

F.  <u>No Sublicensing without Approval and Conditions</u>. Licensee may subcontract its rights under the Licensed Materials to subcontractors and/or affiliates to perform work or perform services on behalf of Licensee in connection with the Licensed Product; provided that subcontractors shall be bound by terms and conditions materially similar to the applicable terms and conditions of this Agreement in any lower tier agreement, and Licensee shall remain responsible for all acts and omissions of any such subcontractors.

7.  **REPRESENTATIONS AND WARRANTIES; DISCLAIMERS.**

A.  <u>By NFLPI</u>. NFLPI represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement, to provide the licenses, and perform its obligations hereunder; (iv) it is a licensing affiliate of the NFLPA; (v) it has been duly appointed as the exclusive licensing agent on behalf of the NFL Players; (vi) it owns or controls all of the Licensed Materials and the Intellectual Property Rights therein; (vii) the Licensed Materials do not infringe, violate, or misappropriate any Intellectual Property Rights of any third party; (viii) this Agreement, and the rights and licenses granted to Licensee herein, do not conflict with or violate any other agreement, contract or obligation of NFLPI or NFLPA; (xi) it will comply with all applicable laws and regulations.

B.  <u>By OneTeam</u>. OneTeam represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement, to provide the licenses, and perform its obligations hereunder; (iv) it is an affiliate of NFLPI and the NFLPA; and (v) it will comply with all applicable laws and regulations.

C.  <u>By NFLPA</u>. NFLPA represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement, to provide the licenses, and perform its obligations hereunder; and (iv) it will comply with all applicable laws and regulations.

D.  <u>By Licensee</u>. Licensee represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement and perform its obligations hereunder; (iv) Licensee will comply with the NFLPA Standard Terms and Style Guide; (v) all elements (including all material of any nature utilizing in any way the rights licensed hereunder, including all packages, cartons, point of sale material, newspaper and magazine

Confidential and Proprietary

advertisements) of the Licensed Products, excluding the Licensed Materials, shall comply with all applicable laws, rules and regulations; (vi) the Licensed Products being administered by Licensee shall comply with all applicable laws; (vii) in the event Licensee becomes aware that Licensee's use of the rights granted hereunder and/or the Licensed Products becomes subject to regulatory action by any securities, gaming or financial regulatory authority, Licensee will promptly notify Licensor (if permitted by applicable law, and without disclosure of confidential information) and upon request from Licensor, cease all use of the Licensed Materials in the NFLPA Collectibles, and NFT Based Game until and unless continued use is mutually agreed upon by the Parties; and (viii) Licensee has not and will not, during the Term or at any time after: (a) challenge or attack any right, title or interest of NFLPA, NFLPI or OneTeam in and to the Licensor's Intellectual Property Rights or the Licensed Materials or an NFL Player's ownership of such NFL Player's Identity, nor shall Licensee knowingly assist others in so doing; (b) secure or seek to secure, directly from any player who is under contract to an NFL club or is seeking to become under contract to an NFL club (i.e. participating in the NFL draft or the NFL combine), or from such player's agent, permission or authorization for the use of such player's Identity in conjunction with the Licensed Product(s); or (c) intentionally or negligently do anything that could in any way damage the reputation or goodwill associated with the Licensed Materials.

8. **TERMINATION; EFFECT OF TERMINATION; SURVIVAL.**

   A. <u>Termination</u>.

      i.   Either Party may terminate this Agreement upon written notice to the other Party: (1) in the event such other Party fails to perform or breaches any material term of this Agreement, provided that the non-breaching Party provided a prior, separate written notice to the breaching Party specifying the nature of the failure and such failure to perform continued for a period of thirty (30) days after receipt of such separate written notice; (2) immediately, in the event that the performance of such other Party's obligations under this Agreement would be in violation of any law, rule, regulation, or order applicable to such other Party (whether now known or hereafter adopted) and the failure to comply with such law, rule, regulation, or order would have a material adverse effect on the terminating Party; provided, that in the event the nature of such violation of law, rule, regulation, or order is susceptible to cure without material adverse effect on the terminating Party, termination shall be as provided in <u>Section 8(A)(i)(1)</u>; or (3) any governmental, administrative, or adjudicatory body (e.g., the Securities and Exchange Commission or state regulatory authorities) determines that the Licensed Product is a security.

      ii.  Licensor may terminate this Agreement upon written notice to Licensee in the event: (1) Licensee engages in any unauthorized use of the Licensed Products and/or Licensed Materials and fails to cure such unauthorized use within thirty (30) days after receipt of written notice from Licensor; (2) Licensee fails to make timely payment of any undisputed amount due under this Agreement and fails to timely cure such failure within ten (10) business days of receipt of written notice from Licensor; (3) Licensee does not introduce and offer for sale the Licensed Product on or before the In-Market Date; or (4) immediately upon written notice to Licensee in the event that NFLPA determines, in its sole discretion, that NFLPA or NFL Players are at risk of regulatory, civil, criminal or employment related action due to the existence of this Agreement.

      iii. Any Party may terminate this Agreement upon written notice in the event any other Party files a petition in bankruptcy or is adjudicated as bankrupt, or if a petition in bankruptcy is filed against any such Party or if such Party becomes insolvent, or makes an assignment

for the benefit of its creditors or an arrangement pursuant to any bankruptcy laws, or if such Party discontinues its business, or if a receiver is appointed for it or its business (and, in the event of such termination, neither such Party nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to sell, exploit or in any way deal with the rights granted hereunder or with any NFLPA Collectibles or NFT Based Game or any carton, container, packaging or wrapping material, advertising, promotional or display material pertaining to any Licensed Materials) and such proceedings, receivership, assignment, or insolvency is not dismissed, discharged or withdrawn within sixty (60) days.

    iv.    ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████.

B.   <u>Effect of Termination</u>.

    i.    Except as provided for in this Agreement, including, without limitation, <u>Section 2(B)</u> in connection with Post-Term Sales (including Automated Post-Term Royalty Payments) and <u>Section 8(B)(ii)</u> in connection with Secondary Sales subject to the Transition Plan, upon expiration or termination of this Agreement for any reason, all rights granted to Licensee under this Agreement shall automatically and immediately cease and revert to Licensor and, except where Licensee has a separate right or license to use such rights independent of this Agreement, Licensee will refrain from further use of such rights or any further reference thereto, direct or indirect. Licensee acknowledges that its failure to cease the use of such rights as set forth in the preceding sentence, at the termination or expiration of this Agreement may result in immediate and irreparable damage to OneTeam, NFLPA, NFLPI and/or individual Player(s), and to the rights of any subsequent licensee(s). The expiration or earlier termination of this Agreement will not relieve any Party from its obligation to pay any monies due to the other Party for any period prior to the effective date of such expiration or termination.

    ii.    Notwithstanding anything in this Agreement to the contrary, to the extent that any consumer has acquired a NFLPA Collectible prior to expiration or termination of this Agreement, that consumer will have the right to continue owning (including retaining, selling/transferring, displaying and/or otherwise exploiting) the NFLPA Collectible (and will continue to own the associated NFT) following the expiration or termination of this Agreement, and Licensee will have the right to continue to provide a digital marketplace for such NFLPA Collectibles, subject to any applicable terms and conditions in this Agreement and as set forth in the Transition Plan. For the avoidance of doubt, the Parties agree Secondary Sales of the NFLPA Collectibles shall be permitted after expiration or termination hereof, subject to payment of the Royalties in connection with Post-Term Sales in accordance with <u>Section 2(B)</u>, and Licensee's compliance with all obligations hereunder.

    iii.    In the event Licensor terminates this Agreement due to Licensee's uncured material breach of this Agreement in accordance with <u>Sections 6(D)</u>, <u>8(A)(i)(1)</u>, <u>8(A)(i)(2)</u>, <u>8(A)(ii)(1)</u>, <u>8(A)(ii)(2)</u>, and/or, <u>8(A)(ii)(3)</u>, Licensee shall pay any remaining Minimum Guarantee payment (minus any Royalty Share payments already made for the License period) applicable to the License Period in which the termination occurs, and any Royalty Share payments (above such Minimum Guarantee) due and owing, if any. Licensor will use good faith and commercially reasonable efforts to mitigate its damages in the event of termination of this Agreement and license the Licensed Materials for inclusion and use in the applicable category, and any Minimum Guarantee payment required to be made by Licensee under this <u>Section 8(B)(iii)</u> shall be reduced to the extent and in the amount

Licensor is able to mitigate its damages and license the Licensed Materials for inclusion and use in NFT Based Games.

C. <u>Survival</u>. Sections 1(G), 2(B), 2(D), 2(E), 2(F), 4(A), 4(B), 5(A), 5(E), the last sentence of 6(A), 8(B)(i-iii), 8(C), 9(A)-(D), 10, 11, 12(D), 12(F), 12(G), 12(I), 12(J), 12(K), 12(L), and 13 of this Agreement (together with all definitions pertinent to the foregoing sections and all other provisions of this Agreement that reasonably may be interpreted as surviving the expiration or earlier termination of this Agreement) will survive any such expiration or termination.

9. **INDEMNIFICATION; INSURANCE.**

A. <u>Indemnification by Licensee</u>. Licensee will defend, indemnify and hold harmless Licensor, their respective parent organizations, affiliates, officers, directors, employees and members, and any of their respective successors or assigns, and NFL Players (collectively, "**Licensor Indemnitees**"), from and against any and all claims, suits, losses, damages and expenses (including reasonable outside attorney's fees and expenses), resulting from third party claims made or suits brought against any Licensor Indemnitee to the extent based on Licensee's breach of this Agreement (each a "**Licensor Claim**").

B. <u>Indemnification by Licensor</u>. NFLPI and OneTeam, each with respect to its rights, duties and obligations hereunder, will, defend, indemnify and hold harmless Licensee, its parent organizations, affiliates, officers, directors, and employees, and any of their respective successors or assigns (collectively "**Licensee Indemnities**), from any liabilities, losses, damages, and expenses (including reasonable attorneys' fees and expenses) resulting from claims made or suits brought against Licensee Indemnities based upon breach of this Agreement by one or more of NFLPA, NFLPI, and/or OneTeam (each a "**Licensee Claim**"). Collectively, Licensee Claims and Licensor Claims shall each be a "**Claim**".

C. <u>Indemnification Procedures</u>. With regard to indemnification, whenever the Party obligated to indemnify the other Party (the "**Indemnifying Party**") has an obligation to indemnify the Party being indemnified (the "**Indemnified Party**") under this Agreement, the following procedures shall apply: The Indemnified Party shall promptly notify the Indemnifying Party in writing of any Claim in respect of which indemnity may be sought, which notice shall assert such indemnification claim and describe the basis for indemnification. The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that such failure shall have adversely prejudiced the Indemnifying Party. The Indemnifying Party shall have the right to control the defense and settlement of the Claim and to appoint lead counsel reasonably satisfactory to the Indemnified Party, unless such lead counsel is required by the Indemnifying Party's insurer, in each case at the Indemnifying Party's expense. The Indemnified Party shall have the right to appoint co-counsel in any Claim, at the Indemnified Party's own expense. In the event the Indemnifying Party does not within a reasonable time assume control of such settlement or defense, the Indemnified Party shall have the right to control such defense and settlement at the Indemnifying Party's expense. The Party not controlling such defense or settlement may participate therein at its own expense. The Parties shall reasonably cooperate with each other in the defense and settlement of such Claim, at the Indemnifying Party's reasonable cost and expense. The Indemnified Party shall not agree to any settlement of such Claim without the prior written consent of the Indemnifying Party, and the Indemnifying Party shall have no obligation to indemnify the Indemnified Party for any Claim settled by the Indemnified Party without the prior consent of the Indemnifying Party. The Indemnifying Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of such Claim in the event the settlement does not release the Indemnified Party and its affiliates from all liabilities and obligations with respect to such Claim, requires any action by the Indemnified Party, imposes injunctive or other equitable relief

23

against the Indemnified Party or any of its affiliates, or involves an admission of fault or wrongdoing by the Indemnified Party or any of its affiliates. In the event an Indemnified Party violates this <u>Section 9(C)</u> with respect to any Claim for indemnification, the Indemnified Party shall have no further right to indemnification for such Claim.

D. <u>Insurance</u>. Each Party shall procure and maintain at its own expense, or establish a self-insurance program to provide for, comprehensive commercial general liability insurance providing adequate protection for Licensee and Licensor against claims or suits through both primary and umbrella policies in amounts no less than at least ████████ Dollars ($████) per occurrence and ████████ Dollars ($████) in the aggregate. Such insurance shall: (i) be underwritten by a carrier rated at least A-VIII in Best's Key Rating Guide licensed in the Territory; (ii) remain in force at all times during the Term and for a period of one (1) year thereafter; (iii) be primary (not contributory) as to any other insurance in force; and (iv) include OneTeam, NFLPI, NFLPA and their respective officers, and employees as additional insureds (in the case of Licensee's insurance policies) and Licensee and its affiliates and their respective officers, and employees (in the case of OneTeam and NFLPI insurance policies). Within ten (10) days of written request of a Party, the other Party shall furnish the requesting Party with a certificate of insurance reflecting such Party and their respective officers, and employees as additional insureds. If any such insurance includes or permits a waiver of subrogation, such waiver shall apply to the insured Parties. If any such insurance provides for a waiver of subrogation in the event that such waiver is required by a third party agreement, then this Agreement shall be deemed to require such waiver. Any claims covered by a Party's insurance policies shall not be offset or reduced in any amount whatsoever by any other insurance which an insured Party may independently maintain. Each Party shall notify the other Parties of all claims regarding the Licensed Materials and Licensed Products under any of the foregoing policies of insurance promptly upon the filing thereof. No Party's indemnification obligations hereunder shall be limited by the amount of insurance requirements hereunder.

10. **LIMITATION OF LIABILITY.**

A. <u>LIMITATION OF LIABILITY</u>. EXCEPT FOR CLAIMS UNDER <u>SECTION 9</u> (INDEMNIFICATION; INSURANCE) AND <u>SECTION 11</u> (CONFIDENTIALITY; PRIVACY) AND EXCEPT FOR CLAIMS RESULTING FROM GROSS NEGLIGENCE, WILLFUL MISCONDUCT (INCLUDING FAILURE TO MAKE PAYMENTS UNDER THIS AGREEMENT), OR FRAUD, EACH OF LICENSOR'S, ON THE ONE HAND, AND LICENSEE'S, ON THE OTHER HAND, MAXIMUM AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO THE GREATER OF (I) THE AMOUNT PAID OR PAYABLE BY LICENSEE TO LICENSOR HEREUNDER DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENTS FIRST GIVING RISE TO THE CLAIM AND (II) ████████ DOLLARS ($████). IN NO EVENT SHALL A PARTY BE LIABLE TO ANOTHER PARTY (WHETHER IN CONTRACT, WARRANTY TORT (INCLUDING NEGLIGENCE OR OTHER THEORY) OR ANY OTHER INDIVIDUAL OR ENTITY FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES (INCLUDING DAMAGES FOR LOSS OF PROFIT, REVENUE, BUSINESS OR DATA), HOWEVER CAUSED, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. FOR CLARITY, ANY FINES OR PENALTIES IMPOSED BY ANY REGULATOR SHALL NOT BE CONSIDERED SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES.

11. **CONFIDENTIALITY; PRIVACY.**

Confidential and Proprietary

A. **Confidentiality.** Except as otherwise expressly set forth herein, no Party may disclose or make available any Confidential Information without the prior written consent of the other Parties. A Party may disclose Confidential Information only to those of its officers, directors, employees, members, shareholders, attorneys, agents, and professional advisors (collectively, "**Representatives**") that have a need to know such information and are bound by confidentiality obligations no less restrictive that those set forth herein, provided that each Party is and will remain responsible for the acts and omissions of its Representatives hereunder. Each Party will protect and keep confidential the Confidential Information, using at least reasonable care and at least the same degree of care as such Party would use with its own confidential information of a similar nature. The receiving Party will use Confidential Information solely as reasonably necessary to perform its obligations and/or exercise or enforce its rights under this Agreement and for no other purposes. The receiving Party may disclose Confidential Information to the extent necessary to comply with applicable law or legal process, provided that the receiving Party will give the disclosing Party prompt notice thereof, to the extent not prohibited by law, and facilitate and comply with any protective order imposed on such disclosure, and the disclosing Party's expense. The receiving Party shall promptly notify the disclosing Party in writing upon learning of any unauthorized use or disclosure of Confidential Information, to the extent not prohibited by law. Notwithstanding anything to the contrary, Licensee may disclose the terms and conditions of this Agreement and such non-public, confidential, or proprietary information as it reasonably deems necessary or advisable to any gaming authority or other governmental entity pursuant to any gaming laws to which it is subject. In the event Licensee needs to make any public securities filings (including, for clarity, with respect to the Securities and Exchange Commission) related to this Agreement and naming the Licensor, except, where prohibited by law, Licensee must provide Licensor with written notice (e-mail being sufficient) prior to any such disclosure. Upon written request of a Party, a Party will return to the other Party, or destroy, as directed by the disclosing Party, all materials, in any medium, which contain, embody or reference any Confidential Information of the other Parties; provided, however that the receiving Party may retain copies of Confidential Information, subject to the confidentiality requirements herein, to the extent required by the receiving Party's commercially reasonable record retention policies, to the extent necessary to comply with legal and/or regulatory requirements, or to the extent any Confidential Information that is contained in an archived computer system backup that was made in accordance with receiving Party's security and/or disaster recovery procedures. Notwithstanding the return of Confidential Information, each Party will continue to be bound by its obligations of confidentiality under this Agreement for a period of two (2) years after the expiration or termination of this Agreement, except for information that qualifies as a trade secret under applicable law, which will continue to be subject to the confidentiality obligations of this Agreement for so long as such information remains a trade secret. The Parties agree that in the event of any actual or threatened breach of the confidentiality obligations hereunder, the Party the Confidential Information belongs to will have no adequate remedy at law and will be entitled to seek injunctive or other equitable relief to prevent such breach, without the necessity of posting a bond, in addition to all other remedies available at law or in equity. Licensor shall not under any circumstances provide any non-public information relating to any NFL Player (other than information specifically embedded in the Licensed Materials) ("**PII**") to Licensee hereunder without Licensee's prior written consent in each case. Provided Licensor has obtained such consent to provide PII to Licensee, Licensee shall not knowingly or negligently engage in any unauthorized use of, or disclose to any third parties, any such PII. Licensee hereby consents to any disclosure of an NFL Player's contact information to the extent such information is needed in connection with an Activation.

12. **MISCELLANEOUS.**

    A. <u>Other Definitions</u>.

Confidential and Proprietary

i.  "**Artwork**" means all artwork produced under the License to the extent that it incorporates the Identities.

ii.  "**Group Player Rights**" means the right to use the Identities of six (6) or more active NFL Players, regardless of team affiliation and whether that number is reached using such rights simultaneously or individually, in any form, media or medium (now known or hereafter developed) during a consecutive twelve (12) month period.

iii.  "**Identities**" means the names, images, likenesses, nicknames, initials, persona, personal indicia, jersey numbers, autograph/signatures (including facsimiles), voices, pictures, photographs, animation, identities, statistics, data, copyrights, biographical information and/or other identifying characteristics of NFL Players (as defined herein).

iv.  "**Intellectual Property Rights**" means all forms of intellectual property rights and protections including without limitation, all right, title and interest arising under U.S. common and statutory law and the laws of other countries to all: (i) proprietary indicia, trademarks, trade names, symbols, logos and/or brand names; (ii) trade secret rights and equivalent rights; (iii) copyrights, other literary property or authors rights, whether or not protected by copyright or as a mask work; and (iv) patents and all filed, pending or potential applications for patents, including any reissue, reexamination, division, continuation or continuation-in-part applications throughout the world now or hereafter filed.

v.  "**Licensed Materials**" means the NFLPA Trademarks, the Identities, Artwork, Secondary Marks.

vi.  "**NFL Player**" means each such player included in and covered by NFLPI licensing programs, whether via the group licensing assignment, Standard NFL Player Contract, or by separate authorization.

vii.  "**NFLPA Trademarks**" means the proprietary indicia, trademarks, trade names, symbols, logos and/or brand names controlled by NFLPI or its affiliates which may be amended from time to time by NFLPI.

viii.  "**NFLPA Standard Terms**" means the policy attached hereto as **Exhibit D**.

ix.  "**Photographs**" means all photographs of player Identities taken by Licensee. For clarity, Licensee shall not own the Identities within the Photographs, and Licensee acknowledges it shall have no right to use or exploit Photographs with Identities following the expiration or termination of this Agreement.

x.  "**Secondary Marks**" means all player-themed secondary marks and/or promotional concepts developed for use and used in connection with the Licensed Product that develops secondary meaning or substantial consumer recognition with respect to individual players or NFLPI.

xi.  "**Style Guide**" means the policy attached hereto as **Exhibit B**.

B.  <u>Non-Disparagement; Moral Turpitude</u>. No Party, nor its affiliates, employees, officers and/or spokesperson(s) (excluding, for clarity, any NFL Player) shall commit any act or do anything which could reasonably be construed to bring any other Party, or a NFL Player into public disrepute, contempt, scandal, or ridicule, or which might be reasonably construed to reflect

unfavorably on any other Party. No Party shall make any public statement disparaging the reputation, products, or services of any other Party or its affiliates. Violation of this provision is hereby deemed an incurable, material breach allowing for immediate termination of the Agreement within thirty (30) days of the non-breaching Party first becoming aware of such violation in the sole discretion of such non-breaching Party, provided that neither of OneTeam, NFLPA, and NFLPI may exercise such termination right due to a violation of this provision by any of OneTeam, NFLPA, or NFLPI.

C.  <u>Independent Contractors</u>. The relationship of Licensor and Licensee established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either Party the power to direct and control the day-to-day activities of the other, (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking, or (iii) allow any Party to create or assume any obligation on behalf of any other Party for any purpose whatsoever.

D.  <u>Confidential Information</u>. "**Confidential Information**" means information disclosed by a Party to the other Party or materials made available to or developed by outside organizations or individuals for the use of a disclosing Party, whether orally, visually, or in written form, including but not limited to the terms and conditions of this Agreement, trade secrets of each Party, any information relating to each Party's product plans, designs, ideas, concepts, costs, prices, finances, marketing plans, business opportunities, personnel, research, development or know-how, technology, documentation, processes, algorithms, proprietary information, and any other technical or business information of each Party. The term "Confidential Information" shall not include, information that (i) is already known by or available to the public through no fault of the receiving Party, (ii) was already in the possession of the receiving Party on a non-confidential basis, (iii) is independently developed by the receiving Party without the use of any Confidential Information provided by the disclosing Party, or (iv) the receiving Party rightfully obtains from a third party who, to the receiving Party's reasonable belief, has the right, without obligation to the disclosing Party, to transfer or disclose such information.

E.  <u>No Assignment, Transfer or Encumbrance</u>. No Party shall assign, transfer, delegate, or otherwise grant an encumbrance of any of its rights or obligations under this Agreement, or this Agreement in its entirety, to any other Party without the other Parties' prior written consent, which such Parties may grant or deny in its sole and absolute discretion; provided, however, that any Party may assign this Agreement without the prior written consent of the other Parties in connection with a merger, acquisition, sale of all or substantially all of such Party's assets, or any similar transaction (including to an affiliate). Further, any attempt by Licensee to grant a security interest in the Licensed Materials or assign, transfer, or otherwise encumber any portion of the Agreement in violation of this section, shall be null and void. For clarity, nothing in this Agreement shall limit Licensee's right to grant a security interest or other encumbrance with respect to any assets, including any Intellectual Property, owned by the Licensee or its affiliates. Nothing in this section shall inhibit any Party's termination rights pursuant to <u>Section</u> 8. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their permitted successors and assigns.

F.  <u>Force Majeure; Governing Law; Binding Effect</u>. In the event any Party is unable to perform any of its obligations under this Agreement due to an event beyond the control of that Party, including natural disaster, acts of God, fire, actions or decrees of governmental bodies, act of war, terrorism, strikes, lockouts, work stoppages, labor disputes, failure or discontinuance of the Internet or failure of communications lines or networks (each a "**Force Majeure Event**"), that Party will use commercially reasonable efforts to resume performance of its obligations but will have no liability to the other Party for failure to perform its obligations under this Agreement for so long as it is unable to do so as a result of such event, provided that in the

Confidential and Proprietary

event the NFL Players strike or otherwise engage in a concerted work stoppage, such strike or work stoppage shall not relieve the NFLPA, NFLPI, or OneTeam of their respective obligations under this Agreement. The affected Party shall give prompt written notice to the other Party and shall be excused on a day-to-day basis to the extent such Force Majeure Event continues (and the non-affected Party shall likewise be excused from performance on a day-to-day basis to the extent its performance relates to the delay or performance so prevented). The affected Party shall use commercially reasonable efforts to minimize and remediate the cause of non-performance and resume performance upon removal of such cause. This Agreement shall be governed by and construed under the laws of the State of New York of the United States of America, without reference to conflicts of law principles that may require application of the law of any other state. Any action arising out of or related to this Agreement shall be initiated and maintained in a forum of competent jurisdiction within New York County, New York, and the Parties irrevocably agree to the exclusive jurisdiction of the federal and state courts located in the State of New York.

G. <u>Interpretation; Severability; Counterparts</u>. This Agreement is the product of negotiations between the Parties, and any rules of construction relating to interpretation against the drafter of this Agreement, or any provision herein, shall not apply to this Agreement and are expressly waived. The headings of sections and subsections in this Agreement are for convenience of reference only and are not intended to restrict, affect or otherwise influence the interpretation or construction of this Agreement. Signatures that are transmitted electronically or by facsimile will have the same effect as original signatures. In the event that any provision of this Agreement is held invalid or unenforceable by a court or other governmental authority of competent jurisdiction, the Parties shall endeavor in good faith to agree to such amendments that will preserve, as far as possible, the intentions expressed in this Agreement. If the Parties fail to agree on such an amendment, such invalid term, condition or provision will be severed from the remaining terms, conditions and provisions, which will continue to be valid and enforceable to the fullest extent permitted by law and the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term. FURTHER, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT IN THE EVENT ANY REMEDY UNDER THIS AGREEMENT IS DETERMINED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE, ALL LIMITATIONS OF LIABILITY AND EXCLUSIONS OF DAMAGES OR OTHER REMEDIES REMAIN IN EFFECT. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

H. <u>Expenses</u>. All expenses, including all legal, accounting, financial, advisory, consulting, and other fees incurred in connection with the negotiation or effectuation of this Agreement will be the obligation of the respective Party incurring such expenses, unless (and only to the extent) the Parties may expressly agree otherwise in writing.

I. <u>Notices; Amendment; Modification; Waiver</u>. All notices and other communications hereunder (including any consents) shall be in writing and shall be deemed effective when (i) delivered personally, (ii) 3 business days after being mailed by first class mail, postage prepaid, or 1 business day after being sent by a reputable overnight delivery service, postage or delivery charges prepaid, to the Parties at their respective addresses stated in this Agreement. Notices also may be given to NFLPA, NFLPI, and OneTeam by electronic mail and will be effective on the date transmitted if confirmed by a signed original sent in the manner provided in the preceding sentence. Copies of notices to Licensor shall also be sent to NFL Players Inc., 1133 20th Street NW, Washington, DC 20036 Attn: Corporate Counsel and OneTeam Partners, LLC 1901 L Street, NW 7th Floor, Washington, DC 20036 Attention Chief Legal Officer. Notices to Licensee shall be sent to the address listed on page 1 of this Agreement, ATTN: Jason Robins,

Confidential and Proprietary

with a copy, which shall not constitute notice, to the address listed on page 1 of this Agreement, ATTN: Stanton Dodge. This Agreement may be amended, modified or supplemented by the Parties but only in a writing that is signed by a duly authorized representative of each Party. No waiver by a Party with respect to this Agreement will be effective or enforceable against a Party unless in writing and signed by that Party. Except as otherwise expressly provided herein, no failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by a Party, and no course of dealing between or among any of the Parties, will constitute a waiver of, or will preclude any other or further exercise of the same or any other right, power or remedy.

J.    Further Assurances. Each of the Parties hereto shall, and shall cause its respective affiliates to, from time to time at the request of the other Party, without any additional consideration, furnish the other Party such further information or assurances, execute and deliver such additional documents, instruments and conveyances, and take such other actions and do such other things, as may be reasonably necessary or appropriate to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.

K.    Licensee Obligations.  Licensee shall cause its sublicensees and affiliates to comply in all respects, as applicable, to all terms and conditions of this Agreement. As a material inducement to Licensor's willingness to allow Licensee's affiliates to use the Licensed Materials in accordance with the terms and conditions of this Agreement, Licensee hereby represents, acknowledges and agrees that any breach of any representation and warranty or default in the performance of any covenant, obligation, agreement or undertaking of any Licensee sublicensee or affiliate shall be deemed to be a breach or default of Licensee, and, subject to the terms and limitations of this Agreement, Licensor shall have the right, exercisable in its sole discretion, to pursue any and all available remedies it may have arising out of any such breach or nonperformance directly against Licensee in the first instance.

L.    Entire Agreement. This Agreement amends and restates the Original Agreement in its entirety. As such, on the Amendment Effective Date, the Original Agreement shall cease to be of any force and effect, and the Parties shall thereafter be governed in accordance with the terms hereof.  This Agreement (including, without limitation, all Exhibits attached hereto) sets forth the entire agreement and understanding of the Parties relating to the subject matter herein and merges all prior discussions between them. Notwithstanding anything herein to the contrary, in the event of a conflict between the terms of <u>Sections 1 to 13</u> of this Agreement on the one hand, and the Standard Terms on the other hand, the terms of <u>Sections 1 to 13</u> of this Agreement will supersede and control.

## 13. **DK PLAYER RESERVE.**

Segregated Account. NFLPA, NFLPI, and OneTeam acknowledge that Licensee or its affiliate(s) has established DK Player Reserve LLC as a legally separate and independent subsidiary for the sole purpose of holding and managing a segregated account (within the meaning of 940 C.M.R. 34.00) restricted to funds owned by DraftKings players (the "**Segregated Account**"). The sole purpose of the Segregated Account shall be to hold customer deposits and player winnings. NFLPA, NFLPI, and OneTeam hereby acknowledge and agree that funds in the Segregated Account are properties of DK Player Reserve LLC, do not belong to Licensee, and shall not be available to pay any of the claims of NFLPA, NFLPI, and/or OneTeam. Notwithstanding the foregoing, Licensee acknowledges and agrees that:

A.    DK Player Reserve LLC has no rights under the Agreement including, but not limited to, any rights to use the Licensed Materials (and DraftKings Inc. hereby undertakes to Licensor that DK Player Reserve LLC shall not use the Licensed Materials); and

Confidential and Proprietary

B.  DraftKings Inc. shall not be entitled to transfer, assign, sublicense, subcontract or otherwise seek to dispose of its rights or obligations under this Agreement and/or this Agreement to DK Player Reserve LLC, and that any such transfer, assignment, sublicense, subcontract or disposal shall be deemed a material breach of the Agreement.

**[SIGNATURE PAGE FOLLOWS]**
**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

30

Confidential and Proprietary

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, NFLPA, NFLPI, OneTeam and Licensee, intending to be legally bound, hereby execute this Agreement as of the Amendment Effective Date and agree as set forth in this Agreement:

**NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED**

By: _____

Name: **Steven Scebelo**

Title: **President, NFL Players Inc.**

**DK CROWN HOLDINGS, INC. (fka DRAFTKINGS INC.)**

By: _____

Name: **Jeremy Elbaum**

Title: **Svp bd**

**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION**

By: _____

Name: **Teri Smith**

Title: **COO**

**ONETEAM PARTNERS, LLC**

By: _____

Name: **Sean Sansiveri**

Title: **CEO**

31

DocuSign Envelope ID: E54CC556-DAE5-47A8-A9DD-955DADD8EE21

**Exhibit A**
**Reporting Statement Template**

Total Net Revenue and Royalties, by Access Method and Player
Total Gross Sales
First Sales
Secondary Sales
First Net Revenue Second Net Revenue
Per Unit Sales by Player
Transaction Fees actually charged
Marketplace Fees
Full accounting of Deductions Units/Packs

Confidential and Proprietary

**Exhibit B**

**NFLPI Style Guide - to be found at the following address:**

https://nflpaweb.blob.core.windows.net/website/Departments/Players-Inc/FY22-NFLPA-Style-Guide.pdf

Confidential and Proprietary

**Exhibit C**
**Transition Plan**

After termination or expiration of this Agreement, and solely to the extent Licensee continues to operate a Licensee owned or controlled digital marketplace:

- Licensee may offer crafting or trading offers for NFLPA Collectibles where owners of NFLPA Collectibles may elect to destroy their NFLPA Collectibles in exchange for prizes or rewards;
- The Parties will have good faith discussions related to allowing Licensee to continue to offer the Reignmakers Franchise Score where end users receive points based on the number and type of NFLPA Collectibles the end user holds in materially the same form as Reignmakers Franchise Score was offered during the Term;
- Owners of NFLPA Collectibles may continue to hold their NFLPA Collectibles in non-custodial wallets, solely as approved by Licensor, and/or DraftKings controlled custodial wallet as authorized in this Agreement;
- Licensee may continue to enable and facilitate Secondary Sales of NFLPA Collectibles through a DraftKings owned or controlled digital marketplace and any other mutually agreed to third-party marketplaces;
- Licensee may list the NFLPA Collectibles for Secondary Sale on the Company's digital collectible marketplace; and
- The Parties will have good faith discussions related to allowing the NFLPA Collectibles to be transferable to third-party marketplaces and/or non-custodial wallets.

Confidential and Proprietary

**Exhibit D**
LICENSEE STANDARD TERMS

## I.       Introduction

The NFL Players Association and NFL Players Incorporated (collectively referred to herein as "**NFLPA**") are committed to conducting their business affairs in a socially responsible and ethical manner consistent with their respective missions. In furtherance of this commitment, the NFLPA requires that all licensees of NFLPA licensed product adhere to the following Licensee Standard Terms (the "**Terms**").

## II.      Application

These Terms shall apply to all Licensees and Licensee Affiliates. "**Licensee**" shall include any person or entity who has entered into a written license agreement with NFLPA ("**License**"). "**Licensee Affiliates**" shall include Licensee's parent organization, subsidiaries, affiliates, officers, directors, or any other related entities throughout the world which create, produce, assemble, package, distribute, promote and/or sell materials pursuant to the Licensed Products contemplated herein ("**Licensed Products**"). As a condition of being permitted to produce and/or sell Licensed Products, each Licensee must comply, and shall cause all Licensee Affiliates to comply, with these Terms and the NFLPA's Online Distribution Policy which is fully integrated into these Terms and may be found here: **https://www.nflpa.com/players/nfl-players-inc-online-distribution-policy**. Further, by entering into a License with NFLPA, Licensee represents that it is in compliance with these Terms. In the event that Licensee has failed to materially comply with these Terms, then NFLPA may provide written notice to Licensee including a reasonable description of such non-compliance and, in the event Licensee has not cured such non-compliance within thirty (30) days, may either terminate the License or require that Licensee implement a corrective action plan on terms acceptable to NFLPA.

## III.     Standards

Licensee and Licensee Affiliates agree to operate work places and contract with companies whose work places adhere to the standards and practices described below.

1. <u>Legal Compliance.</u> Licensee and Licensee Affiliates must materially comply with all applicable legal requirements of the jurisdiction in which it conducts its business and business related to or involving the creation, production, assembly, packaging, distribution, promotion and/or sale of Licensed Products. Where there are differences or conflicts with the Terms and the laws of the jurisdiction, the higher standard shall prevail. Licensed Products shall not be manufactured or produced in any manner that is inconsistent with these Terms.

2. [reserved]

3. [reserved]

4. <u>Employment Standards.</u> Licensee and Licensee Affiliates shall comply with the following employment standards:

Confidential and Proprietary

A. *Wages and Benefits:* Licensee shall pay employees, at a minimum, wages and benefits which comply with all applicable laws and regulations of the jurisdiction in which Licensee conducts its business.

B. *Child Labor*: The use of child labor is not permissible in any circumstance. Workers must be at least fourteen (14) years of age unless the laws of the applicable jurisdiction where the work is to be performed requires a higher legal minimum working age.

C. *Forced Labor*: The use of forced labor and prison labor is not permissible in any circumstance. Labor supplied by prisoners working within the United States pursuant to a lawfully authorized work program sponsored by the U.S. government or State government will only be permissible if the Licensee obtains NFLPA's prior written consent.

D. *Freedom of Association and Collective Bargaining*: Licensee shall recognize and respect the right of employees' freedom of association and collective bargaining. No Licensee shall harass, intimidate, or retaliate against employees who freely associate or bargain collectively. Licensees shall not cooperate with any organizations that prevent workers from organizing a union of their choice. Licensee shall allow union organizers free access to employees. Licensee shall recognize the union of the employees' choice.

E. *Health and Safety:* Licensee must provide workers with a safe and healthy work environment. The health and safety of workers is subject to Title 29 CFR of the Federal Terms of Regulations, enforced by Federal OSHA (Occupational Safety and Health Administration).

F. *Nondiscrimination:* Licensee shall take commercially reasonable steps to prevent discrimination by Licensee as it relates to hiring, salary, benefits, advancement, discipline, termination or retirement, on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion, social or ethnic origin, or otherwise.

G. *Harassment or Abuse:* Licensee shall treat all employees and persons involved in the creation, production, assembly, packaging, distribution, and/or sale of Licensed Products with dignity and respect. In no event shall Licensee cause or knowingly permit any person to be subject to any physical, sexual, psychological, or verbal harassment or abuse.

H. *Legal System:* Licensed Products bearing the name, trademarks, or images of NFLPA shall not be manufactured or produced in any jurisdiction, mutually agreed to by Licensor and NFLPA in good faith, where changes to the legal system of such jurisdiction would prevent NFLPA from protecting its name, trademarks, images, or other interests, or from implementing any provision of these Terms.

I. *Political, Economic, Social Environment:* Licensed Products shall not be manufactured or produced in any jurisdictions in which such activities would violate the U.S. Department of Treasury Office of Foreign Assets Control sanctions programs.

Confidential and Proprietary

IV.    **Sales Guidelines**

**All materials incorporating the Licensed Materials created pursuant to the License that are (i) in connection with the NFLPA Collectibles and NFT-Based Game, or (ii) that require approval by Licensor in accordance with <u>Section 6(B)</u> of the Agreement, are subject to review and approval by NFLPA prior to use.** NFLPA in its sole discretion, retains the right to disapprove any materials deemed to suggest an endorsement by the NFLPA and/or NFL players, or that reflects unfavorably upon the NFLPA and/or NFL players. Specifically, the NFLPA retains the right to disapprove any materials that promote or otherwise reference certain prohibited categories, including, but not limited to:

      A.  Illegal products and services
      B.  Alcohol and tobacco products
      C.  Illegal Lotteries/Illegal Gambling goods and services
      D.  Social cause/issue advocacy
      E.  Dietary/Nutritional supplements and products
      F.  Other pharmaceuticals

Confidential and Proprietary

**Exhibit E**
**Example Royalty Trigger and Royalty Share Calculations**

| Example A – Royalty Trigger Exceeded for Third License Period | | |
|---|---|---|
| First Net Revenue + Second Net Revenue in Third License Period | $ | ███ |
| Royalty Trigger for Third License Period | $ | ███ |
| Royalties (██%) on First Net Revenue + Second Net Revenue for Third License Period | $ | ███ |
| Unadjusted Minimum Guarantee for Third License Period | $ | ███ |
| Royalties above Minimum Guarantee Paid to Licensor for Third License Period | $ | ███ |

| Example B – At Royalty Trigger for Third License Period | | |
|---|---|---|
| First Net Revenue + Second Net Revenue in Third License Period | $ | ███ |
| Royalty Trigger for Third License Period | $ | ███ |
| Royalties (██%) on First Net Revenue + Second Net Revenue for Third License Period | $ | ███ |
| Unadjusted Minimum Guarantee for Third License Period | $ | ███ |
| Royalties above Minimum Guarantee Paid to Licensor for Third License Period | $ | 0 |

| Example C – Royalty Trigger Not Exceeded for Third License Period | | |
|---|---|---|
| First Net Revenue + Second Net Revenue in Third License Period | $ | ███ |
| Royalty Trigger for Third License Period | $ | ███ |
| Royalties (██%) on First Net Revenue + Second Net Revenue for Third License Period | $ | ███ |
| Unadjusted Minimum Guarantee for Third License Period | $ | ███ |
| Royalties above Minimum Guarantee Paid to Licensor for Third License Period | $ | 0 |

Confidential and Proprietary