# EXHIBIT B

*Redacted version of document*

<u>**LICENSE AGREEMENT**</u>

This License Agreement ("**Agreement**") is made and entered into this 19th day of November 2021 (the "**Effective Date**"), by and among, on the one hand, DraftKings Inc. with offices at 222 Berkeley Street, Boston, MA 02116 ("**Licensee**" or the "**Company**"), and on the other hand, NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, with offices at 1133 20th Street NW, Washington, D.C. 20036 ("**NFLPA**"), NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, with offices at 1133 20th Street NW, Washington, D.C. 20036 ("**NFLPI**") and OneTeam Partners, LLC, with offices at 1901 L Street, NW, 7th Floor Washington, DC 20036 ("**OneTeam**" and, together with NFLPI, "**Licensor**"). Each of OneTeam, NFLPI, NFLPA and Licensee is a "**Party**" and collectively, the "**Parties**".

1. **GRANT OF RIGHTS.**

   A. <u>License.</u> Upon the terms and conditions hereinafter set forth, NFLPI grants to Licensee the right, license and privilege of utilizing the Licensed Materials (as defined below) on, and/or in connection with the Licensed Product(s), the creation of Licensed Product(s), and the advertising, marketing and promotion of Licensed Product(s) (the "**License**"). "**Licensed Product(s)**" means (i) NFLPA Collectibles, (ii) Gamified NFTs and (iii) the Game using the NFLPA Collectibles. "**NFLPA Collectible**" means an NFL player-identified collectible fantasy football digital asset distributed solely on the Company's digital collectible marketplace or distributed as otherwise approved by Licensor. "**Gamified NFTs**" means NFTs (as defined below) that are used to create or in connection with missions, crafting/fusion, achievements, collectibles/collections, upgrades/'level ups', leaderboards. The "**Game**" shall mean a NFT-based game in the Fantasy Style Game (as defined below) category and Daily Fantasy Game (as defined below) category. For clarity, Gamified NFTs are non-exclusive to Licensee.

   NFLPA Collectibles will be made available to the consumer individually and/or in packs, and shall be created solely for inclusion, and shall only be capable of being used, in the Game (as defined below) and/or on a digital collectible marketplace.

   Each NFLPA Collectible will (i) include an approved NFL player image, player stats, rarity level (e.g., common, rare, legendary), and (ii) be tied to a non-fungible token (an "**NFT**"). The NFLPA Collectibles will not, in any event, include any NFL-licensed game footage. Visual formats of the assets comprising each NFLPA Collectible shall be approved in accordance with <u>Section 7</u>.

   B. Licensee agrees to introduce and sell the Licensed Product on or before October 1, 2022 (the "**In-Market Date**").

   C. The Game will include standard game mechanics underlying gameplay on Licensee's website/platforms or other websites/platforms approved by Licensor.

   D. Gamified NFTs may be integrated into Licensee's loyalty program or used in connection with a Game.

   E. The License shall allow the Licensee to use the Licensed Products to the full extent as set forth in Section 1(A). The License shall be: (i) non-exclusive for the Gamified NFTs; and (ii) Exclusive for the Games, but solely to the extent (a) utilizing the NFLPA Collectibles and (b) Licensed Materials in the Fantasy Style Game and Daily Fantasy Game categories. "Exclusive" means that neither the NFLPA, the NFLPI nor OneTeam will during the Term

release, or cause or authorize to be released, or license or grant any rights to any Licensed Materials for use with NFTs in connection with any game in the Game category. For clarity, nothing herein shall prevent Licensor from licensing a third party to produce, promote and/or release a non-NFT-related Fantasy Style Game or non-NFT-related Daily Fantasy Game.

F. Sports Betting Utility: Licensor will work with Licensee in good faith on developing strategies and plans to create revenue generating opportunities relating to NFTs connected to or associated with sportsbook or sports betting, including, but not limited to, providing Licensee with notice of any negotiations between Licensor and a third party related to NFTs connected to or associated with sportsbook or sports betting no later than five (5) business days after such negotiations are first initiated with the third party. Licensor will use good faith efforts to include Licensee as a participant in all Licensor requests for proposals or other similar evaluation processes related to NFTs connected to or associated with sportsbook or sports betting. In the event the Parties desire to jointly pursue opportunities related to NFTs connected to or associated with sportsbook or sports betting, the respective rights and obligations of each Party, related to such opportunity, including economic terms, shall be set forth in a mutually agreed to separate agreement(s) or amendment(s) to this Agreement. Notwithstanding the foregoing, and for purposes of clarity, nothing herein shall be construed in a manner that obligates any Party to enter into an agreement related to NFTs connected to or associated with a sportsbook or sports betting.

G. Metaverse: Licensor will work with Licensee in good faith on developing strategies and plans to create revenue generating opportunities relating to NFTs connected to or associated with Metaverse. For purposes of clarity, as used in this Agreement, "**Metaverse**" means concepts related to 'Gamified NFT' such as 'create, train and trade' product (user-generated avatars can be accessorized, trained, 'bred' — power ups, achievements, collections, micro-transactions and competition) when used in connection with a virtual and/or interactive environment. Licensor will use good faith efforts to include Licensee as a participant in all Licensor requests for proposals or other similar evaluation processes related to NFTs connected to or associated with Metaverse. In the event the Parties desire to jointly pursue opportunities related to NFTs connected to or associated with Metaverse, the respective rights and obligations of each Party related to such opportunity, including economic terms, shall be set forth in a mutually agreed to separate agreement(s) or amendment(s) to this Agreement. Notwithstanding the foregoing, and for purposes of clarity, nothing herein shall be construed in a manner that obligates any Party to enter into an agreement related to NFTs connected to or associated with Metaverse.

H. <u>Definitions</u>:

(i)      "**Daily Fantasy Games**" means, in accordance with applicable daily fantasy laws, rules and regulations, football-themed games (which are typically structured in the form of paid competitions on a day-to-day or week-to-week basis (i.e., are not season long games) where winners receive a share of a pre-determined pool of cash or other prizes, and do not include any interactive gameplay); the core of the experience is acquiring a team of real-world players, setting lineups against other fantasy owners, and achieving results based on statistics (with no ability to influence the in-game action). Daily Fantasy Games are not (i) action simulation games, including manager-style simulation games; or (ii) sports betting, or contests of chance dependent to a material degree upon the outcome of a future contingent event not under the consumer's control or influence notwithstanding the skill or knowledge of the consumer.

(ii)    "**Fantasy Style Games**" means, in accordance with applicable fantasy laws, rules and regulations, football themed games that are played through the prism of the user as an "owner" (e.g., game mechanics are specific to fielding a team of eligible players) and are offered to consumers during the full season. These owners build and assemble imaginary teams composed of real-world/actual players from across the applicable league to compete against fellow owners. Results may be determined on a points basis and reflect the statistical performance of the real world/actual players in the actual performance of these players on real sports teams and in real sports events. Fantasy Style Games are played by considering a number of shifting factors through strategic risk-taking and decision-making which help predict a diverse set of future events and may occur in real-time with such real sports events or may be historic or, in some cases, simulated. Owners can compete in a variety of game modes, including but not limited to head-to-head, salary cap, knockout, seasonal keeper, custom draft, and other modes in which lineups are set and scores are tabulated in different ways. Fantasy Style Games as described herein shall not mean or include Daily Fantasy Games. Fantasy Style Games are not (i) action simulation games, including manager-style simulation games; or (ii) sports betting, or contests of chance dependent to a material degree upon the outcome of a future contingent event not under the consumer's control or influence notwithstanding the skill or knowledge of the consumer.

I.    For the avoidance of doubt, upon purchase of the NFLPA Collectibles and/or Licensed Products, end users and third parties will be granted, by NFLPI, a limited, perpetual and irrevocable license to the Licensed Materials in the Licensed Products and/or NFLPA Collectibles and shall have no ability to alter, transform, extract, or make any deviations to the Licensed Materials.

J.    Reserved.

K.    <u>Term.</u> The term of this Agreement shall extend from the Effective Date to February 28, 2027 (the "**Term**") unless terminated in accordance with the provisions hereof. The period of time commencing at the Effective Date and ending February 28, 2023 shall be referred to as the "**First License Period**." The period of time commencing March 1, 2023 and ending February 29, 2024 shall be referred to as the "**Second License Period**." The period of time commencing March 1, 2024 and ending February 28, 2025 shall be referred to as the "**Third License Period**." The period of time commencing March 1, 2025 and ending February 28, 2026 shall be referred to as the "**Fourth License Period**." The period of time commencing March 1, 2026 and ending February 28, 2027 shall be referred to as the "**Fifth License Period**." Licensee acknowledges and agrees that Licensee has and shall have no right to extend or renew this Agreement beyond the Term. No conduct by either Licensor or Licensee (including without limitation, any approvals granted pursuant to Section 7) shall create, imply or infer a new license agreement or an extension of the Term, unless the same is specifically set forth in a written agreement signed by both Licensor and Licensee. The provisions of Section 12(F) (Force Majeure) may not be utilized to extend the Term.

L.    <u>Territory and Distribution.</u> Licensee has the right to distribute the Licensed Product(s) worldwide (the "**Territory**") via the following channels (each an "**Approved Distribution Channel**"):

i.    <u>Online:</u> <u>www.draftkings.com</u> and such other approved domains, owned or controlled by Licensee, that Licensee may, determine to be appropriate for purposes of facilitating the

purchasing, selling, and use of NFTs, including the Licensed Products (including via mobile devices). The proposed domains owned or controlled by Licensee that will be used for purposes of facilitating the purchasing, selling, and use of the Licensed Products shall be subject to Licensor approval, not to be unreasonably withheld. Prior to the In-Market Date, Licensee and Licensor will mutually agree to an approved list of domains and sub-domains to be used as Approved Distribution Channels. Licensee shall not be required to obtain Licensor's approval of any further sub-domains that are that are based off or extensions of a domain or sub domain that has already been approved by Licensor. The Parties acknowledge that the mutual intention of the Parties is to allow for broad distribution of the NFLPA Collectibles beyond the domains owned or controlled by Licensee. Additionally, the Parties will use commercially reasonable efforts to implement whitelist and/or blacklist domains, subject to technological feasibility.

    ii.  <u>Mobile:</u> iOS, Android (Google Play) or direct app download

M.  <u>NFL/Third Party Marks.</u> Licensor makes no representation that it has the authority to grant, nor does it grant herein, the right to utilize any symbols, insignias, logos, or other identifying names or marks of the National Football League ("**NFL**"), any of its member clubs, or any other third party (other than the NFL Players). Accordingly, Licensor hereby disclaims any liability arising out of Licensee's use of the symbols, insignia, or logos of the NFL, any of its member clubs, or any third party (other than NFL Players) in the exercise of the License granted hereunder. For clarity, it shall be the sole responsibility of Licensee, and Licensee agrees, to obtain such permission as may be necessary for the use of such symbols, insignia, or logos of the NFL, any of its member clubs, or any third party (other than NFL Players) from the appropriate rights holder.

N.  <u>No Endorsement.</u> The rights, licenses and privileges granted by NFLPI hereunder shall not constitute or be used by Licensee as a testimonial ao r an endorsement of any product, service, or event by all or any of the NFL Players, NFLPI, the NFLPA, or OneTeam. In the event Licensee is interested in securing an individual NFL Player's personal endorsement, Licensee agrees and acknowledges that such endorsement will require the personal approval of the individual NFL Player, approval of NFLPI, separate payment to NFLPI, and is subject to the terms and conditions contained in <u>Section 3</u>.

O.  <u>Excluded Players.</u> Any NFL Player who is committed individually by contract for products or services competitive with those of Licensee may be required to cease from further inclusion in this Agreement; <u>provided</u>, <u>however</u>, that the exclusion of such NFL Player shall be on an individual basis and such Player shall not be combined with the use of five (5) or more other NFL Players in a similar product which is not licensed by the NFLPA. Notwithstanding the foregoing, to the extent that ███████████████ of NFL Players (or each of the top ███████ ██████ NFL Players by revenue production as ranked by the NFLPA from sales revenue from the prior season, to the extent such NFL Players are actually on an opening day roster) on opening day rosters in any given License Period are either (i) not a party to the NFLPA group license, or (ii) excluded from this Agreement pursuant to this Section or any other section of the Agreement, the Parties agree to meet and confer to agree upon an applicable equitable adjustment in the consideration owed to Licensor pursuant to this Agreement. In the event the Parties cannot agree to an equitable adjustment, Licensee may terminate this Agreement upon written notice to Licensor.

P.  <u>Premium Giveaway Restriction.</u> Licensee shall not use or authorize use of Licensed Product as "premium items" to be included with non-Licensed Product, services or events to promote the

sale of such non-Licensed Product, services or events. Any such promotion using the Licensed Product as premium items shall require the prior written approval of Licensor. For purposes of clarity, Licensee shall take no willful or intentional action, in bad faith, where the intention is to reduce the Royalty paid to Licensor hereunder.

2. **CONSIDERATION**.

A. Minimum Guarantee Payments. Licensee agrees to pay the guaranteed amounts specified below which shall be the total minimum amount of the Royalty Share (as defined below) that Licensee shall pay to Licensor for the use of the License within the Territory for the specified time period, regardless of how many sales occur or how much revenue is generated (the "**Minimum Guarantee**"); provided that, any Royalty Share payments already made for the specified time period may be offset against the Minimum Guarantee for that time period. For the avoidance of doubt, the Parties hereto acknowledge and agree that amounts owing hereunder are due in connection with the applicable License Period for which they are earned, and may not be cross-collateralized with any other License Period during the Term.  For the sake of further clarity: (i) Royalties that are paid for each License Period will serve to draw down against the Minimum Guarantee for that License Period; (ii) in the event the total Royalties paid by Licensee for a given License Period are less than the Minimum Guarantee for that License Period, on the due date for that Minimum Guarantee as set forth below, Licensee will owe only the difference between the Minimum Guarantee and the Royalties previously paid to Licensor for that License Period; and (iii) in the event the total Royalties paid by Licensee for a given License Period exceed the Minimum Guarantee for that License Period, the Minimum Guarantee will be deemed to have been satisfied, and only the required and continued payment of applicable Royalties above the Minimum Guarantee during that License Period shall remain owing.

| License Period | Minimum Guarantee | Due Date |
|---|---|---|
| First License Period | $▮▮▮▮▮ | $▮▮▮▮▮ which may be invoiced on or after January 1, 2022 (the "**First Payment Date**"), with remaining amounts invoiceable hereunder pursuant to the Royalty Share (as defined below) on a monthly basis after the First Payment Date, subject to a True-Up within 60 days following the end of the License Period |
| Second License Period | $▮▮▮▮▮ | Royalty Share which may be invoiced on a monthly basis, subject to a True-Up within 60 days following the end of the License Period |
| Third License Period | $▮▮▮▮▮ | Royalty Share which may be invoiced on a monthly basis, subject to a True-Up within 60 days following the end of the License Period |
| Fourth License Period | $▮▮▮▮▮ | Royalty Share which may be invoiced on a monthly basis, subject to a True-Up within 60 days following the end of the License Period |
| Fifth License Period | $▮▮▮▮▮ | Royalty Share which may be invoiced on a monthly basis, subject to a True-Up within |

| | | 60 days following the end of the License Period |
| --- | --- | --- |

"**True-Up**" shall mean the payment owed by Licensee to Licensor of any amount reflecting the difference between the Royalty Share and the applicable Minimum Guarantee.

B. Royalty Share. In addition to the obligations set forth in <u>Section 2(A)</u>, Licensee shall pay Licensor a percentage of revenue derived from the Licensed Product as follows (the "**Royalty Share**", or "**Royalty**"): ███ Percent (█%) of First Net Revenue and ███ Percent (█%) of Second Net Revenue. Reasonable entry fees (i.e., fees paid by customers in order to interact with or play a game) charged directly or indirectly by Licensee in its normal course of business in connection with the Game shall be excluded from the Royalty Share.  For the avoidance of doubt, Licensee's obligation to pay to Licensor the Royalty Share on Licensed Products shall require Licensee to (i) enable (in or through its own marketplace or another access method) Secondary Sales during and beyond the Term (such sales, the "**Post-Term Sales**"); (ii) use commercially reasonable efforts to charge and collect a Transaction Fee (defined below) on all such Secondary Sales and Post-Term Sales, where actually possible; and (iii) continue to pay Licensor the Royalty on Second Net Revenue, if any, that Licensee actually collects, unless such Royalty on the Second Net Revenue is remitted directly to Licensor, based on any Secondary Sales and Post-Term Sales, in perpetuity, to the extent permitted by law (such Royalty Share, the "**Post-Term Royalty**"). Prior to the In-Market Date, the Parties will mutually agree to a plan that enables Licensee to provide necessary and appropriate services and rights to owners of Licensed Products, NFLPA Collectibles and/or Gamified NFTs as well as rights of Licensor and Licensee, as part of a reasonable wind down following expiration or termination of this Agreement (the "**Transition Plan**"). The Transition Plan shall also include additional terms and conditions to be mutually agreed upon by the Parties, including, without limitation, impact of any breach of the surviving sections of this Agreement, following expiration or termination of this Agreement.  A "**Transaction Fee**" means the fee actually received by Licensee in connection with sales of a Licensed Product by a consumer to another consumer, whether in Licensee's marketplace or otherwise.

Notwithstanding anything else to the contrary in this Agreement, upon and after termination or expiration of this Agreement (i) owners of Licensed Products may continue to hold their Gamified NFTs and/or NFLPA Collectibles in non-custodial wallets and/or DraftKings controlled custodial wallet,  and (ii) Licensee shall continue to enable and facilitate Secondary Sales of Gamified NFTs and/or NFLPA Collectibles through a DraftKings owned or controlled digital marketplace and such other approved domains; and (iii) Licensee shall in no event be permitted to market or promote the Licensed Product, provided; however, Licensee may list the Licensed Products for Secondary Sale.

C. "**First Net Revenue**" shall be defined as any fees or other amounts actually received by Licensee with respect to the Licensed Product in connection with a first sale (a "**First Sale**") to unaffiliated third parties at the invoice price, including revenue received in connection with downloads, licenses (including licensing to end users), subscriptions, sale of products (including digital goods), and any other commercialization directly or indirectly by Licensee, in each case, of or in connection with the Licensed Product ("**Gross Sales**"), less only verifiable (i) adjustments, returns or chargebacks actually credited, (ii) credit card fees, and other third-party electronic transactions processing fees, (iii) sales taxes to government authorities actually paid and associated with Licensee's sale or distribution of the Game, but expressly excluding taxes based on Licensee's net income, (iv) a mutually agreed upon amount (%) of prize pool funding and (v) any amounts charged, retained or deducted by applicable unaffiliated

distributors or platforms (including, for example, Apple Store, Google Play and opensea.io) in connection with downloads of, subscriptions for and in-game transactions and other micro-transactions in the Licensed Product; <u>provided</u>, <u>however</u>, that, except to the extent approved in advance, deductions pursuant to (v) above during any License Period shall not exceed ██ percent (██%) of the Gross Sales received during the applicable License Period. For the avoidance of doubt, Licensee shall not deduct from Gross Sales any amounts, other than the amounts contemplated in (i) and (iii) above, in connection with websites, portals and/or distribution platforms owned and/or operated by or on behalf of Licensee or any of its affiliates. None of the foregoing permitted deductions contemplate "gas" fees related to the blockchain network, or other similar operational costs or charges.

D. "**Second Net Revenue**" shall be defined as any fees or other amounts actually received by Licensee with respect to the Licensed Product in connection with a Secondary Sale (which, for clarity, shall mean and include any transaction after the First Sale (such as by a consumer to another consumer or third party after the First Sale) (each, a "**Secondary Sale**") for which Licensee receives a transaction fee or other payment), less only verifiable (i) adjustments, returns or chargebacks actually credited, (ii) credit card fees, and other electronic transactions processing fees, (iii) sales taxes actually paid to government authorities and associated with Licensee's sale or distribution of the Game or associated with the Secondary Sale, but expressly excluding taxes based on Licensee's net income, and (iv) any amounts charged, retained or deducted by third-party applicable unaffiliated distributors or platforms (including, for example, Apple Store, Google Play and opensea.io) in connection with downloads of, subscriptions for and in-game transactions and other micro-transactions in the Licensed Product; <u>provided</u>, <u>however</u>, that, except to the extent approved in advance, deductions pursuant to (iv) above during any License Period shall not exceed ██ percent (██%) of the Secondary Sales received during the applicable License Period. For the avoidance of doubt, Licensee shall not deduct from Secondary Sales any amounts, other than the amounts contemplated in (i) and (iii) above, in connection with websites, portals and/or distribution platforms owned and/or operated by or on behalf of Licensee or any of its affiliates. None of the foregoing permitted deductions contemplate "gas" fees related to the blockchain network, or other similar operational costs or charges.

E. Royalty Share shall be calculated on a monthly basis and shall be due within sixty (60) days following Licensee's receipt of an accurate and undisputed invoice.

F. In any License Period, unless otherwise agreed in advance and in writing, the total royalty amount paid by Licensee to Licensor under this Agreement (the "**Total Royalty Amount**") shall not be less than the total amounts paid by Licensee (or any of its affiliates) to the NFL (including together with any of such licensor's affiliates and/or related parties) in connection with any equivalent licensing royalties associated with First Sales or Secondary Sales of Licensed Product. For clarity, any amounts paid by Licensee to the NFL or any of its affiliates that are attributed to marketing, promotional or advertising spend shall not be counted for purposes of determining the Total Royalty Amount.

G. <u>Marketing Commitment.</u> Licensee agrees to pay to Licensor a minimum marketing commitment of ████████ Dollars ($████████) per License Period during the Term (the "**Marketing Commitment**") in exchange for marketing Activations approved by Licensee (including the payments for such Activations) and subject to all terms and conditions set forth in <u>Section 3</u> below. The Marketing Commitment shall be paid as follows:

| License Period | Marketing Spend | Due Date |
|---|---|---|
| First License Period | $ ███ | On or before February 28, 2023 |
| Second License Period | $ ███ | On or before February 29, 2024 |
| Third License Period | $ ███ | On or before February 28, 2025 |
| Fourth License Period | $ ███ | On or before February 28, 2026 |
| Fifth License Period | $ ███ | On or before February 28, 2027 |

H. <u>Annual Merchandise Credit</u>. Licensee and Licensor will work together in good faith to explore a protocol for the provision to Licensor of complimentary NFLPA Collectibles in mutually agreed upon quantities that would not be material to the expected revenues under this Agreement.

3. **MARKETING ACTIVATIONS**.

A. <u>Activations</u>. Licensee may spend the Marketing Commitment on activities that promote the Licensed Product, including but not limited to NFL Player public appearances, fan engagements, digital marketing (*e.g.*, social media posts – subject to all applicable FTC guidelines), autographs, and Content Activations (as defined herein) ("**Activations**"). All contact with NFL Players in connection with Activations and/or other promotional activity shall be through NFLPI. All Activations are subject to NFLPI approval and shall be in the form of the pre-approved player activation agreement by and among the NFLPI, OneTeam, and the applicable NFL Player (which may be amended from time to time with notice to Licensee) ("**Player Activation Agreement**"). For clarity, Licensee shall not be a party to the Player Activation Agreement. All Marketing Payment amounts shall be paid to OneTeam – and then to NFL Players through NFLPI. In the event the cost of an Activation will result in Licensee spending above the Marketing Commitment pursuant to Section 2(G), Licensee agrees to pay any such excess amount to OneTeam upon the earlier of execution of the Player Activation Agreement or performance of Activation by the player, provided that Licensee has approved the payments under such Player Activation Agreement that resulted in such excess amount. For clarity, expenditures on marketing efforts that do not include fees paid under a Player Activation Agreement shall not count toward the Marketing Commitment unless after good faith discussion between Licensee and Licensor, Licensee obtains Licensor's prior written approval of such marketing efforts.

B. <u>Content Activations</u>. Licensee may engage OneTeam Media, OneTeam's production/content affiliate ("**OTM**") to create and/or collaborate on promotional content featuring NFL Players to promote Licensee and the Licensed Product. By way of example only and without limiting the content opportunities hereunder, such content may include production of live video content (*e.g.*, for commercials, promotional videos, etc.), voiceover recordings and/or social media activations ("**Content Activation(s)**"). For the purpose of clarity, only the costs actually paid to NFL Players in connection with Content Activations shall count toward the Marketing Commitment. All Content Activations are subject to NFLPI approval and may be subject to additional terms and conditions to be mutually agreed upon by the Parties and/or OTM.

C. <u>Restrictions.</u> Players who are employed by NFL clubs (e.g., work) and/or live in a jurisdiction in which the Licensed Product is considered "gambling" or "betting" may not be available to provide services for Licensee in connection with this Agreement and Licensee agrees not to include such players in its requests for approval for Activations, unless otherwise approved in advance by Licensor following discussion between Licensor and Licensee. All Player Activation Agreements shall terminate on or before the termination or expiration of this Agreement, and each NFL Player shall have, at minimum, the termination rights consistent with that of Licensor as set forth in this Agreement.

4. **STATEMENTS; PAYMENTS.**

A. <u>Statements</u>. Commencing after the In-Market Date, Licensee shall furnish to Licensor, within five (5) business days of the end of a calendar month, a form as set forth in <u>Exhibit A</u>, on a monthly basis during each License Period (each, a "**Reporting Statement**"). Such Reporting Statements shall be furnished to Licensor whether or not any of the Licensed Product(s) have been purchased during the reporting period for which such statement is due. For clarity, Licensee shall be obligated to report on any and all Secondary Sales and/or Royalties on Secondary Sales, in each case, when such Secondary Sale occurs on or through any third-party platforms. For purposes of clarity, to the extent payment is made directly to Licensor pursuant to the applicable smart contract, Licensee's reporting obligations herein shall be deemed satisfied by reporting only on revenue actually received by Licensee. The Parties will work together in good faith to mutually agree upon post termination and/or expiration reporting obligations. The receipt or acceptance by Licensor of any statement or of any Royalty paid (or the cashing of any Royalty check paid) shall not preclude Licensor from questioning the correctness of the Royalties paid at any time. In the event any inconsistencies or mistakes are discovered in connection with the Royalties paid, such mistakes or inconsistencies shall promptly be rectified and the appropriate payment made by the appropriate Party.

B. Records. Licensee shall keep complete and accurate books of account, in accordance with generally accepted accounting practice, and supporting records containing information reasonably necessary for determining the Royalty payable to Licensor hereunder. Additionally, Licensor shall have the right once in every twelve (12) month period during the Term to direct an independent, third party accredited audit firm to inspect and audit Licensee's, or Licensee's affiliates', books of account and supporting records to verify the Royalty payable to Licensor hereunder for the twenty four (24) month period preceding the initiation of the audit, upon reasonable prior written notice, but in no event less than thirty (30) days prior written notice. The audit shall be conducted during Licensee's regular business hours, at Licensee's place of business (or wherever the relevant books and records are held), and in such a manner as not to interfere with Licensee's normal business activities. The independent third-party auditor must agree to be bound by Licensee's reasonable, market standard non-disclosure agreement. In the event any such audit reveals an inconsistency or error in the Royalty paid to Licensor under this Agreement, the deficiency shall promptly be rectified. The cost of such audit, including the fees and expenses associated with the third party accredited audit firm shall be paid by Licensor, provided that in the event such audit reveals a deficiency in the Royalty in excess of ███ percent (█%) of the Royalty paid to Licensor for the audited time period, Licensee shall pay, in addition to the deficiency, the reasonable, documented, fees and expenses of the third party accredited audit firm.

C. <u>Payments.</u> All payments owed to Licensor hereunder shall be delivered or made payable in the name of "OneTeam Partners, LLC", 1901 L Street, NW 7th Floor, Washington, D.C. 20036, or its assignee where applicable, as directed by OneTeam. Without limiting the foregoing, if any

DocuSign Envelope ID: AAEEB170-2381-48A5-8F9B-405994A2D310

undisputed payment is not made when due, which shall be sixty (60) days from the date of receipt of an accurate and undisputed invoice, Licensor shall be entitled to charge and recover interest thereon at the rate of ███████████ percent (██%) monthly, or the maximum interest permitted by law if less, on all payments not timely made by Licensee. Such interest shall be calculated from the date payment was due until the date payment is finally received. OneTeam will submit invoices for payments hereunder to ██████████████████. Any invoice delivered to the aforementioned contact will be deemed received by Licensee. Licensee shall promptly notify Licensor in writing of any change to the contact information provided in this Section 5(C) via email to ███████████████████. Upon issuing any payment to OneTeam hereunder, Licensee shall simultaneously submit to NFLPI a record of same at █████████████████ confirming that Licensee has issued such payment. In addition, Licensee shall simultaneously provide Reporting Statements to OneTeam and NFLPI (for NFLPI to ██████████████).

D.  Licensor acknowledges that Licensee and/or its affiliates are licensed by or are otherwise subject to the authority of various gaming regulatory agencies ("**Regulators**"). Licensor further acknowledges that Licensee's gaming licenses are of vital importance to its business. Licensee has adopted regulatory compliance policies, and Licensor agrees to provide Licensee, upon Licensee's reasonable request, with reasonable documentation, information, and assurances regarding itself, any principal employees, directors, officers, brokers, agents, assigns, or others as may be reasonably necessary in order for Licensee to comply with its regulatory compliance policy, provided that Licensor shall provide Licensee with all such reasonable documentation, information, and assurances in compliance with the requests or requirements of the Regulators. Licensor shall use good faith efforts to promptly notify Licensee of any material, non-public, change regarding Licensor, including, but not limited to, material ownership change, or material change in the nature of the business conducted by Licensor, which should reasonably be known to affect Licensee's ability to conduct business or the business of any of its affiliates, as qualified, licensed, or regulated by the applicable Regulators; provided, for clarity, that Licensee acknowledges and agrees that Licensor does not regularly engage in any commercial activity subject to Regulators, and thus shall not and cannot be expected to be aware of how any particular change in Licensor's business may be relevant to Licensee or any Regulators. . In the event Licensor fails to promptly comply with information requests described in this section or in the event Licensee determines, in good faith and after consultation with outside counsel, that Licensor is, or may be engaged in, or is about to be engaged in, any activity or activities that will materially and negatively impact or affect Licensee's ability to conduct business or the business of any of its affiliates, as qualified, licensed, or regulated by the applicable Regulators or any gaming licenses or permits held by those entities, or that the relationship between Licensor and Licensee could have a material adverse effect thereon or prevent Licensee from obtaining any additional gaming licenses, then Licensee shall have the right to terminate this Agreement immediately, upon written notice, and without penalty or prejudice, provided that in the event such activities or change to relationship is susceptible to cure, termination shall be as provided in Section 9(A). In the event Licensor determines, in good faith and after consultation with outside counsel, that Licensee is, or may be engaged in, or is about to be engaged in, any activity or activities that will materially and negatively impact or affect Licensor's ability to conduct business or the business of any of its affiliates, including as qualified or regulated by the United States Department of Labor, or that the relationship between Licensor and Licensee could have a material adverse effect thereon, then Licensor shall have the right to terminate this Agreement immediately, upon written notice, and without penalty or prejudice, provided that in the event such activities or change to relationship is susceptible to cure, termination shall be as provided in Section 9(A).

6.    **INTELLECTUAL PROPERTY**.

A.  <u>Intellectual Property Rights.</u>  Licensee recognizes the great value of the goodwill associated with the Licensed Materials licensed pursuant to this Agreement and acknowledges that such goodwill belongs exclusively to NFLPI and that said Licensed Materials have acquired secondary meaning in the mind of the public.  Licensee further recognizes that NFLPI retains all Intellectual Property Rights in the Licensed Materials, including, without limitation, all modifications and derivative works.  Licensee agrees that the goodwill accruing from every use of the rights licensed hereunder by Licensee shall inure to the benefit of NFLPI and that Licensee shall not at any time acquire any title or interest in such rights by virtue of any use Licensee may make of such rights hereunder.  All rights relating to the rights licensed hereunder are specifically reserved by NFLPI except for the License herein granted to Licensee to use the rights as specifically and expressly provided in this Agreement.  Licensee hereby irrevocably assigns to NFLPI all Intellectual Property Rights it may now or hereafter possess in the Licensed Materials, and all derivative works thereof and agrees (i) to take, at any actions (including reasonable execution and delivery of affidavits and other documents), reasonably requested by Licensor to effect, perfect or confirm such rights, and (ii) to retain all proprietary marks, legends and patent and copyright notices that appear on the Licensed Materials, Licensed Products and documentation delivered to Licensee by Licensor and all whole or partial copies thereof. Licensee shall cause each third party who makes or contributes to the creation of the Licensed Materials to agree that all rights, including the copyrights, in his or her work shall be owned by NFLPI and to execute necessary documents. Licensee agrees, upon request (e-mail being sufficient), to provide NFLPI with copies and/or duplicates of all Licensed Materials, and derivative works thereof in a reasonable digital format to be set by NFLPI.  Notwithstanding the contrary, each Party will exclusively own and control its respective intellectual property.  All goodwill that accrues from the licensed use of a Party's intellectual property hereunder will inure exclusively to the Party that owns the intellectual property.

B.  <u>Trademarks and Trade Names; Press Releases.</u>  During the Term and within the Territory, and subject to the other terms of this Agreement (including approval), Licensee shall have the right to indicate to the public that it is an authorized manufacturer and distributor of Licensed Products or similar designations mutually agreed to by the Parties. Notwithstanding the foregoing, no Party shall make any public announcement or issue any press release concerning the existence or terms of, or transactions contemplated by, this Agreement without the other Parties' prior written consent.  At no time during or after the Term shall any Party challenge or assist others to challenge the Intellectual Property Rights in any other Party's trademarks or the registration thereof or attempt to register any trademarks or other proprietary indicia confusingly similar to the other Party's trademarks.

C.  <u>Logos.</u> Licensee shall prominently place or cause to be placed the Licensor's "NFL Players Association (and design)" logo (hereinafter "**Logo**") on the Licensed Product(s), advertising (regardless of medium including, without limitation, print, broadcast, Internet, trade show booths, catalogues and other sales), and any other sales/marketing materials used in connection with Licensed Materials that are publicly distributed or otherwise relating to Licensed Materials. Licensee shall comply with the Style Guide at <u>Exhibit B</u>, at all times and in all respects, in relation to Licensed Materials, including with respect to the Logo.

**"Officially Licensed Partner of the National Football League Players Association©
[Year]"**

The foregoing text (Officially Licensed Partner of the National Football League Players Association© [Year]) may be amended from time to time upon notice to Licensee.  If Licensee maintains a website, Licensee shall also prominently place the Logo on a page no more than two clicks from the homepage, and on any other web page within the website promoting or utilizing the rights licensed hereunder. The Logo and the content boxes on the home page shall contain the NFLPI URL as follows: NFLPA.COM/PLAYERS and shall serve as a hyperlink to the NFLPI website at www.nflpa.com/players.

D.  <u>Notification of Unauthorized Use.</u>  Licensee shall promptly notify Licensor in writing upon its discovery of any unauthorized use or infringement of the Licensed Materials, or Licensor's Intellectual Property Rights related thereto. Licensee shall notify Licensor in writing of any infringement by others of the rights covered by this Agreement which may come to Licensee's attention, and NFLPI shall have the sole right to determine whether or not any action shall be taken on account of any such infringement. Licensee shall not institute any suit or take any action on account of any such infringement without first obtaining the written consent of Licensor to do so, which consent Licensor may grant or deny in its sole reasonable discretion. Licensee further agrees to reasonably assist Licensor to the extent reasonably necessary in the procurement of any protection or to protect any of the rights conveyed hereunder, and Licensor, if it so desires, may commence or prosecute at its own expense any claims or suits in its own name related to the protection of any of the rights conveyed hereunder. NFLPI will receive the full amount of any settlement made or damages awarded in connection with any action taken against such infringement.  Nothing in this Section 6(D) shall prevent Licensee from protecting its rights in the Licensed Product(s) separate and apart from the Licensed Materials.

E.  <u>Licensee Property.</u> Licensor acknowledges and agrees that Licensee retains all right, title and interest that it may have in and to the Licensee Property. As used in this Agreement, "**Licensee Property**" shall mean (i) Licensee's name-brand designations, marks, and logos and the related trademarks and copyrights of such; (ii) all Intellectual Property Rights in products made by License, excluding Licensed Materials; and (iii) the trademarks, copyrights and other proprietary materials (including, without limitation, trade secrets, tools, utilities, engines, subroutines, source and object codes, program logic, interactive program structures, etc.) and Intellectual Property Rights developed by or for Licensee except to the extent such rights constitute the Licensed Materials.

## 7.  APPROVALS.

A.  The Parties recognize their mutual intent and desire to develop a streamlined process for Licensor approvals of marketing, promotional, and other materials, to the extent such approval is required pursuant to this Agreement. The specific manner in which the Licensed Materials are to be used hereunder, including with respect to Licensed Product, shall, as provided herein, receive the prior written approval of Licensor.

B.  <u>Artwork and Sample Products.</u> Licensee shall submit to NFLPI for its written approval (in a form reasonably acceptable to NFLPI, which may include NFLPI's electronic submission system), such approval not to be unreasonably withheld, conditioned, or delayed (i) an electronic rendering of Artwork, plans, Photographs and any other representations of Licensed Materials produced by or for Licensee; and (ii) all scripts and story boards for proposed commercials and advertisements for any medium in connection with the Licensed Materials. Licensor shall, within five (5) business days of receipt of any such materials for approval, either approve such materials or reject such materials and provide Licensee with a description of the reasons for such rejection that is sufficient to permit Licensee to revise such materials. Such

samples shall adhere to the NFLPA Standard Terms and Style Guide. Licensee shall use good faith efforts to submit such materials in a timely fashion that allows Licensor more than five (5) business days to review such materials prior to the date of their proposed use by Licensee. Licensor shall use good faith efforts to promptly evaluate all such submissions as soon as reasonably practicable. Once samples have been approved, Licensee will use and distribute such materials in accordance with the approved samples and will not make any changes without NFLPI's prior written approval (e-mail being sufficient). No Licensed Product(s) or marketing materials utilizing the Licensed Materials shall be sold or distributed by the Licensee without such prior written approval. All samples of Licensed Products and/or Licensed Materials submitted to NFLPI shall be provided at Licensee's sole expense. Notwithstanding anything to the contrary contained herein, Licensee is solely responsible for payment of any royalties, fees, fines, or penalties arising out of the use of the Intellectual Property Rights of any third party used in connection with the Licensed Materials. Licensee shall not be required to submit to NFLPI for written approval, any electronic rendering of Artwork, plans, Photographs, or any other representations of Licensed Materials produced by or for Licensee to the extent that such final form of the Licensed Materials are solely created using, and only contain, electronic rendering of Artwork, plans, Photographs, or any other representations of Licensed Materials that were previously approved by NFLPI ("Subsequent Approved Uses"). Licensee shall provide Licensor notice of all Subsequent Approved Uses not less than five (5) business days prior to such use, regardless of any prior approval; provided the Parties agree to confer to the extent Licensor has a reasonable business justification to revoke any prior approval. The Parties will work in good faith to develop an expedited approvals process of less than twenty four (24) hours for periods reasonably identified by Licensee as high value throughout the NFL season (e.g. week one (1) of the NFL season, select prime time games, major matchups, playoffs, Super Bowl) as well as unspecified emergent opportunities throughout the season in connection with corresponding "moment-based" Licensed Product.

C.   The smart contracts to be used for the Licensed Product, shall be subject to reasonable approval by Licensor as they relate to any and all material terms and obligation under this Agreement. The end user terms and conditions (i.e., as linked to the applicable smart contracts) shall be subject to regular review with Licensor. Additionally, the Licensee shall continuously review with the Licensor any relevant and/or material changes to these end user terms and conditions. The Parties shall work together in good faith, and Licensee shall consider in good faith to review any feedback Licensor has on the user terms and conditions, to ensure these user terms and conditions as relevant smart contracts are reflective of both Parties' mutual business interests.

D.   <u>Product Development</u>.  Licensee will consult in good faith with Licensor and keep Licensor reasonably appraised as to the development and any modification of all elements of the Licensed Product(s), including, but not limited to, product and Game mechanics, product appearance (components other than the Licensed Materials which are subject to Licensor's approval in accordance with Section 7(B)), and Licensee will consider any and all feedback provided by Licensor regarding Licensee's plans for development of the Licensed Products.  Licensee's failure to comply with the foregoing shall be deemed a material breach of this Agreement, for which Licensor may terminate this Agreement if Licensee fails to timely cure such failure within ten (10) business days of receipt of written notice from Licensor.  In addition to the preceding sentence, at least once per quarter, or more frequently as mutually agreed to by the Parties, the Parties shall meet (in person or telephonically) to discuss the development of Licensed Products.  Such quarterly meeting shall be conducted at times and in a manner that is mutually acceptable to all Parties.  During such quarterly meetings, Licensor may provide feedback regarding Licensee's plans for development of Licensed Products, which

Licensee shall consider, in good faith. Any information, documents, or other materials provided or discussed in such meetings or as part of feedback provided by Licensor shall be deemed Confidential Information of Licensee. For clarity, Licensee's good faith refusal to implement any feedback or consultation provided by Licensor shall not be a breach of this Agreement, provided such refusal is (i) limited to Game mechanics, (ii) does not reflect poorly on NFL Players and/or (iii) is not reasonably expected to materially and negatively impact revenue received by Licensor under this Agreement.

E. <u>NFL Players.</u> The list of players for whom NFLPI has group licensing authorization (the "**Player Agreement Report**") is available to Licensee via the Internet at https://nflpa.com/players/resources with Licensee's "user name" and "password" to be provided by NFLPI. In addition, NFLPI may secure authorization from players not listed on the Player Agreement Report, including but not limited to retired players who have authorized NFLPI to represent such players as their exclusive license agent for inclusion in NFLPI licensing programs. Notwithstanding the foregoing, during the Term, Licensee shall submit to NFLPI a proposed list of players' names for inclusion in the Licensed Product(s) for the upcoming football season. Licensee shall cross-reference its player list against the current Player Agreement Report. After cross-referencing the lists, Licensee must submit its proposed final player list to NFLPI for approval. With regard to jersey numbers for active NFL Players, it is Licensee's sole responsibility to cross-reference its player list against player rosters posted on www.nfl.com. If applicable, jersey numbers for retired NFL Players must be submitted to NFLPI for approval. NFLPI shall respond to such submissions in writing to Licensee, signifying approval or disapproval in the case of each requested player's name, such approval not to be unreasonably withheld or delayed. Licensee may submit requests in writing to NFLPI for additions, deletions, or substitutions of players' names and NFLPI shall respond to such requests within a reasonable period of time, such approval not to be unreasonably withheld conditioned or delayed.

F. <u>No Sublicensing without Approval and Conditions.</u> Licensee may subcontract its rights under the Licensed Materials to subcontractors; provided that subcontractors shall be bound by terms and conditions materially similar to the applicable terms and conditions of this Agreement in any lower tier agreement, and Licensee shall remain responsible for all acts and omissions of any such subcontractors.

8. **REPRESENTATIONS AND WARRANTIES; DISCLAIMERS**.

A. <u>By NFLPI.</u> NFLPI represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement, to provide the licenses, and perform its obligations hereunder; (iv) it is a licensing affiliate of the NFLPA; (v) it has been duly appointed as the exclusive licensing agent on behalf of the NFL Players; (vi) it owns or controls all of the Licensed Materials and the Intellectual Property Rights therein; (vii) the Licensed Materials do not infringe, violate, or misappropriate any Intellectual Property Rights of any third party; (viii) this Agreement, and the rights and licenses granted to Licensee herein, do not conflict with or violate any other agreement, contract or obligation of NFLPI or NFLPA; (ix) it will comply with all applicable laws and regulations.

B. <u>By OneTeam.</u> OneTeam represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of

incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement, to provide the licenses, and perform its obligations hereunder; (iv) it is an affiliate of NFLPI and the NFLPA; and (v) it will comply with all applicable laws and regulations.

C. <u>By NFLPA.</u> NFLPA represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement, to provide the licenses, and perform its obligations hereunder; and (iv) it will comply with all applicable laws and regulations.

D. <u>By Licensee.</u> Licensee represents and warrants that (i) it is a corporation or entity duly organized, validly existing and in good standing under the laws of its applicable jurisdiction of incorporation or organization; (ii) it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement; (iii) it has the full right, power and authority to enter into this Agreement and perform its obligations hereunder; (iv) Licensee will comply with the NFLPA Standard Terms and Style Guide; (v) all elements (including all material of any nature utilizing in any way the rights licensed hereunder, including all packages, cartons, point of sale material, newspaper and magazine advertisements) of the Licensed Products, excluding the Licensed Materials, shall comply with all applicable laws, rules and regulations; (vi) the Licensed Products being administered by Licensee shall comply with all applicable laws; (vii) in the event Licensee becomes aware that Licensee's use of the rights granted hereunder and/or the Licensed Products becomes subject to regulatory action by any securities, gaming or financial regulatory authority, Licensee will promptly notify Licensor (if permitted by applicable law, and without disclosure of confidential information) and upon request from Licensor, cease all use of the Licensed Rights until and unless continued use is mutually agreed upon by the Parties; and (viii) Licensee has not and will not, during the Term or at any time after: (a) challenge or attack any right, title or interest of NFLPA, NFLPI or OneTeam in and to the Licensor's Intellectual Property Rights or the Licensed Materials or an NFL Player's ownership of such NFL Player's Identity, nor shall Licensee knowingly assist others in so doing; (b) secure or seek to secure, directly from any player who is under contract to an NFL club or is seeking to become under contract to an NFL club (i.e. participating in the NFL draft or the NFL combine), or from such player's agent, permission or authorization for the use of such player's Identity in conjunction with the Licensed Product(s); or (c) intentionally or negligently do anything that could in any way damage the reputation or goodwill associated with the Licensed Materials.

## 9. TERMINATION; EFFECT OF TERMINATION; SURVIVAL.

A. <u>Termination.</u>

    i. Either Party may terminate this Agreement upon written notice to the other Party: (1) in the event such other Party fails to perform or breaches any material term of this Agreement, provided that the non-breaching Party provided a prior, separate written notice to the breaching Party specifying the nature of the failure and such failure to perform continued for a period of thirty (30) days after receipt of such separate written notice; (2) immediately, in the event that the performance of such other Party's obligations under this Agreement would be in violation of any law, rule, regulation, or order

applicable to such other Party (whether now known or hereafter adopted) and the failure to comply with such law, rule, regulation, or order would have a material adverse effect on the terminating Party; provided, that in the event the nature of such violation of law, rule, regulation, or order is susceptible to cure without material adverse effect on the terminating Party, termination shall be as provided in Section 9(A)(i)(1); or (3) any governmental, administrative, or adjudicatory body (e.g., the Securities and Exchange Commission or state regulatory authorities) determines that the Licensed Product is a security.

ii.     Licensor may terminate this Agreement upon written notice to Licensee in the event: (1) Licensee engages in any unauthorized use of the Licensed Products and/or Licensed Materials and fails to cure such authorized use within thirty (30) days after receipt of written notice from Licensor; (2) Licensee fails to make timely payment of any undisputed amount due under this Agreement and fails to timely cure such failure within ten (10) business days of receipt of written notice from Licensor; (3) Licensee does not introduce and offer for sale the Licensed Product on or before the In-Market Date; or (4) immediately upon written notice to Licensee in the event that NFLPA determines, in its sole discretion, that NFLPA or NFL Players are at risk of regulatory, civil, criminal or employment related action due to the existence of this Agreement.

iii.    Any Party may terminate this Agreement upon written notice in the event any other Party files a petition in bankruptcy or is adjudicated as bankrupt, or if a petition in bankruptcy is filed against any such Party or if such Party becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy laws, or if such Party discontinues its business, or if a receiver is appointed for it or its business (and, in the event of such termination, neither such Party nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to sell, exploit or in any way deal with the rights granted hereunder or with any Licensed Products or any carton, container, packaging or wrapping material, advertising, promotional or display material pertaining to any Licensed Materials) and such proceedings, receivership, assignment, or insolvency is not dismissed, discharged or withdrawn within sixty (60) days.

iv.     ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████████████████████████████████ .

B.  Effect of Termination.

i.      Upon expiration or termination of this Agreement for any reason, all rights granted to Licensee under this Agreement shall automatically and immediately cease and revert to Licensor and Licensee will refrain from further use of such rights or any further reference thereto, direct or indirect. Licensee acknowledges that its failure to cease the use of such rights at the termination or expiration of this Agreement may result in immediate and irreparable damage to OneTeam, NFLPA, NFLPI and/or individual Player(s), and to the rights of any subsequent licensee(s). The expiration or earlier termination of this Agreement will not relieve any Party from its obligation to pay any monies due to the other Party for any period prior to the effective date of such expiration or termination.

ii.     Notwithstanding anything in this Agreement to the contrary, to the extent that any consumer has acquired a Licensed Product prior to expiration or termination of this

DocuSign Envelope ID: AAEEB170-2381-48A5-8F9B-405994A2D310

Agreement, that consumer will have the right to continue owning (including retaining, selling/transferring, displaying and/or otherwise exploiting) the Licensed Product (and will continue to own the associated NFT) following the expiration or termination of this Agreement and Licensee will have the right to continue to provide a digital marketplace for such Licensed Products, subject to any applicable terms and conditions set forth in the Transition Plan.  For the avoidance of doubt, the Parties agree Secondary Sales of the Licensed Products shall be permitted after expiration or termination hereof, subject to payment of the Post-Term Royalty in accordance with Section 2(B), and Licensee's compliance with all obligations hereunder.

    **iii.**    In the event Licensor terminates this Agreement due to Licensee's uncured material breach of this Agreement in accordance with Sections 7(D), 9(A)(i)(1), 9(A)(i)(2), 9(A)(ii)(1), 9(A)(ii)(2), and/or, 9(A)(ii)(3), Licensee shall pay any remaining Minimum Guarantee payment  (minus any Royalty Share payments already made for the License period) applicable to the License Period in which the termination occurs, and any Royalty Share payments (above such Minimum Guarantee) due and owing, if any. Licensor will use good faith and commercially reasonable efforts to mitigate its damages in the event of termination of this Agreement and license the Licensed Materials for inclusion and use in applicable category, and any Minimum Guarantee payment required to be made by Licensee under this Section 9(b)(iii) shall be reduced to the extent and in the amount Licensor is able to mitigate its damages and license the Licensed Materials for inclusion and use in Games.

C.   <u>Survival.</u> Sections 1(I), 6(E), 9(B)(ii), 9(C), 10(A)-(C), 11, 12, 13(A), 13(B), 13(D), 13(F), 13(G), 13(I), 13(K), and 14 of this Agreement (together with all definitions pertinent to the foregoing sections and all other provisions of this Agreement that reasonably may be interpreted as surviving the expiration or earlier termination of this Agreement) will survive any such expiration or termination.

## 10.  **INDEMNIFICATION; INSURANCE**.

A.   <u>Indemnification by Licensee.</u> Licensee will defend, indemnify and hold harmless Licensor, their respective parent organizations, affiliates, officers, directors, employees and members, and any of their respective successors or assigns, and NFL Players (collectively, "**Licensor Indemnitees**"), from and against any and all claims, suits, losses, damages and expenses (including reasonable outside attorney's fees and expenses), resulting from third party claims made or suits brought against any Licensor Indemnitee to the extent based on Licensee's breach of this Agreement (each a "**Licensor Claim**").

B.   <u>Indemnification by Licensor.</u> NFLPI and OneTeam, each with respect to its rights, duties and obligations hereunder,   will, defend, indemnify and hold harmless Licensee, its parent organizations, affiliates, officers, directors, and employees, and any of their respective successors or assigns (collectively "**Licensee Indemnities**), from any liabilities, losses, damages, and expenses (including reasonable attorneys' fees and expenses) resulting from claims made or suits brought against Licensee Indemnities based upon breach of this Agreement by one or more of NFLPA, NFLPI, and/or OneTeam (each a "**Licensee Claim**"). Collectively, Licensee Claims and Licensor Claims shall each be a "**Claim**".

C.   <u>Indemnification Procedures.</u>  With regard to indemnification, whenever the Party obligated to indemnify the other Party (the "**Indemnifying Party**") has an obligation to indemnify the Party being indemnified (the "**Indemnified Party**") under this Agreement, the following procedures

shall apply: The Indemnified Party shall promptly notify the Indemnifying Party in writing of any Claim in respect of which indemnity may be sought, which notice shall assert such indemnification claim and describe the basis for indemnification. The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that such failure shall have adversely prejudiced the Indemnifying Party. The Indemnifying Party shall have the right to control the defense and settlement of the Claim and to appoint lead counsel reasonably satisfactory to the Indemnified Party, unless such lead counsel is required by the Indemnifying Party's insurer, in each case at the Indemnifying Party's expense. The Indemnified Party shall have the right to appoint co-counsel in any Claim, at the Indemnified Party's own expense.  In the event the Indemnifying Party does not within a reasonable time assume control of such settlement or defense, the Indemnified Party shall have the right to control such defense and settlement at the Indemnifying Party's expense. The Party not controlling such defense or settlement may participate therein at its own expense. The Parties shall reasonably cooperate with each other in the defense and settlement of such Claim, at the Indemnifying Party's reasonable cost and expense. The Indemnified Party shall not agree to any settlement of such Claim without the prior written consent of the Indemnifying Party, and the Indemnifying Party shall have no obligation to indemnify the Indemnified Party for any Claim settled by the Indemnified Party without the prior consent of the Indemnifying Party. The Indemnifying Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of such Claim in the event the settlement does not release the Indemnified Party and its affiliates from all liabilities and obligations with respect to such Claim, requires any action by the Indemnified Party, imposes injunctive or other equitable relief against the Indemnified Party or any of its affiliates, or involves an admission of fault or wrongdoing by the Indemnified Party or any of its affiliates. In the event an Indemnified Party violates this Section 10(C) with respect to any Claim for indemnification, the Indemnified Party shall have no further right to indemnification for such Claim.

D. <u>Insurance.</u> Each Party shall procure and maintain at its own expense, or establish a self-insurance program to provide for, comprehensive commercial general liability insurance providing adequate protection for Licensee and Licensor against claims or suits in amounts no less than of at least ▉▉▉▉▉▉▉ Dollars ($▉▉▉▉▉▉) per occurrence and ▉▉▉▉▉▉▉ Dollars ($▉▉▉▉▉) in the aggregate.  Such insurance shall: (i) be underwritten by a carrier rated at least A-VIII in Best's Key Rating Guide licensed in the Territory; (ii) remain in force at all times during the Term and for a period of one (1) year thereafter; (iii) be primary (not contributory) as to any other insurance in force; and (iv) name OneTeam, NFLPI, NFLPA and their respective officers, agents and employees as additional insureds (in the case of Licensee's insurance policies) and Licensee and its affiliates and their respective officers, agents and employees (in the case of OneTeam and NFLPI insurance policies).  Within ten (10) days of written request of a Party, the other Party shall furnish the requesting Party with a certificate of insurance naming such Party and their respective officers, agents, and employees as additional insureds. If any such insurance includes or permits a waiver of subrogation, such waiver shall apply to the insured Parties.  If any such insurance provides for a waiver of subrogation in the event that such waiver is required by a third party agreement, then this Agreement shall be deemed to require such waiver.  Any claims covered by a Party's insurance policies shall not be offset or reduced in any amount whatsoever by any other insurance which an insured Party may independently maintain. Each Party shall notify the other Parties of all claims regarding the Licensed Materials and Licensed Products under any of the foregoing policies of insurance promptly upon the filing thereof. No Party's indemnification obligations hereunder shall be limited by the amount of insurance requirements hereunder.

11. **LIMITATION OF LIABILITY.**

LIMITATION OF LIABILITY. EXCEPT FOR CLAIMS UNDER SECTION 10 (INDEMNIFICATION) AND SECTION 12 (CONFIDENTIALITY) AND EXCEPT FOR CLAIMS RESULTING FROM GROSS NEGLIGENCE, WILLFUL MISCONDUCT (INCLUDING FAILURE TO MAKE PAYMENTS UNDER THIS AGREEMENT), OR FRAUD, EACH OF LICENSOR'S, ON THE ONE HAND, AND LICENSEE'S, ON THE OTHER HAND, MAXIMUM AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL BE LIMITED TO THE GREATER OF (I) THE AMOUNT PAID OR PAYABLE BY LICENSEE TO LICENSOR HEREUNDER DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENTS FIRST GIVING RISE TO THE CLAIM AND (II) ███████ ████ DOLLARS ($███████). IN NO EVENT SHALL A PARTY BE LIABLE TO ANOTHER PARTY (WHETHER IN CONTRACT, WARRANTY TORT (INCLUDING NEGLIGENCE OR OTHER THEORY) OR ANY OTHER INDIVIDUAL OR ENTITY FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES (INCLUDING DAMAGES FOR LOSS OF PROFIT, REVENUE, BUSINESS OR DATA), HOWEVER CAUSED, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. FOR CLARITY, ANY FINES OR PENALTIES IMPOSED BY ANY REGULATOR SHALL NOT BE CONSIDERED SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES.

12. CONFIDENTIALITY; PRIVACY. Except as otherwise expressly set forth herein, no Party may disclose or make available any Confidential Information without the prior written consent of the other Parties. A Party may disclose Confidential Information only to those of its officers, directors, employees, members, shareholders, attorneys, agents, and professional advisors (collectively, "**Representatives**") that have a need to know such information and are bound by confidentiality obligations no less restrictive that those set forth herein, provided that each Party is and will remain responsible for the acts and omissions of its Representatives hereunder. Each Party will protect and keep confidential the Confidential Information, using at least reasonable care and at least the same degree of care as such Party would use with its own confidential information of a similar nature. The receiving Party will use Confidential Information solely as reasonably necessary to perform its obligations and/or exercise or enforce its rights under this Agreement and for no other purposes. The receiving Party may disclose Confidential Information to the extent necessary to comply with applicable law or legal process, provided that the receiving Party will give the disclosing Party prompt notice thereof, to the extent not prohibited by law, and facilitate and comply with any protective order imposed on such disclosure, and the disclosing Party's expense. The receiving Party shall promptly notify the disclosing Party in writing upon learning of any unauthorized use or disclosure of Confidential Information, to the extent not prohibited by law. Notwithstanding anything to the contrary, Licensee may disclose the terms and conditions of this Agreement and such non-public, confidential, or proprietary information as it reasonably deems necessary or advisable to any gaming authority or other governmental entity pursuant to any gaming laws to which it is subject. Upon written request of a Party, a Party will return to the other Party, or destroy, as directed by the disclosing Party, all materials, in any medium, which contain, embody or reference any Confidential Information of the other Parties; provided, however that the receiving Party may retain copies of Confidential Information, subject to the confidentiality requirements herein, to the extent required by the receiving Party's commercially reasonable record retention policies, to the extent necessary to comply with legal and/or regulatory requirements, or to the extent any Confidential Information that is contained in an archived computer system backup that was made in accordance with receiving Party's security and/or disaster recovery procedures. Notwithstanding the return of Confidential Information, each Party will continue to be bound by its obligations of confidentiality under this Agreement for a period of two (2) years after the expiration or termination of this Agreement, except for information that qualifies as a trade secret under applicable law, which will

continue to be subject to the confidentiality obligations of this Agreement for so long as such information remains a trade secret. The Parties agree that in the event of any actual or threatened breach of the confidentiality obligations hereunder, the Party who disclosed the Confidential Information will have no adequate remedy at law and will be entitled to seek injunctive or other equitable relief to prevent such breach, without the necessity of posting a bond, in addition to all other remedies available at law or in equity.  Licensor shall not under any circumstances provide any non-public information relating to any NFL Player (other than information specifically embedded in the Licensed Materials) ("**PII**") to Licensee hereunder without Licensee's prior written consent in each case.  Provided Licensor has obtained such consent to provide PII to Licensee, Licensee shall not knowingly or negligently engage in any unauthorized use of, or disclose to any third parties, any such PII.

13. **MISCELLANEOUS.**

   A.  Other Definitions.

   i.  "**Artwork**" means all artwork produced under the License to the extent that it incorporates the Identities.

   ii.  "**Group Player Rights**" means the right to use the Identities of six (6) or more active NFL Players, regardless of team affiliation and whether that number is reached using such rights simultaneously or individually, in any form, media or medium (now known or hereafter developed) during a consecutive twelve (12) month period.

   iii.  "**Identities**" means the names, images, likenesses, nicknames, initials, persona, personal indicia, jersey numbers, autograph/signatures (including facsimiles), voices, pictures, photographs, animation, identities, statistics, data, copyrights, biographical information and/or other identifying characteristics of NFL Players (as defined herein).

   iv.  "**Intellectual Property Rights**" means all forms of intellectual property rights and protections including without limitation, all right, title and interest arising under U.S. common and statutory law and the laws of other countries to all: (i) proprietary indicia, trademarks, trade names, symbols, logos and/or brand names; (ii) trade secret rights and equivalent rights; (iii) copyrights, other literary property or authors rights, whether or not protected by copyright or as a mask work; and (iv) patents and all filed, pending or potential applications for patents, including any reissue, reexamination, division, continuation or continuation-in-part applications throughout the world now or hereafter filed.

   v.  "**Licensed Materials**" means the NFLPA Trademarks, the Identities, Artwork, Secondary Marks.

   vi.  "**NFL Player**" means each such player included in and covered by NFLPI licensing programs, whether via the group licensing assignment, Standard NFL Player Contract, or by separate authorization.

   vii.  "**NFLPA Trademarks**" means the proprietary indicia, trademarks, trade names, symbols, logos and/or brand names controlled by NFLPI or its affiliates which may be amended from time to time by NFLPI.

   viii.  "**NFLPA Standard Terms**" means the policy attached hereto as **Exhibit D**.

ix. "**Photographs**" means all photographs of player Identities taken by Licensee. For clarity, Licensee shall not own the Identities within the Photographs, and Licensee acknowledges it shall have no right to use or exploit Photographs with Identities following the expiration or termination of this Agreement.

x. "**Secondary Marks**" means all player-themed secondary marks and/or promotional concepts developed for use and used in connection with the Licensed Product that develops secondary meaning or substantial consumer recognition with respect to individual players or NFLPI.

xi. "**Style Guide**" means the policy attached hereto as **Exhibit B**.

B. Non-Disparagement; Moral Turpitude. No Party, nor its affiliates, employees, officers and/or spokesperson(s) (excluding, for clarity, any NFL Player) shall commit any act or do anything which could reasonably be construed to bring any other Party, or a NFL Player into public disrepute, contempt, scandal, or ridicule, or which might be reasonably construed to reflect unfavorably on any other Party. No Party shall make any public statement disparaging the reputation, products, or services of any other Party or its affiliates. Violation of this provision is hereby deemed an incurable, material breach allowing for immediate termination of the Agreement within thirty (30) days of the non-breaching Party first becoming aware of such violation in the sole discretion of such non-breaching Party, provided that neither of OneTeam, NFLPA, and NFLPI may exercise such termination right due to a violation of this provision by any of OneTeam, NFLPA, or NFLPI.

C. Independent Contractors. The relationship of Licensor and Licensee established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either Party the power to direct and control the day-to-day activities of the other, (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking, or (iii) allow any Party to create or assume any obligation on behalf of any other Party for any purpose whatsoever.

D. Confidential Information. "**Confidential Information**" means information disclosed by a Party to the other Party or materials made available to or developed by outside organizations or individuals for the use of a disclosing Party, whether orally, visually, or in written form, including but not limited to the terms and conditions of this Agreement, trade secrets of each Party, any information relating to each Party's product plans, designs, ideas, concepts, costs, prices, finances, marketing plans, business opportunities, personnel, research, development or know-how, technology, documentation, processes, algorithms, proprietary information, and any other technical or business information of each Party. The term "Confidential Information" shall not include, information that (i) is already known by or available to the public through no fault of the receiving Party, (ii) was already in the possession of the receiving Party on a non-confidential basis, (iii) is independently developed by the receiving Party without the use of any Confidential Information provided by the disclosing Party, or (iv) the receiving Party rightfully obtains from a third party who, to the receiving Party's reasonable belief, has the right, without obligation to the disclosing Party, to transfer or disclose such information.

E. No Assignment, Transfer or Encumbrance. No Party shall assign, transfer, delegate, or otherwise grant an encumbrance of any of its rights or obligations under this Agreement, or this Agreement in its entirety, to any other Party without the other Parties' prior written consent, which such Parties may grant or deny in its sole and absolute discretion; provided, however, that any Party may assign this Agreement without the prior written consent of the other Parties

in connection with a merger, acquisition, sale of all or substantially all of such Party's assets, or any similar transaction (including to an affiliate). Further, any attempt by Licensee to grant a security interest in the Licensed Materials or assign, transfer, or otherwise encumber any portion of the Agreement in violation of this section, shall be null and void. For clarity, nothing in this Agreement shall limit Licensee's right to grant a security interest or other encumbrance with respect to any assets, including any Intellectual Property, owned by the Licensee or its affiliates. Nothing in this section shall inhibit any Party's termination rights pursuant to <u>Section 9</u>. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their permitted successors and assigns.

F.  <u>Force Majeure; Governing Law; Binding Effect.</u>  In the event any Party is unable to perform any of its obligations under this Agreement due to an event beyond the control of that Party, including natural disaster, acts of God, fire, actions or decrees of governmental bodies, act of war, terrorism, strikes, lockouts, work stoppages, labor disputes, failure or discontinuance of the Internet or failure of communications lines or networks (each a "**Force Majeure Event**"), that Party will use commercially reasonable efforts to resume performance of its obligations but will have no liability to the other Party for failure to perform its obligations under this Agreement for so long as it is unable to do so as a result of such event, provided that in the event the NFL Players strike or otherwise engage in a concerted work stoppage, such strike or work stoppage shall not relieve the NFLPA, NFLPI, or OneTeam of their respective obligations under this Agreement.  The affected Party shall give prompt written notice to the other Party and shall be excused on a day-to-day basis to the extent such Force Majeure Event continues (and the non-affected Party shall likewise be excused from performance on a day-to-day basis to the extent its performance relates to the delay or performance so prevented). The affected Party shall use commercially reasonable efforts to minimize and remediate the cause of non-performance and resume performance upon removal of such cause. This Agreement shall be governed by and construed under the laws of the State of New York of the United States of America, without reference to conflicts of law principles that may require application of the law of any other state.  Any action arising out of or related to this Agreement shall be initiated and maintained in a forum of competent jurisdiction within New York County, New York, and the Parties irrevocably agree to the exclusive jurisdiction of the federal and state courts located in the State of New York.

G.  <u>Interpretation; Severability; Counterparts.</u>  This Agreement is the product of negotiations between the Parties, and any rules of construction relating to interpretation against the drafter of this Agreement, or any provision herein, shall not apply to this Agreement and are expressly waived.  The headings of sections and subsections in this Agreement are for convenience of reference only and are not intended to restrict, affect or otherwise influence the interpretation or construction of this Agreement. Signatures that are transmitted electronically or by facsimile will have the same effect as original signatures.  In the event that any provision of this Agreement is held invalid or unenforceable by a court or other governmental authority of competent jurisdiction, the Parties shall endeavor in good faith to agree to such amendments that will preserve, as far as possible, the intentions expressed in this Agreement.  If the Parties fail to agree on such an amendment, such invalid term, condition or provision will be severed from the remaining terms, conditions and provisions, which will continue to be valid and enforceable to the fullest extent permitted by law and the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.  FURTHER, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT IN THE EVENT ANY REMEDY UNDER THIS AGREEMENT IS DETERMINED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE, ALL LIMITATIONS OF LIABILITY AND EXCLUSIONS OF DAMAGES OR OTHER

REMEDIES REMAIN IN EFFECT. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

H.  <u>Expenses.</u> All expenses, including all legal, accounting, financial, advisory, consulting, and other fees incurred in connection with the negotiation or effectuation of this Agreement will be the obligation of the respective Party incurring such expenses, unless (and only to the extent) the Parties may expressly agree otherwise in writing.

I.  <u>Notices; Amendment; Modification; Waiver.</u>  All notices and other communications hereunder (including any consents) shall be in writing and shall be deemed effective when (i) delivered personally, (ii) 3 business days after being mailed by first class mail, postage prepaid, or 1 business day after being sent by a reputable overnight delivery service, postage or delivery charges prepaid, to the Parties at their respective addresses stated in this Agreement.  Notices also may be given to NFLPA, NFLPI, and OneTeam by electronic mail and will be effective on the date transmitted if confirmed by a signed original sent in the manner provided in the preceding sentence.  Copies of notices to Licensor shall also be sent to NFL Players Inc., 1133 20th Street NW, Washington, DC 20036 Attn: Corporate Counsel and OneTeam Partners, LLC 1901 L Street, NW 7th Floor, Washington, DC 20036 Attention Chief Legal Officer.  Notices to Licensee shall be sent to the address listed on page 1 of this Agreement, ATTN: Jason Robins, with a copy, which shall not constitute notice, to the address listed on page 1 of this Agreement, ATTN:  Stanton Dodge. This Agreement may be amended, modified or supplemented by the Parties but only in a writing that is signed by a duly authorized representative of each Party. No waiver by a Party with respect to this Agreement will be effective or enforceable against a Party unless in writing and signed by that Party.  Except as otherwise expressly provided herein, no failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by a Party, and no course of dealing between or among any of the Parties, will constitute a waiver of, or will preclude any other or further exercise of the same or any other right, power or remedy.

J.  <u>Further Assurances.</u>  Each of the Parties hereto shall, and shall cause its respective affiliates to, from time to time at the request of the other Party, without any additional consideration, furnish the other Party such further information or assurances, execute and deliver such additional documents, instruments and conveyances, and take such other actions and do such other things, as may be reasonably necessary or appropriate to carry out the provisions of this Agreement and give effect to the transactions contemplated hereby.

K.  <u>; Entire Agreement</u>. This Agreement (including, without limitation, all Exhibits attached hereto) sets forth the entire agreement and understanding of the Parties relating to the subject matter herein and merges all prior discussions between them.  Notwithstanding anything herein to the contrary, in the event of a conflict between the terms of Sections 1 to 14 of this Agreement on the one hand, and the Standard Terms on the other hand, the terms of Sections 1 to 14 of this Agreement will supersede and control.

14.  DK PLAYER RESERVE. NFLPA, NFLPI, and OneTeam acknowledge that DraftKings Inc. has established DK Player Reserve LLC as a legally separate and independent subsidiary for the sole purpose of holding and managing a segregated account (within the meaning of 940 C.M.R. 34.00) restricted to funds owned by DraftKings Inc. players (the "**Segregated Account**"). The sole purpose of the Segregated Account shall be to hold customer deposits and player winnings. NFLPA, NFLPI, and OneTeam hereby acknowledge and agree that funds in the Segregated Account are properties of DK Player Reserve LLC and do not belong to DraftKings Inc. and shall not be available to pay

DocuSign Envelope ID: AAEEB170-2381-48A5-8F9B-405994A2D310

any of the claims of NFLPA, NFLPI, and/or OneTeam. Notwithstanding the foregoing, DraftKings Inc. acknowledges and agrees that:

A. DK Player Reserve LLC has no rights under the Agreement including, but not limited to, any rights to use the Licensed Materials (and DraftKings Inc. hereby undertakes to Licensor that DK Player Reserve LLC shall not use the Licensed Materials); and

B. DraftKings Inc. shall not be entitled to transfer, assign, sublicense, subcontract or otherwise seek to dispose of its rights or obligations under this Agreement and/or this Agreement to DK Player Reserve LLC, and that any such transfer, assignment, sublicense, subcontract or disposal shall be deemed a material breach of the Agreement.

**[SIGNATURE PAGE FOLLOWS]**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, NFLPA, NFLPI, OneTeam and Licensee, intending to be legally bound, hereby execute this Agreement as of the Effective Date and agree as set forth in this Agreement:

**NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED**

By: _____
        Steven Scebelo

Name: _____

Title: _____
                President

**DRAFTKINGS INC.**

By: _____
        Jason Robins

Name: _____
                Jason Robins

Title: _____
                CEO DraftKings

**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION**

By: _____
        Teri Smith

Name: _____
                Teri Smith

Title: _____
                Chief Operating Officer

**ONETEAM PARTNERS, LLC**

By: _____
        Henry Lowenfels

Name: _____
                Henry Lowenfels

Title: _____
                Chief Product Officer

Exhibit A

**Reporting Statement Template**

Total Net Revenue and Royalties, by Access Method and Player
Total Gross Sales
First Sales
Secondary Sales
First Net Revenue
Second Net Revenue
Per Unit Sales by Player
Transaction Fees actually charged
Full accounting of Deductions
Units/Packs

**Exhibit B**

**NFLPI Style Guide - to be found at the following address:**

https://nflpaweb.blob.core.windows.net/website/Departments/Players-Inc/FY22-NFLPA-Style-Guide.pdf

DocuSign Envelope ID: AAEEB170-2281-48A5-8F9B-405994A2D210

**Exhibit C**

**RESERVED**

## Exhibit D

### LICENSEE STANDARD TERMS

### I.        Introduction

The NFL Players Association and NFL Players Incorporated (collectively referred to herein as " **NFLPA**")  are committed to conducting their business affairs in a socially responsible and ethical manner consistent  with  their respective missions. In furtherance of this commitment, the NFLPA requires that all licensees of NFLPA licensed product adhere to the following Licensee Standard Terms (the "**Terms**").

### II.        Application

These Terms shall apply to all Licensees and Licensee Affiliates. "**Licensee**" shall include any person or entity who  has  entered  into  a  written  license  agreement  with  NFLPA ("**License**"). "**Licensee Affiliates**" shall include Licensee's parent organization, subsidiaries, affiliates, officers, directors,  or any other related entities throughout the world which create, produce, assemble, package, distribute, promote and/or sell materials pursuant to the Licensed Products contemplated herein ("**Licensed Products**"). As a condition of being permitted to produce and/or sell Licensed Products, each Licensee must comply, and shall cause all Licensee Affiliates to comply, with these Terms and the NFLPA's Online Distribution Policy which is fully integrated into these Terms and may be found  here:  **https://www.nflpa.com/players/nfl-players-inc-online-distribution-policy**. Further, by entering into a License with NFLPA, Licensee represents that it is in compliance with these Terms. In the event that Licensee has failed to materially comply with these Terms, then NFLPA may provide written notice to Licensee including a reasonable description of such non-compliance and, in the event Licensee has not cured such non-compliance within thirty (30) days, may either terminate the License or require that Licensee implement a corrective action plan on terms acceptable to NFLPA.

### III.        Standards

Licensee and Licensee Affiliates  agree to operate work places  and contract with companies whose work places  adhere to the standards and practices described below.

1. Legal Compliance. Licensee and Licensee Affiliates must materially comply with all applicable legal requirements of the jurisdiction in which it conducts its business and business  related  to  or  involving  the  creation,  production,  assembly,  packaging, distribution, promotion and/or sale of Licensed Products. Where there are differences or conflicts with the Terms and the laws of the jurisdiction, the higher standard shall prevail. Licensed Products shall not be manufactured or produced in any manner that is inconsistent with these Terms.

2. [reserved]

3. [reserved]

4. Employment Standards. Licensee and Licensee Affiliates shall comply with the following employment  standards:

A. *Wages and Benefits:* Licensee shall pay employees, at a minimum, wages and benefits which comply with all applicable laws and regulations of the jurisdiction in which Licensee conducts its business.

B. *Child Labor*: The use of child labor is not permissible in any circumstance. Workers must be at least fourteen (14) years of age unless the laws of the applicable jurisdiction where the work is to be performed requires a higher legal minimum working age.

C. *Forced Labor*: The use of forced labor and prison labor is not permissible in any circumstance. Labor supplied by prisoners working within the United States pursuant to a lawfully authorized work program sponsored by the U.S. government or State government will only be permissible if the Licensee obtains NFLPA's prior written consent.

D. *Freedom of Association and Collective Bargaining*: Licensee shall recognize and respect the right of employees' freedom of association and collective bargaining. No Licensee shall harass, intimidate, or retaliate against employees who freely associate or bargain collectively. Licensees shall not cooperate with any organizations that prevent workers from organizing a union of their choice. Licensee shall allow union organizers free access to employees. Licensee shall recognize the union of the employees' choice.

E. *Health and Safety:* Licensee must provide workers with a safe and healthy work environment. The health and safety of workers is subject to Title 29 CFR of the Federal Terms of Regulations, enforced by Federal OSHA (Occupational Safety and Health Administration).

F. *Nondiscrimination:* Licensee shall take commercially reasonable steps to prevent discrimination by Licensee as it relates to hiring, salary, benefits, advancement, discipline, termination or retirement, on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion, social or ethnic origin, or otherwise.

G. *Harassment or Abuse:* Licensee shall treat all employees and persons involved in the creation, production, assembly, packaging, distribution, and/or sale of Licensed Products with dignity and respect. In no event shall Licensee cause or knowingly permit any person to be subject to any physical, sexual, psychological, or verbal harassment or abuse.

H. *Legal System:* Licensed Products bearing the name, trademarks, or images of NFLPA shall not be manufactured or produced in any jurisdiction, mutually agreed to by Licensor and NFLPA in good faith, where changes to the legal system of such jurisdiction would prevent NFLPA from protecting its name, trademarks, images, or other interests, or from implementing any provision of these Terms.

I. *Political, Economic, Social Environment:* Licensed Products shall not be manufactured or produced in any jurisdictions in which such activities would violate the U.S. Department of Treasury Office of Foreign Assets Control sanctions programs.

## IV.    Sales Guidelines

**All materials created pursuant to the License or in connection with the Licensed Products are subject to review and approval by NFLPA prior to use.** NFLPA in its sole discretion, retains the right to disapprove any materials deemed to suggest an endorsement by the NFLPA and/or NFL players, or that reflects unfavorably upon the NFLPA and/or NFL players. Specifically, the NFLPA retains the right to disapprove any materials that promote or otherwise reference certain prohibited categories, including, but not limited to:

      A.   Illegal products and services
      B.   Alcohol and tobacco products
      C.   Illegal Lotteries/Illegal Gambling goods and services
      D.   Social cause/issue advocacy
      E.   Dietary/Nutritional supplements and products
      F.   Other pharmaceuticals

**DocuSign**

## Certificate Of Completion

Envelope Id: AAFEB170228148A58F9B40F994A2D210                    Status: Completed
Subject: Please DocuSign: DK NFLPA OTP License Agreement EXECUTION VERSION (Nov. 19, 2021).docx
Source Envelope:
Document Pages: 31                    Signatures: 4                    Envelope Originator:
Certificate Pages: 6                    Initials: 0                    Stacie Brown
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                    IP Address: 104.129.199.19

## Record Tracking

Status: Original                    Holder: Stacie Brown                    Location: DocuSign
          11/19/2021 3:40:41 PM

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| Jason Robins | DocuSigned by: *Jason Robins* A86F56ED257746F... | Sent: 11/19/2021 4:32:59 PM |
| | | Viewed: 11/19/2021 4:34:59 PM |
| CEO DraftKings | | Signed: 11/19/2021 4:35:07 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 174.196.203.101 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** Accepted: 11/19/2021 4:34:59 PM ID: 701019ae-b85d-407a-84de-63f0cb81a91f | | |
| Steven Scebelo | DocuSigned by: 159D37FFE61E4E7... | Sent: 11/19/2021 4:35:11 PM |
| | | Viewed: 11/19/2021 4:48:10 PM |
| President | | Signed: 11/19/2021 4:53:49 PM |
| NFLPA | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Drawn on Device | |
| | Using IP Address: 100.14.61.181 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** Accepted: 11/19/2021 4:48:10 PM ID: efa42f15-6ee1-42a2-bad7-e26a9664772e | | |
| Teri Smith | DocuSigned by: *Teri Smith* 0FC95A3A6F0C4C4... | Sent: 11/19/2021 4:53:53 PM |
| | | Viewed: 11/19/2021 5:01:28 PM |
| Chief Operating Officer | | Signed: 11/19/2021 5:05:27 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 73.163.174.31 | |
| **Electronic Record and Signature Disclosure:** Accepted: 11/19/2021 5:01:28 PM ID: 034fdaa5-40b3-4440-962e-7798ea929cf9 | | |
| Henry Lowenfels | DocuSigned by: *Henry Lowenfels* 971B99E7292D421... | Sent: 11/19/2021 5:05:30 PM |
| | | Viewed: 11/19/2021 5:38:50 PM |
| Chief Product Officer | | Signed: 11/19/2021 5:39:24 PM |
| OneTeam | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 73.58.200.215 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** Accepted: 11/19/2021 5:38:50 PM ID: 28ed4d87-a8cf-405d-b87d-36f480040c18 | | |

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Michael Hermalyn <br><br> ▮▮▮▮▮▮▮▮▮▮▮ <br> Security Level: Email, Account Authentication (None) <br><br> **Electronic Record and Signature Disclosure:** <br>   Accepted: 11/19/2021 4:12:54 PM <br>   ID: a76aa72f-8d16-4b50-87d8-d7bfe495e4fc | **COPIED** | Sent: 11/19/2021 5:39:27 PM |
| Asa Miller <br><br> ▮▮▮▮▮▮▮▮▮ <br> Security Level: Email, Account Authentication (None) <br><br> **Electronic Record and Signature Disclosure:** <br>   Not Offered via DocuSign | **COPIED** | Sent: 11/19/2021 5:39:28 PM |
| Ezra Kucharz <br><br> ▮▮▮▮▮▮▮▮ <br> Chief Business Officer <br> Security Level: Email, Account Authentication (None) <br><br> **Electronic Record and Signature Disclosure:** <br>   Accepted: 11/16/2021 9:32:43 AM <br>   ID: ef37259a-1219-4947-9ee1-3051b0e9ee2a | **COPIED** | Sent: 11/19/2021 5:39:29 PM |
| Sean Sansiveri <br><br> ▮▮▮▮▮▮▮▮ <br> Security Level: Email, Account Authentication (None) <br><br> **Electronic Record and Signature Disclosure:** <br>   Not Offered via DocuSign | **COPIED** | Sent: 11/19/2021 5:39:31 PM <br> Viewed: 11/19/2021 5:47:56 PM |
| Pyrs Carvolth <br><br> ▮▮▮▮▮▮▮▮ <br> Security Level: Email, Account Authentication (None) <br><br> **Electronic Record and Signature Disclosure:** <br>   Not Offered via DocuSign | **COPIED** | Sent: 11/19/2021 5:39:32 PM |
| Greg O'Brien <br><br> ▮▮▮▮▮▮▮▮ <br> Counsel <br> Security Level: Email, Account Authentication (None) <br><br> **Electronic Record and Signature Disclosure:** <br>   Not Offered via DocuSign | **COPIED** | Sent: 11/19/2021 5:39:33 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/19/2021 4:32:59 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Certified Delivered | Security Checked | 11/19/2021 5:38:50 PM |
| Signing Complete | Security Checked | 11/19/2021 5:39:24 PM |
| Completed | Security Checked | 11/19/2021 5:39:33 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, DraftKings Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact DraftKings Inc.:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ███████████████

**To advise DraftKings Inc. of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at ███████████████ and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from DraftKings Inc.**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to ███████████████ and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with DraftKings Inc.**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to ███████████████ and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify DraftKings Inc. as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by DraftKings Inc. during the course of your relationship with DraftKings Inc..