# GIBSON DUNN

Orin Snyder
Partner
T: +1 212.351.2400
osnyder@gibsondunn.com

October 28, 2024

The Honorable Analisa Torres
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *Nat'l Football League Players Ass'n v. DraftKings Inc.*, No. 24-cv-6407 (S.D.N.Y.)

Dear Judge Torres:

Pursuant to Rule III(B) in this Court's Rules of Practice in Civil Cases, we write on behalf of Defendants DraftKings Inc. and DK Crown Holdings Inc. (together, "DraftKings") regarding DraftKings' anticipated motion for partial dismissal of the Complaint.[1] Plaintiffs' damages claims are barred as a matter of law under the clear and unambiguous limitation of liability provision in the parties' contract and Plaintiffs' binding pleading admissions.

## I. Background

DraftKings is a leading sports gaming company. Compl. ¶ 1. In 2021, when the market for non-fungible tokens ("NFTs") was "white hot," DraftKings launched its own "digital sports-themed NFTs" to use in the company's Reignmakers contests, "and a marketplace where consumers [could] purchase them." *Id.* ¶¶ 2–3. In November 2021, DraftKings entered into a License Agreement with the National Football League Players Association ("NFLPA"), the National Football League Players Inc. ("NFLPI"), and OneTeam Partners LLC (the NFLPA Licensors' agent). The Agreement provided, among other things, for DraftKings to use NFLPI's intellectual property in DraftKings' NFT products. Compl. Ex. B ("Agreement") § 1. In exchange, DraftKings agreed to make certain payments until the earlier of: (i) the expiration of the term of the Agreement or (ii) the termination of the Agreement. *Id.* §§ 2(A), 9. The parties expressly agreed that after termination, the *only* remaining payments owed would be those "for any period *prior* to the effective date of such . . . termination." *Id.* § 9(B)(i) (emphasis added).

In November 2021, the parties knew the NFT business faced an uncertain and evolving legal and regulatory environment. Recognizing the potential risks, the highly sophisticated parties sought to protect themselves by agreeing to broad termination rights and other contract terms. Among other things, the parties agreed that DraftKings alone had "the right to terminate" the Agreement "if federal or state laws or regulations . . . make it materially impracticable for [DraftKings] to benefit from the rights granted hereunder." Agreement § 9(A)(iv). And they agreed that either party could terminate the Agreement if "any governmental, administrative, or adjudicatory body (e.g., the Securities and Exchange Commission or state regulatory authorities) determines that the Licensed Product is a security." *Id.* § 9(A)(i). Further recognizing the uncertainty and potential risks, the parties agreed to a limitation of liability provision. Except for "claims resulting from gross negligence, willful misconduct (including failure to make payments under this Agreement),

---

[1] Pursuant to Rule III(B)(ii), DraftKings sent Plaintiffs a letter concerning the grounds for DraftKings' motion to dismiss. Plaintiffs responded by letter stating they do not intend to amend the Complaint.

or fraud," each party's "maximum aggregate liability under this Agreement shall be limited to the greater of" (i) "the amount paid or payable by [DraftKings] to" Plaintiffs during the 12-month period "preceding the events first giving rise to the claim" and (ii) ▮▮▮▮. *Id.* § 11. The parties also agreed, "in no event shall a party be liable . . . for any special, consequential, incidental, or indirect damages." *Id.* The parties amended the Agreement in December 2023, but retained the broad termination rights and limitation of liability. Compl. Ex. A ("Amended Agreement").

By July 2024, the legal and regulatory landscape for NFTs had changed dramatically. In March 2023, a putative class action lawsuit was filed against DraftKings in the District of Massachusetts, *Dufoe v. DraftKings, Inc.* Compl. ¶ 55. This lawsuit alleged DraftKings' NFT products were unregistered "securities" sold in violation of federal securities laws. *Id.* Beginning in July 2023, DraftKings received subpoenas from regulators concerning, among other things, NFTs sold on DraftKings' former Marketplace. On July 2, 2024, the *Dufoe* court denied DraftKings' motion to dismiss, determining plaintiffs had "plausibly alleged that DraftKings NFTs in the context of the Marketplace are securities." *Id.* ¶¶ 56–57. In addition, a growing number of other regulators and courts made or accepted claims that NFTs are securities. Under these circumstances, it was materially impracticable for DraftKings to benefit from the rights under the Agreement. Among other things, if DraftKings had continued to operate its NFT marketplace and sell NFTs, every sale could increase dollar-for-dollar the rescission damages the purported *Dufoe* class might seek. As a result of these circumstances, among others, on July 29, 2024, DraftKings sent Plaintiffs a notice of termination and shut down the entirety of its NFT business the next day. *Id.* ¶¶ 59–60.

Weeks later, Plaintiffs filed this suit, alleging DraftKings' termination was in anticipatory breach or, alternatively, a breach of contract. Plaintiffs seek ▮▮▮▮ in damages, representing the remaining "guaranteed payments" under the Agreement, and unspecified "consequential damages." Comp. ¶¶ 68, 74, 81. Plaintiffs allege DraftKings "neglected to pay the second of four ▮▮▮▮ installment payments . . . due on August 1, 2024." *Id.* ¶ 68. But that payment only became "invoiceable"—not due—"on or after August 1, 2024." Amended Agreement § 2(A).

## II. Plaintiffs' Damages Claims Are Barred By The Limitation Of Liability

Plaintiffs' substantive claims are meritless, and DraftKings looks forward to presenting the evidence demonstrating the validity of its termination. It was entirely reasonable for DraftKings— a publicly traded company licensed by many gaming regulators—to discontinue offering its NFT products and NFT Marketplace after *Dufoe*, and in light of the regulator inquiries into DraftKings and the growing number of other regulators and courts that made or accepted claims that NFTs are securities. It was materially impracticable for DraftKings to operate its NFT business in a way that would allow it to benefit from the rights granted under the Agreement. But, at this stage of the proceedings, the pleadings and the plain text of the negotiated limitation of liability provision confirm Plaintiffs' damages claims are ripe for dismissal under Rule 12(b)(6).

New York courts "routinely enforce[] liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d

125, 138 (2d Cir. 2016). Here, the limitation of liability is clear and unambiguous. It provides, outside of narrowly defined exemptions, the "*maximum* aggregate liability" is the greater of (i) the amount paid or payable by DraftKings under the Agreement in the preceding twelve months, and (ii) ███. Amended Agreement § 10(A) (emphasis added). This provision bars Plaintiffs' damages claim for all remaining "guaranteed payments." Compl. ¶¶ 68, 74, 81. Plaintiffs' request for an unspecified additional amount of consequential damages is likewise barred by the limitation of liability, which states "*in no event* shall a party be liable . . . for any special, consequential, incidental, or indirect damages." Amended Agreement § 10(A) (emphasis added).[2]

The limited exemptions for "gross negligence, willful misconduct (including failure to make payments under this Agreement), or fraud" do not apply here as a matter of law. The Complaint does not and could not possibly allege DraftKings engaged in gross negligence or fraud. Nor do Plaintiffs' allegations come close to alleging "willful misconduct"—which, as a matter of black-letter New York contract law, requires facts to support a plausible inference DraftKings "willfully intend[ed] to inflict harm on plaintiff[s]." *Process Am.*, 839 F.3d at 138. Plaintiffs' response letter did not identify any case offering a different definition under New York law. Instead, they resorted to a case applying *Delaware* law, which does not apply here. *See Manhattan Chrystie St. Dev. Fund, LLC v. Witkoff Grp. LLC*, 2023 WL 4191102, at *2, *4–5 (N.Y. Sup. Ct. June 26, 2023).

Plaintiffs do not allege any intent to inflict harm; their own allegations negate any such inference. Plaintiffs allege the "impetus for" DraftKings' termination of the Agreement was the NFT market had "cooled down" and DraftKings was "facing a civil lawsuit and regulatory inquiries into its [NFT] product." Compl. ¶ 3. These allegations are "binding judicial admissions" and cannot be cured by amendment. *Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*, 2008 WL 905188, at *7 (S.D.N.Y. Mar. 31, 2008). Accepting Plaintiffs' *own allegations* as true, DraftKings did not terminate the Agreement to inflict harm on Plaintiffs—rather, DraftKings terminated the Agreement due to, among other things, the legal and regulatory risks posed by its NFT business, including to its other highly regulated businesses, which made it materially impracticable for DraftKings to benefit from the rights granted under the Agreement. This reasonable business decision is the opposite of willful misconduct. Plaintiffs also allege that DraftKings terminated the Agreement due to "buyer's remorse," Compl. ¶ 3, which is far from the "truly culpable, harmful conduct" required for willful misconduct. *Process Am.*, 839 F.3d at 138; *see Morgan Stanley & Co., Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) (similar).

Plaintiffs' response letter concedes the limitation of liability provision is "clear, unequivocal, and unambiguous." To evade it, they offer two meritless responses. *First*, Plaintiffs say the parenthetical phrase "(including failure to make payments under this Agreement)" defines *all* failures to make payments as willful misconduct. This argument makes no sense. The Agreement includes numerous defined terms; these sophisticated parties could have made "willful misconduct" a defined term, but chose not to do so. Plaintiffs' interpretation also defies the plain

---

[2] Plaintiffs' response letter argues the consequential damages limitation does not apply "if DraftKings' repudiation is . . . in bad faith." But courts routinely dismiss damages as barred where, as here, the plaintiff does not plausibly allege bad faith. *See, e.g., Constellation Brands, Inc. v. Keste, LLC*, 2014 WL 6065776, at *6 (W.D.N.Y. Nov. 13, 2014).

language of the contract and violates fundamental canons of construction. As a matter of plain meaning and ordinary usage, consider a doctor who instructs a patient to "avoid fried foods (including fruits and vegetables)." No patient would ever conclude they should avoid *all* fruits and vegetables, but instead avoid only *fried* fruits and vegetables. The patient should avoid french fries, not salads. Likewise, the Agreement does not exempt *all* failures to make payments from the limitation of liability, but only those failures to make payments that qualify as "willful misconduct." *See Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199–201 (2d Cir. 2003). Numerous courts have interpreted similar limitations of liability provisions exactly that way. For example, if a party may not recover indirect or consequential damages "including . . . lost profits," it is barred from recovering lost profits only "insofar as they fall within the broader categories of indirect or consequential damages." *In re Indesco Int'l, Inc.*, 451 B.R. 274, 315–16 (S.D.N.Y. Bankr. Apr. 13, 2011); *see also, e.g.*, *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 102–03 (S.D.N.Y. 2015).

That plain meaning follows from the *noscitur a sociis* canon: The "including" phrase must be read in light of the language preceding it—*i.e.*, "willful misconduct." *Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 48 A.D.2d 46, 48 (1st Dep't 1975). "Willful misconduct" demands more than "a simple breach of contract" under New York law. *Process Am.*, 839 F.3d at 139–40. Yet Plaintiffs' reading would transform *all* failures to make payments—even if not done with an intent to inflict harm (for example, if a payment check was lost in the mail)—into willful misconduct. This reading would impermissibly "ascrib[e]" to the parenthetical phrase "a meaning so broad that it is inconsistent with its accompanying words." *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210–11 (2d Cir. 2016). As a matter of basic contract interpretation, the only "failure to make payments" excluded are those that themselves constitute "willful misconduct"—that is, failures to make payments *intended to inflict harm*. Plaintiffs' allegations negate any inference that DraftKings intended to inflict harm on Plaintiffs—which, among other things, make clear there was no "willful misconduct" and the limitation of liability applies.

*Second*, Plaintiffs insist limitation of liability cannot be raised on a motion to dismiss. Not so. Courts regularly enforce limitations of liability at the motion-to-dismiss stage, dismissing claims for damages inconsistent with such provisions. *See, e.g.*, *VL8 Pool, Inc. v. Glencore Ltd.*, 2021 WL 1152936, at *3 (S.D.N.Y. Mar. 25, 2021); *Pacs Indus., Inc. v. Cutler-Hammer, Inc.*, 103 F. Supp. 2d 570, 573 (E.D.N.Y. 2000).[3] The Court should do so here. Plaintiffs cannot avoid the limitation of liability in the very contract they seek to enforce. Plaintiffs' pleading admissions confirm the limitation of liability applies and require dismissal of their claims for any damages greater than either the amount paid or payable by DraftKings during the 12-month period immediately preceding the events first giving rise to the claim, or ▮.

---

[3] Plaintiffs' cases either do not involve a contractual limitation of liability, *see, e.g.*, *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006); *Crimpers Promotions Inc. v. Home Box Off., Inc.*, 724 F.2d 290, 296 (2d Cir. 1983), or involve a dispute concerning whether the claimed damages are general or consequential damages, *see Intelligen Power Sys., LLC v. dVentus Techs. LLC*, 2015 WL 3490256, at *7 (S.D.N.Y. June 2, 2015).

Sincerely,

*/s/ Orin Snyder*

Orin Snyder

cc: All counsel of record (via ECF and e-mail)