

200 Park Avenue
New York, NY 10166
T +1 (212) 294-6700
F +1 (212) 294-4700

DAVID L. GREENSPAN
Partner
(212) 294-4616
dgreenspan@winston.com

November 4, 2024

Hon. Analisa Torres, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *Nat'l Football League Players Ass'n et al. v. DraftKings Inc. et al.*, No. 1:24-cv-06407-AT

Dear Judge Torres,

We represent Plaintiffs, the National Football League Players Association ("NFLPA") and National Football League Players Incorporated ("NFLPI," together with the NFLPA, "NFLPA Licensors" or "Plaintiffs"), in the above-referenced action. We write pursuant to Rules III.A and III.B of the Court's Individual Practices in Civil Cases, and in response to DraftKings Inc.'s and DK Crown Holdings Inc.'s (together, "DraftKings" or "Defendants") letter regarding their anticipated motion for partial dismissal of the Complaint. *See* ECF No. 20 ("Letter").

The clear and unambiguous limitation of liability provision in the parties' contract does not apply to DraftKings' "failure to make payments under th[e] Agreement" as a matter of law. Alternatively, DraftKings' fact-based argument that its pretextual repudiation of the agreement does not amount to "willful misconduct" under New York law must be rejected at the motion to dismiss stage.

### I.   Background

The NFLPA is the labor union for all NFL players, and NFLPI is the exclusive group licensing representative of the names, images and likenesses of NFL players. Compl. (ECF No. 1), ¶¶ 10–13. DraftKings is a leading digital sports entertainment and gaming company. *See id.* ¶¶ 14–25. To capitalize on the NFT boom and also to broaden the reach of DraftKings' fantasy sports contests and gaming offerings, DraftKings entered into a License Agreement with the NFLPA Licensors, effective November 19, 2021 (expiring February 28, 2027) to allow DraftKings to create digital sports-themed NFTs of NFL players. *See id.* ¶¶ 16, 25–36. Those NFTs could be bought and sold on DraftKings' proprietary NFT Marketplace and were designed to be used in DraftKings' fantasy sports competitions, which came to be known as "Reignmakers" contests. *See id.* ¶¶ 42–45.



DraftKings agreed to pay the NFLPA Licensors a substantial minimum guaranteed payment ("Minimum Guarantee"), payable "regardless of how many sales occur or how much revenue is generated." *See id.* ¶ 37 (quoting Am. License Agmt. (ECF No. 1-1), § 2(A)). The License Agreement was terminable upon certain specified triggering events, some of which related to the uncertain legal and regulatory environment surrounding NFTs at the time the License Agreement was executed. *See id.* ¶¶ 36, 52–53.

DraftKings complains that in March 2023 it was sued for alleged securities violations in *Dufoe v. DraftKings*, and then "[b]eginning in July 2023, DraftKings received subpoenas from regulators" concerning its NFT products. Ltr. at 2. But months later, in December 2023, DraftKings nevertheless entered, undeterred, into an Amended License Agreement which left intact the parties' substantive rights and obligations, including the Minimum Guarantee and grounds for termination. *See* Compl. ¶¶ 50–54.

Those provisions animate this dispute. On July 29, 2024, after the court in *Dufoe* denied DraftKings' motion to dismiss,[1] DraftKings sent the NFLPA Licensors a "Notice of Termination." *Id.* ¶¶ 59–60; Notice of Termination (ECF No. 1-3). DraftKings claimed that the district court in *Dufoe* had "determined that the NFTs sold on [*sic*] Marketplace are securities subject to federal and state registration requirements" and that, "[a]s a result," DraftKings had "invoke[d] [its] termination rights." Compl. ¶ 59; Notice of Termination at 1–2. DraftKings discontinued the NFT Marketplace on July 30 and has refused to make Minimum Guarantee payments for the period post-repudiation. *See* Compl. ¶¶ 59, 66, 68. But each provision invoked by DraftKings in its Notice of Termination was facially inapplicable. Specifically:

- No "federal or state law[] or regulation[] . . . [has] ma[d]e it materially impracticable for [DraftKings] to benefit from the rights" granted under the Amended License Agreement. Notice of Termination at 2 (quoting Am. License Agmt. § 8(A)(iv)). The *Dufoe* motion-to-dismiss decision is not even a "federal or state law[] or regulation[]" (Compl. ¶ 64);

- No "governmental, administrative, or adjudicatory body . . . [has] determine[d] that the Licensed Product is a security." Notice of Termination at 2 (quoting Am. License Agmt. § 8(A)(i)(3)). An order denying a motion to dismiss is not a determination "on the merits that ends the litigation." *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498 (1989). DraftKings knows this: while it tells Plaintiffs and this Court that the *Dufoe* court already determined that its NFT products are securities, DraftKings continues to tell the *Dufoe* court (and investors) that its NFT products are not securities (*see* Compl. ¶¶ 62–63)[2];

- The *Dufoe* motion-to-dismiss decision does not render "the performance of such other Party's [*i.e.*, the NFLPA Licensors'] obligations under th[e] Agreement . . . in violation of any law, rule, regulation, or order applicable to the [NFLPA Licensors]." Notice of Termination at 2 (quoting Am. License Agmt. § 8(A)(i)(2)); and

---

[1] *Dufoe v. DraftKings Inc.*, 2024 WL 3278637, at *11 (D. Mass. July 2, 2024).

[2] *See* Answer ¶ 92, *Dufoe,* No. 1:23-cv-10524-DJC (D. Mass. Aug. 15, 2024), ECF No. 74 ("Defendants deny the allegations of Paragraph 92."); DraftKings Inc., Quarterly Report for the Quarterly Period ended June 30, 2024 (Form 10-Q) at 45 (Aug. 2, 2024).



November 4, 2024<br>Page 3

- DraftKings has not "discontinue[d] its business." Notice of Termination at 2 (quoting Am. License Agmt. § 8(A)(iii)). Though DraftKings *chose* to shut down Reignmakers and its NFT Marketplace, it continues to operate an immensely profitable business of which Reignmakers was only a small part—a point it stressed when it was expedient to do so in *Dufoe* (*see* Compl. ¶ 66).

In short, motivated by "[b]uyers' remorse," DraftKings terminated based on "conjured up . . . pretextual justifications" in disregard of its contractual obligations to the NFLPA Licensors. Compl. ¶¶ 3–7. But DraftKings—concededly a "highly sophisticated part[y]" (*see* Ltr. at 1)—had committed to make the **minimum guaranteed** payments to the NFLPA Licensors regardless of whether its gamble paid off. *See* Am. License Agmt. § 2(A). As a result of DraftKings' anticipatory breach, the NFLPA Licensors are entitled to all guaranteed unpaid sums due under the Amended License Agreement, including the Minimum Guarantee, discounted to present value. *See Long Island R.R. Co. v. Northville Indus. Corp.*, 362 N.E.2d 558, 566 (N.Y. 1977).

## II. The Limitation of Liability Provision Does Not Apply to Plaintiffs' Claims

DraftKings' anticipated motion boils down to a question that is so straightforward it borders on the tautological: Does the limitation of liability provision's express carve-out for a "failure to make payments" carve out DraftKings' undisputed "failure to make payments" from the ████████ cap on liability? In attempting to answer this question in the negative, DraftKings resorts to an inapposite analogy to fried fruits and vegetables and advocates for an interpretation of the Amended License Agreement that would permit DraftKings to repudiate at its whim and then gift itself an exemption from the majority of its **minimum guaranteed** payment obligations. This position defies "the clear and unambiguous limitation of liability provision" (Ltr. at 1) and New York law.

To begin with a (typically) uncontroversial principle: terms in a contract are not to be interpreted in a manner that renders them meaningless. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (finding it impermissible to "by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing") (quotation marks and citation omitted). In the context of parentheticals, this doctrine mandates that the phrase contained in the parenthetical serves to define the preceding term—whether by modifying or expanding its meaning—rather than reading the parenthetical as subsumed by the prefatory phrase. *Reina v. Robert P. Kulchinsky, M.D., P.C.*, 2005 WL 3240581, at *2 (N.Y. Sup. Ct. May 25, 2005) (holding that "the language in parenthesis [in the parties' contract] defines, rather than limits, the term" preceding the parenthetical); *see GPIF-I Equity Co., LTD v. HDG Mansur Inv. Servs.*, 2013 WL 3989041, at *7 (S.D.N.Y. Aug. 1, 2013) (finding that a "parenthetical phrase [within the parties' agreement] modifie[d] [the parenthetical's preceding phrase]"). This makes sense: to read an "including" parenthetical as being qualified by the preceding term deprives the parenthetical itself of meaning. *In re Trs. Established Under the Pooling & Servicing Agreements*, 375 F. Supp. 3d 441, 453 (S.D.N.Y. 2019) (rejecting party's interpretation of parenthetical in parties' contract that would have effectively "divest[ed] the entire parenthetical of meaning" because "under New York law, courts may not excise terms under the guise of interpreting the writing"). Put differently, if Plaintiffs must prove that any "failure to make payments" satisfies DraftKings' gerrymandered definition of "willful misconduct," the parenthetical would become entirely superfluous. That cannot be the case. *Vt. Teddy Bear Co.*, 807 N.E.2d at 879; *see also Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of N.Y., LLC*, 469 F.



November 4, 2024
Page 4

Supp. 2d 80, 87 (E.D.N.Y. 2007) (recognizing "the fundamental contract principle that . . . contracting parties retain the freedom to precisely define their rights and obligations in any way they wish").

Further reinforcing the definitional nature of the "failure to make payments" parenthetical is the fact that "willful misconduct" is not a uniformly defined term of art under New York law. DraftKings contends that willful misconduct necessarily requires the intent "to inflict harm," going as far as to describe this as "black-letter law." But the case from which DraftKings alchemizes this contention expressly recognized that New York courts apply varying definitions of willful misconduct, with many courts applying the phrase to require only intentional conduct, not conduct intended to cause harm. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 139 (2d Cir. 2016) (recognizing and applying a "more lenient" definition of willful misconduct that does not require the intent to inflict harm); *see also Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 200–01 (E.D.N.Y. 2010) (recognizing that "[c]ourts interpreting 'willful misconduct' in exculpation clauses . . . have defined the term as 'intentional' conduct," and "appl[ying] the 'intentional' standard in [the] analysis of plaintiffs' breach of contract claims"). Accordingly, even *if* the Amended License Agreement did not already define a "failure to make payments" as "willful misconduct" exempt from any limit on liability, there would be no serious question that DraftKings engaged in "willful misconduct" under New York law—especially given the meritless nature of its purported grounds for termination. Defendants' "payment check" did not get "lost in the mail" (Ltr. at 4); DraftKings conjured up pretextual grounds to terminate and then repudiated its payment obligations. For example, DraftKings now characterizes the *Dufoe* decision as a dramatic change in the regulatory landscape for NFTs that left it with no choice but to terminate (Ltr. at 2), yet DraftKings had already tried to repudiate the parties' original agreement one year earlier. *See* Compl. ¶¶ 47–49.

Nor does the "*noscitur a sociis*" canon salvage DraftKings' argument. Canons of construction may only be invoked where the meaning of the language at issue is not plain on its face. *N.Y. Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 324 (S.D.N.Y. 2019) ("[T]he *inference* created by [canons of construction] cannot take precedence over the unambiguous language of the contract.") (emphasis in original). Here, as DraftKings states in its Letter (at 1), the language at issue is plain as day. The canon therefore is inapplicable.[3]

Finally, if the Court does not reject DraftKings' interpretation of the limitation on liability provision as a matter of law, then DraftKings' fact-based arguments about its supposedly unintentional, benevolent behavior under the contract must be rejected at this phase because they are antithetical to Plaintiffs' detailed allegations of DraftKings' "pretextual justifications," "buyers' remorse," "nonsensical" positions, "gamesmanship," and willful repudiation. Compl. ¶¶ 3–4, 49–50. Even DraftKings' arguments about the limitation on consequential damages must be rejected on a pleadings motion given the inapplicability of such limitations where a party's repudiation is proven to be in bad faith—a fact-based question. *See Long Island Lighting Co. v. Transam. Delaval, Inc.*, 646 F. Supp. 1442, 1458 (S.D.N.Y. 1986) ("A defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith.").

---

[3] Even if it were appropriate to resort to *noscitur a sociis* due to a contractual ambiguity, resolution would be unsuitable for disposition on a motion to dismiss. *See Harris v. Reagan*, 77 N.Y.S.3d 187, 190 (N.Y. App. Div. 2018) ("[I]f ambiguity [in a contract] exists, a motion [to dismiss] must be denied.").



November 4, 2024<br>Page 5

                          Respectfully submitted,

                          _/s/ David L. Greenspan_

                          David L. Greenspan

cc:      All Counsel of Record (via ECF and email)