UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                   :

NATIONAL FOOTBALL LEAGUE        :
PLAYERS ASSOCIATION and NATIONAL  :
FOOTBALL LEAGUE PLAYERS        :
INCORPORATED,                     :

                Plaintiffs,    :  No. 1:24-cv-6407 (AT)
                                 :

      v.                        :  **Oral Argument Requested**
                                 :

DRAFTKINGS INC. and DK CROWN     :
HOLDINGS INC.,                 :

                Defendants.   :
--------------------------------------------------------x

 

**DEFENDANTS DRAFTKINGS INC. AND DK CROWN HOLDINGS INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR**
<u>**MOTION FOR PARTIAL DISMISSAL OF THE COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ............................................................................................. 6

LEGAL STANDARD ...................................................................................... 9

ARGUMENT ................................................................................................ 10

    I.     The Limitation Of Liability Bars Plaintiffs' Claim For The Allegedly
         Remaining "Guaranteed Payments" Under The Agreement ............................... 10

        A.    The "Willful Misconduct" Exemption To The Limitation Of Liability
            Does Not Apply ....................................................................................... 11

        B.    Plaintiffs' Contrary Interpretation Of The "Willful Misconduct"
            Exemption Violates Plain Meaning And Well-Settled Canons of
            Construction ............................................................................................ 14

    II.    The Limitation Of Liability Also Bars Plaintiffs' Claim For
         Consequential Damages ..................................................................................... 20

CONCLUSION ............................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anthem, Inc. v. Express Scripts, Inc.*,
  2022 WL 1558879 (S.D.N.Y. Mar. 31, 2022) ....................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................9

*Avon Co. v. Fareva Morton Grove, Inc.*,
  2022 WL 2208156 (S.D.N.Y. June 21, 2022) ....................................................17

*Bank of Am. Secs. LLC v. Solow Bldg. Co. II, LLC*,
  47 A.D.3d 239 (1st Dep't 2007) .......................................................................13

*Beal Sav. Bank v. Sommer*,
  8 N.Y.3d 318 (2007)..........................................................................................19

*Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*,
  597 U.S. 424 (2022)...........................................................................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................9

*In re CCT Commc'ns, Inc.*,
  464 B.R. 97 (Bankr. S.D.N.Y. 2011) .................................................................14

*Constellation Brands, Inc. v. Keste, LLC*,
  2014 WL 6065776 (W.D.N.Y. Nov. 13, 2014) ..................................................22

*Convergia Networks, Inc. v. Huawei Techs. Co.*,
  2008 WL 4787503 (S.D.N.Y. Oct. 30, 2008)....................................................20

*Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prod., Inc.*,
  958 F. Supp. 2d 488 (S.D.N.Y. 2013).................................................................13

*Devash LLC v. German Am. Cap. Corp.*,
  104 A.D.3d 71 (1st Dep't 2013) ........................................................................14

*Dufoe v. DraftKings Inc.*,
  2024 WL 3278637 (D. Mass. July 2, 2024).........................................................8

*DynCorp v. GTE Corp.*,
  215 F. Supp. 2d 308 (S.D.N.Y. 2002)................................................................10

*Electron Trading, LLC v. Morgan Stanley & Co. LLC,*
  157 A.D.3d 579 (1st Dep't 2018) ...........................................................................21

*Fabrique Innovations, Inc. v. Fed. Ins. Co.,*
  853 F. App'x 709 (2d Cir. 2021) .......................................................................12, 14

*Fabrique Innovations, Inc. v. Fed. Ins. Co.,*
  354 F. Supp. 3d 340 (S.D.N.Y. 2019) ....................................................................13

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,*
  314 U.S. 95 (1941) ...........................................................................................15, 19

*Five Star Dev. Resort Comms., LLC v. iStar RC Paradise Valley, LLC,*
  2012 WL 4119561 (S.D.N.Y. Sept. 18, 2012) ....................................................13, 14

*Friel v. Dapper Labs, Inc.,*
  657 F. Supp. 3d 422 (S.D.N.Y. 2023) ......................................................................8

*Gallo v. Moen, Inc.,*
  813 F.3d 265 (6th Cir. 2016) ..................................................................................18

*Garber v. Legg Mason, Inc.,*
  347 F. App'x 665 (2d Cir. 2009) ..............................................................................7

*Goldstein v. Pataki,*
  516 F.3d 50 (2d Cir. 2008) .......................................................................................9

*In re Indesco Int'l, Inc.,*
  451 B.R. 274 (S.D.N.Y. Bankr. Apr. 13, 2011) ....................................................16, 18

*Kass v. Kass,*
  91 N.Y.2d 554 (1998) .............................................................................................17

*LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.,*
  424 F.3d 195 (2d Cir. 2005) ....................................................................................14

*Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.,*
  2008 WL 905188 (S.D.N.Y. Mar. 31, 2008) ...........................................................12

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,*
  84 N.Y.2d 430 (1994) ...........................................................1, 10, 11, 12, 14, 18

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.,*
  930 F. Supp. 2d 532 (S.D.N.Y. 2013) ................................................................11, 12

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.,*
  112 F. Supp. 3d 83 (S.D.N.Y. 2015) .......................................................................16

*Oscar Gruss & Son, Inc. v. Hollander*,
    337 F.3d 186 (2d Cir. 2003)...................................................................................17

*Pacs Indus., Inc. v. Cutler-Hammer, Inc.*,
    103 F. Supp. 2d 570 (E.D.N.Y. 2000) ...................................................................11

*Penncro Assocs., Inc. v. Sprint Spectrum, LP*,
    499 F.3d 1151 (10th Cir. 2007) .........................................................................4, 16

*Perrigo Pharma Int'l Designated Activity Co. v. Mead Johnson & Co. LLC*,
    2024 WL 1375947 (S.D.N.Y. Apr. 1, 2024)......................................................21, 22

*Popkin v. Sec. Mut. Ins. Co. of N.Y.*,
    48 A.D.2d 46 (1st Dep't 1975) ..............................................................................17

*Powermat Techs., Ltd. v. Belkin Int'l Inc.*,
    2020 WL 2892385 (S.D.N.Y. Apr. 2, 2020)...........................................................10

*Press v. Primavera*,
    685 F. Supp. 3d 216 (S.D.N.Y. 2023)......................................................................8

*Process Am., Inc. v. Cynergy Holdings, LLC*,
    839 F.3d 125 (2d Cir. 2016)..............................................2, 10, 11, 12, 13, 17

*Qube Films Ltd v. Padell*,
    2016 WL 881128 (S.D.N.Y. Mar. 1, 2016) ............................................................12

*Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys., USA, Inc.*,
    2021 WL 149027 (S.D.N.Y. Jan. 15, 2021) ...............................................20, 21, 22

*Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*,
    8 F.4th 642 (7th Cir. 2021) .............................................................................4, 16, 17

*RM Realty Holdings Corp. v. Moore*,
    64 A.D.3d 434 (1st Dep't 2009) .............................................................................17

*Rothstein v. Am. Int'l Grp., Inc.*,
    837 F.3d 195 (2d Cir. 2016)..............................................................................3, 18

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013)......................................................................7

*Serengetti v. JP Morgan Chase Bank, N.A.*,
    2020 WL 2216661 (S.D.N.Y. May 7, 2020) ...........................................................20

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
    581 F. App'x 72 (2d Cir. 2014) ..............................................................................19

*Stifel, Nicolaus & Co., Inc. v. Shift Techs., Inc.*,
    2022 WL 3648145 (S.D.N.Y. Aug. 23, 2022) ........................................................17

*TOA Sys., Inc. v. Int'l Bus. Machines Corp.*,
    2019 WL 5693388 (S.D.N.Y. Nov. 4, 2019) .........................................................20

*Trainum v. Rockwell Collins, Inc.*,
    2017 WL 2377988 (S.D.N.Y. May 31, 2017) .......................................................14

*Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of N.Y.*,
    2024 WL 1349221 (S.D.N.Y. Mar. 29, 2024) .....................................................18

*VL8 Pool, Inc. v. Glencore Ltd.*,
    2021 WL 1152936 (S.D.N.Y. Mar. 25, 2021) .....................................................20

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) ...........................................................................................14

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .............................................................................................18

**STATUTE**

28 N.Y. Prac., Contract Law § 10:7 .............................................................................19

**OTHER AUTHORITIES**

*In re Impact Theory, LLC*,
    Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act
    of 1933, Making Findings, and Imposing a Cease-and-Desist Order, Release No. 11226
    (Aug. 28, 2023) .......................................................................................................8

*In re Stoner Cats 2, LLC*,
    Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act
    of 1933, Making Findings, and Imposing a Cease-and-Desist Order, Release No. 11233
    (Sept. 13, 2023) ......................................................................................................8

*Webster's Third International Dictionary* (2002) ..................................................3, 15

## PRELIMINARY STATEMENT

Plaintiffs' demand for ███████ in damages plus consequential damages is barred by the plain language of the unambiguous limitation of liability provision in the parties' agreement. That agreement granted DraftKings the right to use certain of Plaintiffs' intellectual property in digital sports-themed non-fungible tokens ("NFTs") in DraftKings' Reignmakers fantasy-style contests. When they entered the agreement, these highly sophisticated parties knew NFTs faced an uncertain and evolving legal and regulatory environment. Recognizing these potential risks, among other things, the parties agreed to cap damages absent extraordinary circumstances, and to prohibit consequential damages altogether.

Specifically, the parties expressly agreed the "*maximum* aggregate liability" could not exceed the greater of (i) the amount paid or payable by DraftKings under the agreement in the preceding twelve months, and (ii) ███████. They agreed the cap would apply to *all* claims, except those "resulting from gross negligence, willful misconduct (including failure to make payments under this Agreement), or fraud." And they agreed "in *no* event" would either party be liable for "any" consequential damages. Limitation of liability provisions, particularly in contracts between sophisticated parties in uncertain and evolving business ventures, are commonplace and routinely enforced—reflecting the important public policy of permitting parties to allocate the risks of economic loss when contracting. *See Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994).

In July 2024, DraftKings exercised its broad termination rights to terminate the parties' agreement. DraftKings' termination was expressly permitted by several provisions in the agreement, including because the legal and regulatory landscape for NFTs had changed dramatically, making it "materially impracticable" for DraftKings to benefit from its rights under

the agreement. Plaintiffs' breach of contract and anticipatory breach of contract claims arising from that termination are meritless, and DraftKings looks forward to presenting evidence demonstrating the validity of its termination. But at this stage of the proceedings, DraftKings is asking the Court to dismiss Plaintiffs' damages claim to the extent it exceeds the limitation of liability and to dismiss Plaintiffs' claim for consequential damages. These damages claims are barred as a matter of law by the pleadings, plain text of the agreement, and fundamental canons of construction.

The limitation of liability provision is clear and unambiguous. It caps damages unless Plaintiffs can prove gross negligence, willful misconduct, or fraud. Plaintiffs have not even attempted to allege gross negligence, willful misconduct, or fraud. Even more, binding judicial admissions in Plaintiffs' own complaint preclude any finding of willful misconduct. Under black-letter New York law, willful misconduct requires "willful[] inten[t] to inflict harm." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016). This is fatal here because, accepting Plaintiffs' own allegations as true, DraftKings did not terminate the Agreement to inflict harm on Plaintiffs—rather, DraftKings terminated the Agreement because of, among other things, "[b]uyers' remorse," that the NFT market had "cooled down," and that DraftKings was "facing a civil lawsuit and regulatory inquiries into its [NFT] product." Compl. ¶ 3. This reasonable business decision is the opposite of willful misconduct. ***Plaintiffs thus allege—and have represented to this Court—that DraftKings terminated the agreement based on buyer's remorse and legal and regulatory risk, not to inflict harm***.

To evade the limitation of liability they bargained for, Plaintiffs rip the phrase "(including failure to make payments under this Agreement)" from its surrounding context and argue it means the limitation of liability does not apply to *any* claims arising from DraftKings' alleged failure to

make payments under the agreement. According to Plaintiffs' implausible interpretation, *any* failure to make payments—even if DraftKings underpaid an invoice by $5.00—would be considered willful misconduct. That is not what the contractual language means at all. Case law in this District makes clear that Plaintiffs' interpretation is wrong. The phrase "(including failure to make payments under this Agreement)" follows "willful misconduct"—and the use of "including" means the parenthetical phrase does not exempt *all* failures to make payments from the limitation of liability, but only those failures to make payments that otherwise qualify as "willful misconduct." That conclusion is supported by the plain language of the agreement, well-settled principles of contract interpretation, canons of construction, and common sense.

1.      It is textbook English grammar that the word "including" illustrates a *part* or *component* of a larger whole. *See Webster's Third International Dictionary*, 1143 (2002) (defining "include" as "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate"). The phrase "willful misconduct (including failures to make payments)" thus encompasses only those failures to make payments that *otherwise* constitute willful misconduct— *i.e.*, conduct intended to inflict harm. It does not expand "willful misconduct" to include an entirely different category of conduct—such as conduct motivated by "buyer's remorse" or legal or regulatory risk posed by continuing to run an NFT business. Such a reading would impermissibly "ascrib[e]" to the parenthetical phrase "a meaning so broad that it is inconsistent with its accompanying words." *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210–11 (2d Cir. 2016).

Everyone understands this as a matter of ordinary speech. Suppose the NFL's rulebook says (in fact, it does say) that players are "prohibited from . . . tripping an opponent, including the runner." NFL Rule 12, § 2, Art. 14(c). The meaning of that rule is obvious: it applies only to a

"runner" who is *also* an "opponent." Yet Plaintiffs' interpretation would mean that even if a player trips his own teammate running with the ball, and not an opponent, he should be penalized. That makes no sense.

Take another example. Say a doctor tells a patient to avoid all fried foods, including fruits and vegetables. The doctor is not discouraging eating all fruits, just those that are fried—the patient should stay away from apple fritters, not all apples. *See Reid Hosp. & Health Care Servs., Inc. v. Conifer Revenue Cycle Sols., LLC*, 8 F.4th 642, 650 (7th Cir. 2021) (citing *Penncro Assocs., Inc. v. Sprint Spectrum, LP*, 499 F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.)). The same thing is true here: The parenthetical phrase confirms that failures to make payment are not covered by the limitation of liability provision only if they otherwise qualify as willful misconduct. It does not re-define willful misconduct to mean something else that covers *all* contractual breaches for failure to make payments.

2.     Well-settled principles of contract interpretation and canons of construction confirm the same point.

*First*, the phrase "including failures to make payments" must be read in context under the fundamental *noscitur a sociis* canon—a word or phrase is known by the company it keeps. The phrases "gross negligence," "willful misconduct," and "fraud" provide necessary context for the meaning of the adjoining phrase "including failures to make payments." Collectively, these three phrases suggest the only kind of behavior exempted from the liability limitation is that which is done with an elevated *mens rea*. The same is true for "willful misconduct" in particular, the phrase immediately preceding the "including failures to make payments" parenthetical. As a matter of New York law, willful misconduct requires *more* than simply forgetting to pay an invoice, making a rational business decision, or similar conduct. It requires a willful intent to inflict harm. But

Plaintiffs' interpretation would transform every failure to make a payment—even a completely inadvertent failure—into "willful misconduct," an absurd outcome that is inconsistent with the surrounding words and the *noscitur a sociis* canon.

*Second*, sophisticated parties do not hide elephants in contractual mouseholes. Parenthetical phrases are typically used to convey afterthoughts, not fundamental rewrites. If these parties intended to expand "willful misconduct" far beyond the limits of New York law and exempt even inadvertent failures to pay from the limitation of liability provision, they would not have done so by using a parenthetical.

*Third*, Plaintiffs' interpretation violates the surplusage canon by rendering the word "including" meaningless. If Plaintiffs were correct, the limitation of liability provision would mean the exact same thing even if it omitted that word and instead said "resulting from gross negligence, willful misconduct, fraud, or failure to make payments." But that is not what the agreement says, precisely because that is not what the parties meant.

DraftKings' termination of the agreement was valid and, ultimately, Plaintiffs are not entitled to any damages in this lawsuit. As a threshold matter, though, at the pleading stage, Plaintiffs' maximum potential damages are capped by the limitation of liability provision. Their own binding judicial admissions that DraftKings terminated the agreement due to "buyer's remorse," that the NFT marked had "cooled down," and the legal and regulatory risks posed by its NFT business, rather than an intent to inflict harm, confirm the limitation of liability applies and requires dismissal of their claims for damages in excess of those permitted by that provision. The Court should dismiss (i) Plaintiffs' claims for any damages greater than either the amount paid or payable by DraftKings during the 12-month period immediately preceding the events first giving rise to the claim, or ███████, and (ii) Plaintiffs' claims for consequential damages.

# BACKGROUND

DraftKings is a leading sports gaming company. In 2021, when the market for NFTs was "white hot," DraftKings launched its own "digital sports-themed NFTs" to use in the company's Reignmakers fantasy-style contests "and a marketplace where consumers [could] purchase them." Compl. ¶¶ 2–3. In November 2021, DraftKings entered into a License Agreement with the National Football League Players Association ("NFLPA"), the National Football League Players Inc. ("NFLPI"), and OneTeam Partners LLC (the NFLPA Licensors' agent). The Agreement provided, among other things, for DraftKings to use NFLPI's intellectual property in DraftKings' NFT products. Compl. Ex. B ("Agreement") § 1. In exchange, DraftKings agreed to make certain payments until the earlier of: (i) the expiration of the term of the Agreement or (ii) the termination of the Agreement. *Id.* §§ 2(A), 9. The parties expressly agreed that after termination, the *only* remaining payments owed would be those "for any period *prior* to the effective date of such . . . termination." *Id.* § 9(B)(i) (emphasis added).

At the time of contract, the parties knew the NFT business faced an uncertain legal and regulatory environment. Recognizing the potential risks, the highly sophisticated parties sought to protect themselves by agreeing to broad termination rights and other contract terms. For example, the parties agreed DraftKings alone had "the right to terminate" the Agreement "if federal or state laws or regulations . . . make it materially impracticable for [DraftKings] to benefit from the rights granted hereunder." Agreement § 9(A)(iv). And they agreed that either party could terminate the Agreement if "any governmental, administrative, or adjudicatory body (e.g., the Securities and Exchange Commission or state regulatory authorities) determines that the Licensed Product is a security." *Id.* § 9(A)(i).

Further recognizing the uncertainty and potential risks, the parties agreed to a limitation of

liability provision.  Except for "claims resulting from gross negligence, willful misconduct (including failure to make payments under this Agreement), or fraud," each party's "maximum aggregate liability under this Agreement shall be limited to the greater of" (i) "the amount paid or payable by [DraftKings] to" Plaintiffs during the 12-month period "preceding the events first giving rise to the claim" and (ii) ████████.  Agreement § 11.[1]  The parties also agreed, "in no event shall a party be liable (whether in contract, warranty tort (including negligence or other theory) . . . for any special, consequential, incidental, or indirect damages (including damages for loss of profit, revenue, business or data), however caused, even if such party has been advised of the possibility of such damages."  *Id.*  The parties amended the Agreement in December 2023, but they retained the broad termination rights and limitation of liability.  Compl. Ex. A ("Amended Agreement").  Both the Agreement and the Amended Agreement are governed by New York law. *See* Agreement § 13(F); Amended Agreement § 12(F).

By July 2024, the legal and regulatory landscape for NFTs had changed dramatically.  In March 2023, a putative class action lawsuit was filed against DraftKings in the District of Massachusetts:  *Dufoe v. DraftKings, Inc.*  Compl. ¶ 55.  The lawsuit alleged DraftKings' NFT products were unregistered "securities" sold in violation of federal and state securities laws.  *Id.* Beginning in July 2023, DraftKings received subpoenas from regulators concerning, among other things, NFTs sold on DraftKings' former Marketplace.  *See* DraftKings Inc., Annual Report for Fiscal Year 2023 (Form 10-K) at 52.[2]  On July 2, 2024, the district court denied DraftKings' motion to dismiss, ruling plaintiffs had "plausibly alleged that DraftKings NFTs in the context of the

---

[1] Section 11—the limitation of liability provision—is drafted in uppercase.  For the Court's convenience, DraftKings uses sentence case when quoting the limitation of liability.

[2] The Court can take judicial notice of DraftKings' SEC filing.  *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009); *SEC v. Straub*, 921 F. Supp. 2d 244, 251 n.3 (S.D.N.Y. 2013).

Marketplace are securities." Compl. ¶ 57. In addition, a growing number of other regulators and courts made or accepted claims that certain NFTs are securities. *See*, *e.g.*, *Dufoe v. DraftKings Inc.*, 2024 WL 3278637, at *4 (D. Mass. July 2, 2024) ("In recent years, multiple courts have held that blockchain-based digital assets may be investment contracts."); *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 433 (S.D.N.Y. 2023) (holding that plaintiffs adequately alleged that defendant's "offer of the NFT . . . was an offer of an 'investment contract' and therefore a 'security,' required to be registered with the SEC"); Admin. Proc. File. No. 3-21655, *In re Stoner Cats 2, LLC*, Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order, Release No. 11233 (Sept. 13, 2023) (settlement of SEC enforcement action charging company with an unregistered securities offering through its sale of NFTs); Admin. Proc. File. No. 3-21585, *In re Impact Theory, LLC*, Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order, Release No. 11226 (Aug. 28, 2023) (same).[3]

This dramatic change in legal and regulatory risk—the *Dufoe* decision, the regulatory subpoenas to DraftKings, and the growing number of other regulators and courts that made or accepted claims that certain NFTs are securities—made it materially impracticable for DraftKings to benefit from the rights granted under the Agreement. The potential consequences were real. For example, if DraftKings had continued to operate its NFT marketplace and sell NFTs, every sale could increase dollar-for-dollar the rescission damages the purported *Dufoe* class might seek. As a result of these circumstances, among others, DraftKings sent Plaintiffs a notice of termination

---

[3] The Court may take judicial notice of these SEC orders. *See Press v. Primavera*, 685 F. Supp. 3d 216, 225 (S.D.N.Y. 2023).

on July 29, 2024, and shut down the entirety of its NFT business the next day, not merely the portion that made use of Plaintiffs' intellectual property. Compl. ¶¶ 59–60.

Weeks later, Plaintiffs filed this suit, alleging DraftKings' termination was in anticipatory breach or, alternatively, a breach of contract. Plaintiffs seek ████████ in damages, representing the allegedly remaining post-termination "guaranteed payments" under the Agreement, as well as unspecified "consequential damages." Comp. ¶¶ 68, 74, 81. Plaintiffs' damages demand is inflated and based on misleading allegations.[4] It also violates the Agreement's limitation of liability provision.

## LEGAL STANDARD

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The complaint must contain more than "conclusory statements" or "naked assertions devoid of further factual enhancement." *Id*. (quoting *Twombly*, 550 U.S. at 557) (cleaned up). "[A]t a bare minimum, the operative standard requires the plaintiff to provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (cleaned up).

---

[4] Plaintiffs allege DraftKings "neglected to pay the second of four ████████ installment payments . . . due on August 1, 2024." Compl. ¶ 68. But that payment only became "invoiceable on or after August 1, 2024"—and only became "payable by [DraftKings] within thirty (30) days of receipt of an accurate and undisputed invoice." Amended Agreement § 2(A) (emphasis added). DraftKings timely paid that invoice.

**ARGUMENT**

I.   **The Limitation Of Liability Bars Plaintiffs' Claim For The Allegedly Remaining "Guaranteed Payments" Under The Agreement.**

Plaintiffs' ▆▆▆▆▆ damages claim should be dismissed as a matter of law because it exceeds the parties' negotiated limitation of liability provision. That provision is clear and unambiguous. Outside of narrowly defined exemptions, the "*maximum* aggregate liability" under the Agreement is the greater of (i) the amount paid or payable by DraftKings under the Agreement in the preceding twelve months, and (ii) ▆▆▆▆▆. Amended Agreement § 10(A) (emphasis added). Those limited exemptions for "claims resulting from gross negligence, willful misconduct (including failure to make payments under this Agreement), or fraud" do not apply here as a matter of law.

New York courts "routinely enforce[] liability-limitation provisions when contracted by sophisticated parties." *Process Am.*, 839 F.3d at 138 (quoting *Metro. Life Ins. Co.*, 84 N.Y.2d at 438). Enforcement serves the important public policy of permitting parties to contractually limit their liability and "allocat[e] . . . the risk of economic loss" if a contract is not fully performed. *Metro. Life Ins. Co.*, 84 N.Y.2d at 436. Although parties "may later regret their assumption of the risks of non-performance in this matter," "the courts let them lie on the bed they made." *Id*.

Courts also regularly enforce limitations of liability at the pleading stage, dismissing claims for damages inconsistent with such provisions. *See, e.g.*, *Powermat Techs., Ltd. v. Belkin Int'l Inc.*, 2020 WL 2892385, at *15 (S.D.N.Y. Apr. 2, 2020) (granting motion for judgment on pleadings and based on the pleadings alone, enforcing the limitation of liability clause, such that "any damages awarded to [plaintiff] on its breach of contract claim . . . [could] not exceed the fees paid by [defendant] in the 12 months preceding the date on which [plaintiff]'s 'claim was made'"); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 318 (S.D.N.Y. 2002) (granting defendant's motion

to dismiss "[plaintiff]'s allegations seeking recovery in contract against [defendant] in excess of $24,750,000," the cap established by the limitation of liability); *Pacs Indus., Inc. v. Cutler-Hammer, Inc.*, 103 F. Supp. 2d 570, 573 (E.D.N.Y. 2000) (similar).

Here, Plaintiffs do not dispute the limitation of liability provision is valid and enforceable under New York law. Nor do they dispute that their damages claim for all allegedly remaining "guaranteed payments" far exceeds the "maximum" liability allowed. Compl. ¶¶ 68, 74, 81; Amended Agreement § 10(A). Instead, they try to evade this contractual bar by invoking the "willful misconduct" exemption to the limitation of liability.[5] But it is clear from the plain and unambiguous text of the Agreement and from Plaintiffs' own binding judicial admissions that the "willful misconduct" exemption does not apply as a matter of law.

### A. The "Willful Misconduct" Exemption To The Limitation Of Liability Does Not Apply.

It is black-letter New York law that "willful misconduct" requires a showing of "willful[] inten[t] to inflict harm." *Process Am.*, 839 F.3d at 138. The New York Court of Appeals has construed "willful acts" provisions in negotiated contracts to require "conduct which is tortious in nature, i.e., wrongful conduct in which defendant *willfully intends to inflict harm* on plaintiff at least in part through the means of breaching the contract between the parties." *Metro. Life Ins. Co.*, 84 N.Y.2d at 438 (emphasis added). To qualify as willful misconduct, therefore, the breaching party's conduct must have "extended *well* beyond a simple breach of the contract." *Process Am.*, 839 F.3d at 140 (cleaned up).

For that reason, "[a] party acting in their own economic self-interest is not enough to constitute . . . willful misconduct." *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*,

---

[5] In their pre-motion letter, Plaintiffs do not argue the exemptions for fraud or gross negligence apply. Nor could they. The Complaint does not and could not possibly allege DraftKings engaged in gross negligence or fraud.

930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013). And "merely intentional nonperformance . . . motivated by financial self-interest" does not qualify. *Metro. Life.*, 84 N.Y.2d at 438; *see also Fabrique Innovations, Inc. v. Fed. Ins. Co.*, 853 F. App'x 709, 713 (2d Cir. 2021) (same).

Plaintiffs do not and could not allege facts to support a plausible inference of willful misconduct under New York law. To the contrary, Plaintiffs' own allegations negate any such inference. In their own complaint, Plaintiffs allege the "impetus for" DraftKings' termination of the Agreement was the NFT market had "cooled down," DraftKings was "facing a civil lawsuit and regulatory inquiries into its [NFT] product," and DraftKings experienced "[b]uyer's remorse." Compl. ¶ 3.

These allegations are "binding judicial admissions" and cannot be cured by amendment. *Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc*., 2008 WL 905188, at *7 (S.D.N.Y. Mar. 31, 2008). Accepting Plaintiffs' own allegations as true, DraftKings terminated the Agreement not to inflict harm on Plaintiffs but to protect itself from potential financial losses and the legal and regulatory risk posed by its NFT business.

This type of reasonable business decision is night and day from the "truly culpable, harmful conduct" required for willful misconduct. *Process Am.*, 839 F.3d at 138; *see*, *e.g.*, *Peak Ridge Master*, 930 F. Supp. 2d at 545 (allegations that defendant "engaged in conduct" that was "self-serving and aimed at maximizing its profits" are "insufficient to plead . . . willful misconduct"). For example, courts have found willful misconduct where an escrow agent on a movie deal "personally appropriat[ed] $120,000" from the escrow account, repeatedly withdrew unauthorized funds, and "fail[ed] to respond to Plaintiff's repeated inquiries." *Qube Films Ltd v. Padell*, 2016 WL 881128, at *5 (S.D.N.Y. Mar. 1, 2016). In another case, a court found willful misconduct where a defendant financial company "willfully knew of material breaches of" mortgage loans it

sold, including that files were incomplete, borrowers' incomes were overstated, and the loans violated the originators' policies, but "failed to cure these breaches for more than five years." *Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prod., Inc*., 958 F. Supp. 2d 488, 501 (S.D.N.Y. 2013). By contrast, a court held there was no willful misconduct where a bankrupt furniture store resold a fabric company's goods at lower than the contracted-for prices during store closing sales, as "[t]here is no evidence that [defendant's] sale of [plaintiff's] goods was motivated by anything other than [defendant's] own economic self-interest." *Fabrique Innovations, Inc. v. Fed. Ins. Co*., 354 F. Supp. 3d 340, 352 (S.D.N.Y. 2019), *aff'd*, 853 F. App'x 709 (2d Cir. 2021). Plaintiffs' own allegations—that DraftKings terminated the Agreement due to "buyer's remorse" and legal and regulatory risk—make clear that, at most, DraftKings was motivated by "economic self-interest" and as a result, there was no intent to inflict harm and therefore no willful misconduct. *Id.*

In their pre-motion letter, Plaintiffs do not—and could not—argue they sufficiently alleged any intent to inflict harm. Instead, Plaintiffs say "willful misconduct" is "not a uniformly defined term of art under New York law" and urge the Court to adopt a "more lenient" standard for willful misconduct that "require[s] only intentional conduct." Dkt. 23 at 4. This is flatly wrong. Plaintiffs' arguments are contrary to New York law.[6] New York courts have long made clear that

---

[6] In their pre-motion letter, Plaintiffs argue the Second Circuit's decision in *Process America* recognized a "more lenient" standard for "willful misconduct" that requires only "intentional conduct." Dkt. 23 at 4. Plaintiffs mischaracterize *Process America*—which makes clear that willful misconduct "extends *well* beyond a simple breach of contract," even intentional. 839 F.3d at 139 (cleaned up). Plaintiffs cite a portion of *Process America* that discusses *Bank of Am. Secs. LLC v. Solow Bldg. Co. II, LLC*, 47 A.D.3d 239 (1st Dep't 2007). Courts have repeatedly criticized the *Solow* decision and held that to the extent *Solow* "is read to suggest that an intentional and opportunistic contract breach, without more, is grounds for non-enforcement of an exculpatory clause, it is inconsistent with [New York] state law." *Five Star Dev. Resort Comms., LLC v. iStar RC Paradise Valley, LLC*, 2012 WL 4119561, at *5 (S.D.N.Y. Sept. 18, 2012) (applying New

"willful misconduct" does not "encompass merely intentional breaches of contract," but instead requires "wrongful conduct in which defendant willfully intends to inflict harm on plaintiff." *Trainum v. Rockwell Collins, Inc.*, 2017 WL 2377988, at *11–12 (S.D.N.Y. May 31, 2017). Cases are legion to this effect.[7]

Plaintiffs do not and cannot plead any intent to inflict harm, and thus fail to plausibly allege willful misconduct under New York law. The exemption to the limitation on liability for willful misconduct does not apply as a matter of law.

### B. Plaintiffs' Contrary Interpretation Of The "Willful Misconduct" Exemption Violates Plain Meaning And Well-Settled Canons of Construction.

Recognizing their inability to allege willful misconduct, Plaintiffs seek to evade the limitation of liability provision by erasing that term from the Agreement. Plaintiffs argue the parenthetical phrase "willful misconduct (including failure to make payments under this Agreement)" means *any and every* failure to make payments constitutes willful misconduct exempted from the limitation of liability. That interpretation is at odds with the case law, defies the plain language of the contract, and violates multiple, well-settled canons of construction.

**Plain Language**. "[W]hen parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." *Vt. Teddy Bear Co. v. 538 Madison Realty*

---

York law); *see also Devash LLC v. German Am. Cap. Corp.*, 104 A.D.3d 71, 77 (1st Dep't 2013) (limiting *Solow* and holding that "the type of intentional wrongdoing that could render a limitation in the [contract at issue] unenforceable is that which is 'unrelated to any legitimate economic self-interest'").

[7] *See, e.g., Metro. Life Ins. Co.*, 84 N.Y.2d at 438; *Fabrique*, 853 F. App'x at 713 (willful misconduct requires "truly culpable, harmful conduct" and "merely intentional nonperformance . . . motivated by financial self-interest" is not sufficient); *Five Star Dev., LLC*, 2012 WL 4119561, at *5 ("an intentional and opportunistic contract breach, without more" is not "grounds for non-enforcement of an exculpatory clause"); *In re CCT Commc'ns, Inc.*, 464 B.R. 97, 106 (Bankr. S.D.N.Y. 2011) ("[W]illful misconduct does not include the voluntary and intentional failure or refusal to perform a contract for economic reasons.").

*Co.*, 1 N.Y.3d 470, 475 (2004) (citation and ellipsis omitted). "[W]ords and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quotation marks and alterations omitted). Here, the plain meaning of the Agreement makes clear that the only "failure[s] to make payments" excluded from the limitation of liability are those that otherwise qualify as "willful misconduct."

This reading follows from the ordinary meaning and syntax of the contractual language. "Include" means "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate." *Webster's Third International Dictionary*, 1143 (2002); *see Anthem, Inc. v. Express Scripts, Inc.*, 2022 WL 1558879, at *5 (S.D.N.Y. Mar. 31, 2022) ("New York courts will commonly refer to dictionary definitions" to determine the "plain and ordinary meaning" of contractual terms). "Including" is used in a phrase to list items that are a *part* or *component* of the category it illustrates—in this case, "willful misconduct." *See Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (the term "including" "connotes simply an illustrative application of the general principle"). But an "including" phrase does not expand the scope of the category it illustrates to include new and different items. So, here, the parenthetical phrase does not expand "willful misconduct" to include *all* failures to make payments.

As a matter of ordinary usage, consider a doctor who instructs a patient to "avoid fried foods (including fruits and vegetables)." No patient would ever conclude they should avoid *all* fruits and vegetables, but instead avoid only *fried* fruits and vegetables. The patient should avoid french fries, not salads. The "including" phrase clarifies that doctor's orders prohibit *certain subsets* of fried foods; it does not define fried foods to mean something else entirely. Or suppose a football league had a rule governing "eligible receivers (including offensive linemen)." Plaintiffs

15

would never argue the rule applied to *all* offensive linemen. Instead, they would correctly understand that the parenthetical phrase includes only those offensive linemen who otherwise qualify as eligible receivers. Similarly, here, the parenthetical phrase does not exempt *all* failures to make payments from the limitation of liability, but only those failures to make payments that otherwise qualify as "willful misconduct." *See Penncro Assocs.*, 499 F.3d at 1156 (Gorsuch, J.) (using a similar analogy to interpret an analogous limitation of liability provision excluding "consequential damages," which the contract provided "include, but are not limited to, lost profits, lost revenues and lost business opportunities," and rejecting argument "that *any* lost profits are (forbidden) consequential damages").

Courts have interpreted similar limitations of liability provisions exactly that way. For example, in *In re Indesco Int'l, Inc*., 451 B.R. 274 (S.D.N.Y. Bankr. Apr. 13, 2011), the court considered a provision stating the parties "may not recover punitive, consequential, liquidated, incidental, or indirect damages, including lost profits." *Id.* at 316. The court construed this provision to mean a party would be barred from recovering lost profits *only* "insofar as they fall within the broader categories of indirect or consequential damages." *Id.*; *see also*, *e.g.*, *Nielsen Co. (U.S.), LLC v. Success Sys., Inc*., 112 F. Supp. 3d 83, 103 (S.D.N.Y. 2015) (holding the same as to provision that "exculpates the parties from liability for 'special, incidental, consequential, indirect, punitive or exemplary damages including but not limited to . . . lost profits,'" and stating that "[t]he term 'lost profits' as it is used here, clearly refers to an example" of damages that could fall under the exclusion, but did not in that case).

Similarly, in *Reid Hospital*, the court construed a limitation of liability provision stating "neither Party will be liable for, any amounts for indirect, incidental, special, consequential (including without limitation lost profits, lost revenue, or damages for the loss of data) or punitive

damages." 8 F.4th at 646. The court rejected the defendant's argument that the parenthetical phrase "redefine[d] the term 'consequential damages' to include *all* lost revenue"—and instead held that lost revenue was only subject to the limitation of liability when the lost revenue itself constituted "consequential" damages. *Id.* at 650–51; *cf. Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199–201 (2d Cir. 2003); *Stifel, Nicolaus & Co., Inc. v. Shift Techs., Inc*., 2022 WL 3648145, at *4–5 (S.D.N.Y. Aug. 23, 2022). The same is true here. The only "failure[s] to make payments" excluded from the limitation of liability are those that qualify as "willful misconduct."[8]

**Canons of Construction.** Well-settled canons of construction confirm this plain language reading—and preclude Plaintiffs' contrary interpretation. *See RM Realty Holdings Corp. v. Moore*, 64 A.D.3d 434, 437–38 (1st Dep't 2009) (using "well-settled canons of contract interpretation" to interpret unambiguous contractual language).

1.     The phrase "including failure to make payments" cannot be read "isolated from the context." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). Under the "old fundamental maxim" *noscitur a sociis*, "the meaning of a word in a provision may be ascertained by a consideration of the company in which it is found and the meaning of the words which are associated with it." *Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 48 A.D.2d 46, 48 (1st Dep't 1975). Applying that canon here, the parenthetical phrase "including failure to make payments" must be read in light of the phrase preceding it—*i.e.*, "willful misconduct." As explained above, "willful misconduct" requires more

---

[8] *Reid Hospital* refutes Plaintiffs' argument that the parenthetical phrase "serves to define the preceding term"—"willful misconduct." Dkt. 23 at 3. This argument also makes no sense. The Agreement includes numerous defined terms (indeed, the Agreement has sections titled "Definitions" for defined terms, *see* Amended Agreement §§ 1(F), 2(C), 2(D), 12(A)). These sophisticated parties knew how to define terms in the Agreement and could have made "willful misconduct" a defined term—but chose not to do so. This is "strong evidence that the omission" of a definition for "willful misconduct" was "intentional." *Avon Co. v. Fareva Morton Grove, Inc.*, 2022 WL 2208156, at *6 (S.D.N.Y. June 21, 2022); *see Stifel*, 2022 WL 3648145, at *5.

than "a simple breach of contract," even intentional, as a matter of New York law. *Process Am.*, 839 F.3d at 139–40. The language surrounding "willful misconduct"—"gross negligence" and "fraud"—reinforces this reading. These three phrases—"willful misconduct," "gross negligence," and "fraud"—collectively suggest the only kind of behavior exempted from the liability limitation is that which is done with an elevated *mens rea*: for example, the intent to cause harm. *See Metro. Life Ins. Co.*, 84 N.Y.2d at 438. Yet Plaintiffs' reading would impose strict liability for *any and all* failures to make payments—even entirely accidental ones. Such a reading would impermissibly "ascrib[e]" to the parenthetical phrase "a meaning so broad that it is inconsistent with its accompanying words." *Rothstein*, 837 F.3d at 210–11. The *noscitur a sociis* canon therefore confirms the only "failure to make payments" excluded from the liability limitation are those that are done with the intent to injure Plaintiffs and therefore constitute "willful misconduct."[9]

2. This reading is further confirmed by the well-settled principle that contracts, like statutes, are presumed not to "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *cf. Gallo v. Moen, Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) (applying this principle to contract interpretation). "[A] parenthetical is 'typically used to convey an aside or afterthought.'" *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 440 (2022). If these sophisticated parties had intended to overthrow the "willful misconduct" exemption to the limitation of liability—and to exclude *all* failures to make payments from the

---

[9] Plaintiffs erroneously assert the *noscitur a sociis* canon can "only be invoked where the meaning of the language at issue is not plain on its face." Dkt. 23 at 4. That is wrong. Courts routinely use the *noscitur a sociis* canon to interpret unambiguous contractual language. *See, e.g.*, *Vida Longevity Fund, LP v. Lincoln Life & Annuity Co. of N.Y.*, 2024 WL 1349221, at *5 (S.D.N.Y. Mar. 29, 2024) ("employing the canon of construction of *noscitur a sociis*" to interpret unambiguous contractual language); *In re Indesco Int'l*, 451 B.R. at 316 (applying the *noscitur a sociis* canon to interpret unambiguous limitation of liability provision).

limitation of liability—they would have expressly said so.  They would not, however, have upended the settled meaning of the "willful misconduct" exemption through "so subtle, indirect, and opaque a mechanism" as a parenthetical.  *Id.*

3.    Plaintiffs' interpretation also violates the surplusage canon by rendering the word "including" meaningless.  "It is a cardinal rule of contract construction that a court should adopt an interpretation that renders no portion of the contract meaningless."  28 N.Y. Prac., Contract Law § 10:7; *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007).  When "interpreting a contract, a court will strive to give meaning to every sentence, clause and word."  *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 581 F. App'x 72, 73 (2d Cir. 2014).

Here, by treating every "failure to pay" as "willful misconduct," Plaintiffs effectively remove the word "including" from the provision.  If Plaintiffs were correct, the parties could have exempted "gross negligence, willful misconduct, failure to make payments, or fraud" from the limitation of liability—and meant the exact same thing.  The parties did not do that.  Plaintiffs' interpretation fails to give any meaning to "including" or the use of a parenthetical clause, violating the surplusage canon.[10]

For these reasons, as a matter of basic contract interpretation, the only "failure[s] to make payments" excluded from the limitation of liability are those that constitute "willful misconduct"—that is, failures to make payments *intended to inflict harm.*  Plaintiffs' allegations negate any inference that DraftKings intended to inflict harm or engaged in "willful misconduct." Plaintiffs' own binding pleading admissions confirm the limitation of liability applies and require

---

[10] DraftKings' interpretation does not render the "including" parenthetical phrase "superfluous," as Plaintiffs say (*see* Dkt. 23 at 3).  The parenthetical confirms that a failure to make payments that otherwise constitutes "willful misconduct" is exempt from the limitation of liability.  DraftKings' interpretation is consistent with the ordinary meaning of "including" and does not render the parenthetical phrase surplusage.  *See Fed. Land Bank of St. Paul*, 314 U.S. at 100.

dismissal as a matter of law of their claim for any damages greater than either the amount paid or payable by DraftKings during the 12-month period immediately preceding the events first giving rise to the claim, or ███████.

## II.     The Limitation Of Liability Also Bars Plaintiffs' Claim For Consequential Damages.

Plaintiffs' request for "consequential damages" should be dismissed as barred by the limitation of liability. *See* Compl. ¶¶ 74, 81. The parties expressly agreed that "*in no event* shall a party be liable . . . for *any* special, *consequential*, incidental, or indirect damages." Amended Agreement § 10(A) (emphases added). This categorical bar on consequential damages—which is valid and enforceable under New York law—requires dismissal of Plaintiffs' claim for such damages. *See*, *e.g.*, *VL8 Pool, Inc. v. Glencore Ltd.*, 2021 WL 1152936, at *3–4 (S.D.N.Y. Mar. 25, 2021) (dismissing claim for consequential damages as barred by limitation of liability); *Serengetti v. JP Morgan Chase Bank, N.A.*, 2020 WL 2216661, at *4–5 (S.D.N.Y. May 7, 2020) (same); *TOA Sys., Inc. v. Int'l Bus. Machines Corp.*, 2019 WL 5693388, at *3 (S.D.N.Y. Nov. 4, 2019) (same).

Plaintiffs seek refuge in the "bad faith" exception to the enforceability of limitations of liability, arguing that in addition to willful misconduct, limitation of liability provisions are not enforceable when a defendant has acted in bad faith. Dkt. 23 at 4. The "bad faith" exception, however, presents "a high bar" under New York law. *Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys., USA, Inc.*, 2021 WL 149027, at *2 (S.D.N.Y. Jan. 15, 2021). That is especially true in a "commercial contract," like this one, "between sophisticated parties." *Convergia Networks, Inc. v. Huawei Techs. Co.*, 2008 WL 4787503, at *5 n.5 (S.D.N.Y. Oct. 30, 2008). To set aside a contractual limitation of liability under the "bad faith" exception, New York courts "demand[] nothing short of a compelling demonstration of egregious intentional misbehavior evincing extreme culpability; malice; recklessness; deliberate or callous indifference

to the rights of others, or an extensive pattern of wanton acts." *Radiology & Imaging Specialists*, 2021 WL 149027, at *2. Plaintiffs' allegations do not come close to satisfying this rigorous standard.

Plaintiffs do not allege, even in conclusory fashion, that DraftKings acted in "bad faith." Nor do they allege any facts to support a plausible inference of bad faith. To the contrary, Plaintiffs' own allegations preclude any such inference. As explained, Plaintiffs allege the "impetus for DraftKings' decision to" terminate the Agreement was that the "market for NFTs ha[d] cooled down," DraftKings was "facing a civil lawsuit and regulatory inquiries into its [NFT] product," and DraftKings experienced "[b]uyer's remorse." Compl. ¶ 3. Accepting Plaintiffs' own allegations as true, DraftKings did not act in bad faith.

This type of reasonable business decision is the opposite of bad faith. As New York courts have repeatedly held, "acting out of self-interest *alone* precludes a finding of bad faith or intentional wrongdoing." *Perrigo Pharma Int'l Designated Activity Co. v. Mead Johnson & Co. LLC*, 2024 WL 1375947, at *15 (S.D.N.Y. Apr. 1, 2024) (emphasis added). "The 'type of intentional wrongdoing that could render a [liability] limitation in [a contract] unenforceable is that which is *unrelated to any* legitimate economic self-interest.'" *Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 157 A.D.3d 579, 580–81 (1st Dep't 2018) (emphasis added). "Stated otherwise, a party can intentionally breach a contract to advance a legitimate economic self-interest and still rely on the contractual limitation [of liability] provision." *Id.* at 581 (quotation marks omitted). Plaintiffs therefore do not—and cannot—allege the type of bad faith or intentional wrongdoing that would allow them to evade the limitation of liability's bar on consequential damages.

In their pre-motion letter, Plaintiffs resort to arguing that whether DraftKings' termination

of the Agreement was "in bad faith" is "a fact-based question" that cannot be resolved on a motion to dismiss. Dkt. 23 at 4. This is wrong. Courts routinely dismiss claims for consequential damages as barred by contractual liability limitations at the pleading stage where, as here, the plaintiff does not plausibly allege bad faith. *See*, *e.g.*, *Perrigo Pharma*, 2024 WL 1375947, at *14–16 (granting motion to dismiss based on limitation of liability and concluding that plaintiff "failed to allege that [defendant] acted in bad faith or in an intentionally wrongful way" because "none of [plaintiff's] allegations specifically suggest that [defendant] intended to harm [plaintiff] rather than merely to act in its own economic self-interest"); *Radiology & Imaging Specialists*, 2021 WL 149027, at *3 (dismissing claim for consequential damages based on limitation of liability and reasoning that "Plaintiff fails to plead sufficient facts" to plausibly allege "bad faith" or "willful misconduct," as required to "nullify[] a limitation of liability clause under New York law"); *Constellation Brands, Inc. v. Keste, LLC*, 2014 WL 6065776, at *6 (W.D.N.Y. Nov. 13, 2014) (similar). The Court should do the same here.

**CONCLUSION**

For these reasons, the Court should dismiss (i) Plaintiffs' claims for any damages in excess of either the amount paid or payable by DraftKings during the 12-month period immediately preceding the events first giving rise to the claim, or ████████, and (ii) Plaintiffs' claims for consequential damages.

Dated: New York, New York
        November 25, 2024

                         GIBSON, DUNN & CRUTCHER LLP

                     By: /s/ *Orin Snyder*
                          Orin Snyder
                          Matt Benjamin
                          Grace E. Hart
                          GIBSON, DUNN & CRUTCHER LLP
                          200 Park Avenue
                          New York, NY 10166
                          (212) 351-4000
                          osnyder@gibsondunn.com
                          mbenjamin@gibsondunn.com
                          ghart@gibsondunn.com

                          Jacob T. Spencer (*pro hac vice* forthcoming)
                          GIBSON, DUNN & CRUTCHER LLP
                          1700 M Street, N.W.
                          Washington, DC 20036
                          (202) 955-8500
                          jspencer@gibsondunn.com

                          *Attorneys for Defendants DraftKings Inc. and DK Crown Holdings Inc.*