**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬x

NATIONAL FOOTBALL LEAGUE PLAYERS : 
ASSOCIATION and NATIONAL FOOTBALL : 
LEAGUE PLAYERS INCORPORATED, : 
                                    : 
          Plaintiffs, :      Case No. 1:24-cv-06407-AT
                                      : 
     v. : 
                                      : 
DRAFTKINGS INC. and DK CROWN : 
HOLDINGS INC., : 
                                    : 
          Defendants. : 
                                    : 

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬x

### PLAINTIFFS NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION AND NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL DISMISSAL <u>OF THE COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A.    DraftKings' NFT Marketplace and the Parties' Original License Agreement ........... 3

    B.    DraftKings Threatens to Repudiate and the Parties Amend the License Agreement ................................................................................................................. 6

    C.    After the *Dufoe* Court Denies DraftKings' Motion to Dismiss, DraftKings Sends Plaintiffs the Notice of Termination .................................................................. 7

ARGUMENT ........................................................................................................................ 10

    I.    THE UNAMBIGUOUS LANGUAGE OF THE LIMITATION OF LIABILITY PROVISION EXEMPTS PLAINTIFFS FROM ANY CAP ON DAMAGES ....................................................................................................... 10

        A.    The *Amended License Agreement*'s Definition of "Willful Misconduct" Controls—Not the Use of That Term in Other Contracts and Contexts ......................................................................... 11

        B.    DraftKings' Willful "Failure to Make Payments Under th[e] Agreement" Affords Plaintiffs Full Recovery of Their Damages ....................................................................................................... 15

    II.    WHETHER PLAINTIFFS ARE ENTITLED TO CONSEQUENTIAL DAMAGES AS A RESULT OF DRAFTKINGS' BAD FAITH IS A QUESTION OF FACT ....................................................................................... 19

CONCLUSION ..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Artvale, Inc. v. Rugby Fabrics Corp.*,
232 F. Supp. 814 (S.D.N.Y. 1964) ...................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................................20

*Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*,
597 U.S. 424 (2022)..........................................................................................17

*Dufoe v. DraftKings Inc.*,
2024 WL 3278637 (D. Mass. July 2, 2024)................................................... *passim*

*Dufoe v. DraftKings Inc.*,
No. 1:23-cv-10524-DJC (D. Mass.)...................................................... *passim*

*Electron Trading, LLC v. Morgan Stanley & Co. LLC*,
69 N.Y.S.3d 633 (N.Y. App. Div. 2018) ...............................................22

*Brown ex rel. Emergent Props. Inc. v. Bldg. Engines, Inc.*,
2022 WL 2532177 (S.D.N.Y. Apr. 15, 2022), 2022 WL 3274124 (S.D.N.Y.
Aug. 11, 2022), *aff'd sub nom. Brown v. Bldg. Engines, Inc.*, 2023 WL
4540565 (2d Cir. July 14, 2023) ...............................................................13

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
314 U.S. 95 (1941)............................................................................................17

*Friel v. Dapper Labs, Inc.*,
657 F. Supp. 3d 422 (S.D.N.Y. 2023).........................................................9

*Friel v. Dapper Labs, Inc.*,
No. 1:21-cv-05837 (S.D.N.Y.)...........................................................4, 6, 7, 22

*Gallo v. Moen, Inc.*,
813 F.3d 265 (6th Cir. 2016) ......................................................................10

*Henry v. Cap. One, N.A.*,
2023 WL 4044107 (2d Cir. June 16, 2023) ......................................9, 20

*Holmes v. Air Line Pilots Ass'n, Int'l*,
745 F. Supp. 2d 176 (E.D.N.Y. 2010) ...................................................14

*Hotchkiss v. Nat'l City Bank of N.Y.*,
200 F. 287 (S.D.N.Y. 1911)...........................................................................13

*Innophos, Inc. v. Rhodia, S.A.*,
  832 N.Y.S.2d 197 (N.Y. App. Div. 2007), *aff'd* 882 N.E.2d 389 (N.Y. 2008)......................12

*Local Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of N.Y., LLC*,
  469 F. Supp. 2d 80 (E.D.N.Y. 2007) ...................................................12

*Long Island Lighting Co. v. Transamerica Delaval, Inc.*,
  646 F. Supp. 1442 (S.D.N.Y. 1986)....................................................20

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
  643 N.E.2d 504 (N.Y. 1994) ...........................................................12

*Perrigo Pharma Int'l Designated Activity Co. v. Mead Johnson & Co. LLC*,
  2024 WL 1375947 (S.D.N.Y. Apr. 1, 2024)..............................................20, 22, 23

*PNC Bank, N.A. v. Dana Transp., Inc.*,
  2022 WL 3701441 (S.D.N.Y. Aug. 26, 2022), *rev'd on other grounds*, 2024
  WL 4662987 (2d Cir. Nov. 4, 2024)....................................................13, 14

*Popkin v. Sec. Mut. Ins. Co. of New York*,
  367 N.Y.S.2d 492 (N.Y. App. Div. 1975) ..............................................18

*President Container Grp. 11, LLC v. Systec Corp.*,
  467 F. Supp. 3d 158 (S.D.N.Y. 2020).................................................20, 22

*Radiology & Imaging Specialists v. Fujifilm Med. Sys.*,
  2021 WL 149027 (S.D.N.Y. Jan. 15, 2021) ............................................20, 23

*Reina v. Robert P. Kulchinsky, M.D., P.C.*,
  2005 WL 3240581 (N.Y. Sup. Ct. May 25, 2005).......................................17

*Sabella v. Scantek Med., Inc.*,
  2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009)..........................................14, 16

*In re Sarex Corp.*,
  509 F.2d 689 (2d Cir. 1975)..........................................................17

*Scenic Am., Inc. v. Dep't of Transp.*,
  583 U.S. 936 (2017)..................................................................17

*Tom Doherty Assocs. Inc. v. Saban Ent. Inc.*,
  869 F. Supp. 1130 (S.D.N.Y. 1994), *aff'd* 60 F.3d 27 (2d Cir. 1995) ..................13

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
  807 N.E.2d 876 (N.Y. 2004)...........................................................16

*VTech Holdings Ltd. v. Lucent Techs., Inc.*,
  172 F. Supp. 2d 435 (S.D.N.Y. 2001)..................................................14

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)..........................................................................................................10

**Other Authorities**

Andrew Hayward, *Disney NFT Platform Revealed by Dapper Labs, With Star
    Wars and Pixar Included*, DECRYPT (Nov. 14, 2023),
    https://decrypt.co/205941/disney-reveals-nft-platform-dapper-labs-including-
    star-wars-pixar .................................................................................................................9

*Bad Faith*, BLACK'S LAW DICTIONARY (2d ed. 1910) ................................................................21

*Bad Faith*, BLACK'S LAW DICTIONARY (12th ed. 2024) .............................................................21

*Misconduct*, DICTIONARY.COM, https://www.dictionary.com/browse/misconduct
    (last visited Dec. 16, 2024) ............................................................................................16

Press Release, Bill Hinman, Director of Division of Corporation Finance, SEC, &
    Valerie Szczepanik, Senior Advisor for Digital Assets and Innovation, SEC,
    Statement on "Framework for 'Investment Contract' Analysis of Digital
    Assets" (Apr. 3, 2019), https://www.sec.gov/newsroom/speeches-
    statements/statement-framework-investment-contract-analysis-digital-assets........................4

Vishal Chawla, *Biden Will Name Gary Gensler as SEC Chairman*,
    CRYPTOBRIEFING (Jan. 18, 2021), https://cryptobriefing.com/biden-
    nominates-gary-gensler-sec-chairman/ ............................................................................4

*Willful*, DICTIONARY.COM, https://www.dictionary.com/browse/willful (last
    visited Dec. 16, 2024) ....................................................................................................16

## PRELIMINARY STATEMENT

The Amended License Agreement at issue in this case contains a limitation of liability clause that excludes "willful misconduct (including failure to make payments under th[e] Agreement)." Defendants DraftKings Inc. and DK Crown Holdings Inc. (collectively, "DraftKings") ask the Court to conclude that the exception nonetheless does not apply to DraftKings' undisputed "failure to make payments under th[e] Agreement." In an attempt to conjure up a dispute where none should exist, DraftKings rattles off a string of hypotheticals—such as what might happen if a $5 royalty check got lost in the mail, or if an NFL player tripped a teammate, or if a doctor advised against eating fried foods. But this case isn't about any of those counterfactuals: it is about what Plaintiffs have actually alleged—DraftKings' undisputed and purposeful "failure to make payments under th[e] Agreement," *i.e.*, one of the specific things the parties agreed would not be subject to any liability cap. The answer to the question presented by DraftKings' Motion[1] just that simple.

DraftKings' Motion is merely the latest iteration of its relentless attempts to repudiate the deal it made with Plaintiffs (the "NFLPA Licensors"). DraftKings, a company whose business is to take calculated risks through online casino sportsbooks, knowingly wagered approximately ▓▓▓▓▓▓ in ***Minimum Guarantee*** payments on a novel NFT product featuring Plaintiffs' intellectual property (the names, images and likenesses of NFL players). DraftKings is a self-described "highly sophisticated part[y]" that made its bet eyes-wide-open to the reality that "NFTs faced an uncertain and evolving legal and regulatory environment." Br. at 1. Unfortunately for all parties—who shared together in DraftKings' NFT sales revenues above the Minimum

---

[1] References and citations to "Motion" or "Br." herein correspond to DraftKings' Memorandum of Law in Support of Their Motion for Partial Dismissal of the Complaint. ECF No. 32.

Guarantee—DraftKings' bet on its product turned out to be a bad one. But instead of honoring its contractual obligations, DraftKings has tried to escape its responsibility to pay.

DraftKings first threatened to renege in April 2023 by incorrectly claiming that if it shuttered its NFT product, it could excuse its own financial commitments. DraftKings eventually gave up this position, and in December 2023, the parties agreed to an amendment that benefited DraftKings in several respects. Then, in July 2024, DraftKings sent a notice of termination, this time falsely claiming it could terminate because a district court had "determined" its NFT products to be securities by allowing certain claims to proceed past the motion-to-dismiss stage, which obviously does not constitute any such "determination." Most recently, in its Motion, DraftKings emphasizes a third termination provision, asserting that "federal or state laws or regulations . . . make it materially impracticable for Licensee to benefit from the rights granted hereunder." But DraftKings has identified no such federal or state law or regulation, and for good reason: none exists. Each of these shifting "justifications" for termination is baseless on the face of the contract and under the indisputable facts. Tellingly, DraftKings does not ask the Court to dismiss either cause of action by arguing that its repudiation was proper under the contract's termination provisions, because it quite clearly was not.

Instead, DraftKings seeks to limit its liability, arguing that when the parties explicitly stipulated that a "failure to make payments under th[e] Agreement" would not be subject to the Agreement's limitation of liability, they actually meant something entirely different. DraftKings spills a great deal of ink advocating for a definition of "willful misconduct" so demanding it wouldn't include what DraftKings admits was an intentional "failure to make payments." Per DraftKings, so long as not paying Plaintiffs is in DraftKings' financial self-interest—as it always would be—then the failure to pay can *never* amount to willful misconduct. Despite DraftKings'

tortured analogies and citations to "willful misconduct" in *other* contracts and cases, however, there can be no doubt that *these* parties' use of "willful misconduct" in *their* contract *must* "includ[e] failure to make payments under th[e] Agreement" because that is exactly what they said. This straightforward conclusion, based on the explicit language of the limitation of liability provision, is not an "elephant hiding in a mousehole"; it is an elephant in the room far too large to ignore. Plaintiffs respectfully request that the Motion be denied.

## BACKGROUND

### A. DraftKings' NFT Marketplace and the Parties' Original License Agreement

2021 marked the surge of "alternative assets" (those that are not stocks, bonds, or cash), including non-fungible tokens ("NFTs"). Compl. (ECF No. 1) ¶ 27. As one of the leading online fantasy sports and betting companies in the United States, DraftKings was eager to capitalize on the public's newfound fascination with NFTs. *Id.* ¶¶ 14–25, 29. It had the capital to spare and sought to further bolster its revenues by incorporating sports-themed alternative assets into its slate of offerings. *Id.*

Accordingly, on July 21, 2021, DraftKings announced that it would be entering the NFT marketplace, acting as both seller and broker of NFTs featuring the likenesses of a discrete group of prominent athletes. *Id.* ¶¶ 30–31. DraftKings' NFT Marketplace launched roughly a month later, and those niche, one-off player offerings were an instant sensation. *Id.* ¶ 32.

Motivated by the profitability of its newest endeavor, DraftKings soon sought to acquire from Plaintiffs—the labor union for all NFL players (the "NFLPA") and the exclusive group licensing representative of NFL players on behalf of the NFLPA ("NFLPI")—the intellectual property rights to the names, images and likenesses of NFL players for use in "NFLPA Collectibles." *See id.* ¶¶ 10–12, 33–34. The NFTs could be bought and sold on DraftKings' website and used in DraftKings' fantasy sports competitions (known as "Reignmakers" contests). *See id.*

¶¶ 42–45. To bring those plans to life, DraftKings entered into a license agreement with Plaintiffs, effective November 19, 2021 (the "License Agreement" (ECF No. 1-2)). *See id.* ¶ 36.

As DraftKings admits, it entered into the License Agreement with full awareness that "the NFT business faced an uncertain legal and regulatory environment." Br. at 6. In May 2021, for example, investors in Dapper Labs ("Dapper")—an NFT company—filed a putative class action alleging that Dapper's NBA NFT products were securities and that Dapper had violated federal securities laws by failing to register them with the Securities and Exchange Commission ("SEC"). *See* Ex. A to Notice of Removal, *Friel v. Dapper Labs, Inc.* ("*Dapper*"), No. 1:21-cv-05837 (S.D.N.Y. July 7, 2021), ECF No. 4-1. And the SEC—which had been warning corporations for at least two years that some NFTs could potentially constitute securities under federal law—had just seen noted cryptocurrency skeptic Gary Gensler appointed its chair. *See* Press Release, Bill Hinman, Director of Division of Corporation Finance, SEC, & Valerie Szczepanik, Senior Advisor for Digital Assets and Innovation, SEC, Statement on "Framework for 'Investment Contract' Analysis of Digital Assets" (Apr. 3, 2019), https://www.sec.gov/newsroom/speeches-statements/statement-framework-investment-contract-analysis-digital-assets; Vishal Chawla, *Biden Will Name Gary Gensler as SEC Chairman*, CRYPTOBRIEFING (Jan. 18, 2021), https://cryptobriefing.com/biden-nominates-gary-gensler-sec-chairman/ ("The appointment of [Gary] Gensler [to SEC chairman] is expected to bring in a new era of more refined cryptocurrency regulations in the United States."). Nevertheless, DraftKings chose to press on with acquiring the right to use NFL players' identities in certain NFT products, outbidding rivals to secure these exclusive rights.

The NFLPA Licensors protected themselves from the business risks inherent in tying up their rights in this particular market by securing for themselves ***"Minimum Guarantee"*** payments

that were payable *"regardless of how many sales occur or how much revenue is generated."* *See* Compl. ¶ 37 (quoting License Agmt. § 2(A)) (emphasis added); *see also id.* ¶ 40. Such minimum guarantees are a common feature in intellectual property agreements. *See id.* ¶ 38. The licensee, which commercializes the intellectual property, reaps the bulk of revenue royalties should their product be successful; the licensor obtains a minimum payment stream plus a distinct share of the product's upside potential (the revenue royalty). *See id.* As a publicly traded company with diversified and profitable business lines that would thrive regardless of the performance of the licensed product, DraftKings was well-suited to make such a commitment. *See id.* ¶¶ 14–25.

The License Agreement also provided both parties protections against future contingencies, including some of the risks inherent in the legal landscape discussed above. Specifically, it allowed each of DraftKings and the NFLPA Licensors to terminate the License Agreement upon discrete, specified triggering events, including:

- if any Party "files a petition in bankruptcy or is adjudicated as bankrupt, or if a petition in bankruptcy is filed against any such Party or if such Party becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy laws, or if such Party discontinues its business, or if a receiver is appointed for it or its businesses" (License Agmt. § 9(A)(iii));

- if "any governmental, administrative, or adjudicatory body (e.g., the Securities and Exchange Commission or state regulatory authorities) determines that the Licensed Product is a security" (*id.* § 9(A)(i)(3));

- "if federal or state laws or regulations, ████████████████████████, make it materially impracticable for [DraftKings] to benefit from the rights granted hereunder" (*id.* § 9(A)(iv)); and

- "immediately in the event that the performance of such other Party's obligations under th[e] Agreement would be in violation of any law, rule, regulation, or order applicable to such other Party (whether now known or hereafter adopted) and the failure to comply with such law, rule, regulation, or order would have a material adverse effect on the terminating Party" (*id.* § 9(A)(i)(2)).

*See* Compl. ¶ 36. Finally, the License Agreement also contained the limitation of liability provision that DraftKings invokes in its Motion. *See* License Agmt. § 11.

**B.** **DraftKings Threatens to Repudiate and the Parties Amend the License Agreement**

DraftKings launched the first NFLPA Collectibles in May 2022. *See* Compl. ¶ 42. By February 2023, however, additional industrywide warning signs appeared, with NFT prices and trading volume declining across the board. *Id.* ¶ 46. Just one month later—on March 9, 2023—a putative class action was filed against DraftKings, alleging (much like *Dapper*) that DraftKings' NFT products were unregistered "securities." *See id.* ¶ 55; Compl., *Dufoe v. DraftKings Inc.*, No. 1:23-cv-10524-DJC (D. Mass. Mar. 9, 2023), ECF No. 1. DraftKings responded to the allegations that its NFTs were securities by calling them "demonstrably untrue." Compl. ¶ 56.

The broader downturn in the NFT market and the filing of the putative class action had no bearing on the Minimum Guarantee payments owed to the NFLPA Licensors. *Id.* ¶ 47. But DraftKings—confronted with dwindling interest in its products—refused to assure that it would make the payments owed. *Id.* An April 29, 2023 deadline for a "True-Up" payment came and went without remittance. *Id.* ¶ 48. DraftKings threatened to voluntarily discontinue Reignmakers and its NFT Marketplace, claiming that it could do so to excuse its payment obligations. *Id.* DraftKings could not have actually believed this argument: the termination provision it invoked contemplates the complete end to a party's business, not a highly profitable company's decision to stop selling a single product in order to evade payment obligations. *Id.* ¶ 49. Sure enough, after the NFLPA Licensors threatened legal action in response to this frivolous tactic, DraftKings made the True-Up payment. *See id.*

Despite DraftKings' machinations, Plaintiffs tried to make the partnership work. To address DraftKings' poor sales, Plaintiffs agreed to amend the License Agreement. *Id.* ¶ 50.

Among other things, Plaintiffs agreed to expand DraftKings' permitted uses of the intellectual property, to reduce DraftKings' marketing commitments, and to allow the latter to be more flexibly spent. *Id.* ¶ 51; *compare* License Agmt. § 2(G), *with* Amended License Agmt. (ECF No. 1-1) § 2(H). The parties entered into the Amended License Agreement memorializing these terms on December 19, 2023.

Critically, the Amended License Agreement retained the same grounds for termination based upon future contingencies that had been included in the License Agreement. *Compare* License Agmt. § 9(A), *with* Amended License Agmt. § 8(A) (framing termination rights "if" and "in the event" of specified future developments). DraftKings is thus foreclosed from relying on developments (like SEC subpoenas) that occurred *before* it entered into the Amended License Agreement as a basis for subsequently terminating that agreement. Indeed, DraftKings also warrantied in the Amended License Agreement that the licensed NFTs "compl[ied] with all applicable laws, rules and regulations." Amended License Agmt. § 7(D). But other than the *Dufoe* motion-to-dismiss decision that would come down six months after the amendment was signed, *everything* in DraftKings' laundry list of excuses for terminating occurred *before* DraftKings entered into the Amended License Agreement. *See* Br. at 7–8 (identifying DraftKings' receipt of subpoenas from regulators in July 2023, the denial of the motion to dismiss in *Dapper* in February 2023, and the settlements of two SEC enforcement actions in August and September 2023—all pre-December 19, 2023).

### C.    After the *Dufoe* Court Denies DraftKings' Motion to Dismiss, DraftKings Sends Plaintiffs the Notice of Termination

On July 2, 2024, the district court in *Dufoe* denied DraftKings' motion to dismiss. The district court did not, of course, make any merits determination about whether DraftKings' NFTs are in fact securities. Like every other district court ever presented with a Rule 12(b)(6) motion,

the *Dufoe* court "accepted as true" all of Dufoe's allegations, deferred deciding fact issues raised by DraftKings until after discovery, and "evaluate[d] *only* whether Dufoe ha[d] plausibly *alleged* that DraftKings NFTs in the context of the Marketplace are securities." *Dufoe*, 2024 WL 3278637, at *1, *4 (D. Mass. July 2, 2024) (emphases added).

A few weeks later, DraftKings sent Plaintiffs a "Notice of Termination" claiming that the *Dufoe* district court had "determined that the NFTs sold on [*sic*] Marketplace are securities subject to federal and state registration requirements" and that, "[a]s a result," DraftKings had "invoke[d] [its] termination rights." Compl. ¶ 59 (quoting Notice of Termination (ECF No. 1-3) at 1–2). Without waiting for Plaintiffs to respond, DraftKings discontinued the NFT Marketplace in short order.

The Notice of Termination was not an apology for an "entirely accidental" failure to make payments under the Amended License Agreement (*see* Br. at 18), as DraftKings' counterfactual example suggests. It was the culmination of DraftKings' yearslong crusade to willfully, pretextually and baselessly terminate the Amended License Agreement and License Agreement and circumvent its Minimum Guarantee payment obligations. *See* Compl. ¶¶ 67–68. DraftKings knew full well that the *Dufoe* opinion determined absolutely nothing about whether DraftKings' NFTs constitute securities. For example, in its August 10-Q filing with the SEC—submitted after both the pleadings decision in *Dufoe* and the Notice of Termination—DraftKings said it would continue to "vigorously defend" against the claims that NFTs sold on its Marketplace are securities. Compl. ¶ 63 (quoting DraftKings Inc., Quarterly Report for the Quarterly Period ended June 30, 2024 (Form 10-Q) at 45 (Aug. 2, 2024)). In the same vein, DraftKings' Answer in *Dufoe* specifically denies that the products are securities. *Compare* Am. Compl. ¶ 92, *Dufoe*, No. 1:23-cv-10524-DJC (D. Mass. Aug. 4, 2023), ECF No. 38, *with* Answer ¶ 92 (D. Mass. Aug. 15, 2024),

ECF No. 74 ("Defendants deny the allegations of Paragraph 92."). In other words, the fabricated explanation DraftKings gave Plaintiffs for terminating under Section 8(A)(1)(iii) of the Amended License Agreement was the polar opposite of what DraftKings was telling the court in *Dufoe* and its investors (*e.g.*, in its 10-Q filing after the decision).[2]

The kitchen-sink Notice of Termination cited three more termination provisions—each excerpted above—all of which are patently inapplicable. *One*, DraftKings referenced (as it does again here) the right to terminate "if federal or state laws or regulations, ██████████████ █████████, make it materially impracticable for [DraftKings] to benefit from the rights granted hereunder." *See* Notice of Termination at 2 (citing Amended License Agmt. § 8(A)(iv)); *see* Compl. ¶ 64. But DraftKings still cannot identify *any* such change in "federal or state law[]or regulation" because none exists. It is equally and independently frivolous for DraftKings to contend that since it signed the Amended License Agreement it has become "materially impracticable" for it to benefit from Plaintiffs' intellectual property. Dapper, for instance, faced a lawsuit similar to *Dufoe*, filed a motion to dismiss that was denied, and yet continues to sell NFTs.[3] There was no reason DraftKings could not continue to benefit from the use of NFL players' identities in NFTs; rather, DraftKings decided it no longer wanted to pay the price it had agreed to for those rights.

*Two*, DraftKings cited a termination right "in the event that the performance of such *other* Party's obligations under this Agreement would be in violation of any law, rule, regulation, order

---

[2] DraftKings Inc., Quarterly Report for the Quarterly Period ended June 30, 2024 (Form 10-Q) at 45 (Aug. 2, 2024).

[3] *See, e.g.*, *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023); Andrew Hayward, *Disney NFT Platform Revealed by Dapper Labs, With Star Wars and Pixar Included*, DECRYPT (Nov. 14, 2023), https://decrypt.co/205941/disney-reveals-nft-platform-dapper-labs-including-star-wars-pixar (reporting on Dapper's agreement with Disney to mint NFTs *after* denial of Dapper's motion to dismiss class action related to its NBA-related NFT offerings).

applicable to such *other* Party." Notice of Termination at 2 (citing Amended License Agmt. § 8(A)(i)(2)) (emphases added); Compl. ¶ 65. This termination ground is available only when the *"other"* party's (here, Plaintiffs') performance under the Amended License Agreement would be illegal. DraftKings doesn't even make that argument.

*Three*, DraftKings went back to the well with the "discontinued its business" termination provision it had previously threatened to exercise and then abandoned, despite the fact that DraftKings has not filed for bankruptcy, been placed into receivership, or "discontinued its business." Notice of Termination at 2 (citing Amended License Agmt. § 8(A)(iii)); Compl. ¶ 66. In *Dufoe*, by contrast, DraftKings had "emphasize[d] . . . that the NFT marketplace is not DraftKings's entire business," asserting that its "revenue exceeded $2.24 billion in 2022." Compl. ¶ 66 (quoting *Dufoe*, 2024 WL 3278637, at *5). DraftKings thus once again tried to excuse its repudiation with the NFLPA Licensors by advancing an argument that it had disavowed elsewhere.

In sum, DraftKings' willful and pretextual repudiation of the Amended License Agreement amounts to a deliberate attempt to renege on the bargain it struck and the risks it assumed. DraftKings' convoluted reading of the limitation of liability provision is just more of the same— an attempt to twist the plain language of the agreement to evade its clear obligations. *See* Amended License Agmt. § 10(A) (emphasis added).

## ARGUMENT

### I. THE UNAMBIGUOUS LANGUAGE OF THE LIMITATION OF LIABILITY PROVISION EXEMPTS PLAINTIFFS FROM ANY CAP ON DAMAGES

DraftKings contends that sophisticated parties "do not hide elephants in contractual mouseholes." Br. at 5; *see id.* at 18 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). That axiom may hold true when discussing ancillary statutory terms (*Whitman*, 531 U.S. at 468) or even efforts to imply language into an otherwise silent contractual agreement (*Gallo v.*

*Moen, Inc.*, 813 F.3d 265, 268–69 (6th Cir. 2016)). But in-text language, smack in the middle of an all-caps provision, addressing the exact conduct alleged ("failure to make payments under th[e] Agreement"), is no "mousehole." This elephant is right there in the room. DraftKings' studious and strained efforts to write the clause out of the parties' agreement cannot change that fact. By the Amended License Agreement's unambiguous language, Plaintiffs may recover their damages in full.

A.    The *Amended License Agreement*'s Definition of "Willful Misconduct" Controls—Not the Use of That Term in Other Contracts and Contexts

The plain language of the Amended License Agreement excludes "willful misconduct (including failure to make payments under th[e] Agreement)" from the contract's limitation of liability provision. Plaintiffs have alleged, and DraftKings does not dispute, that DraftKings has failed to make Minimum Guarantee payments due; Plaintiffs have also alleged that failure was intentional and prohibited by the contract. *See, e.g.*, Compl. ¶ 68. These facts alone compel denying the Motion.

Rather than confront this reality, DraftKings urges the Court to constrain the scope of culpable willful misconduct to tortious actions evidencing a "willful inten[t] to inflict harm." Br. at 11 (arguing that "'willful acts' provisions in negotiated contracts [] require 'conduct which is tortious in nature'") (citations omitted). It insists that, contrary to the language in the Amended License Agreement, this so-called "black-letter" common law definition of "willful misconduct" controls, and the Court's inquiry into the limitation of liability provision should not proceed (one parenthetical) further. *Id.* at 11–20. But DraftKings misses the point. The question presented is not whether the NFLPA has alleged "willful misconduct" as the term might have been understood in unrelated contracts and unrelated contexts, but whether the NFLPA has alleged "willful misconduct" *as specifically defined in the Amended License Agreement*. In a case cited by

DraftKings six times, the New York Court of Appeals rejected the Appellate Division's interpretation of "willful acts" in a limitation of liability provision by reference to New York tort law rather than by reference to its usage in the contract at issue:

> [T]he issue is *what the parties intended by 'willful acts'* as an exception to their contractual provision limiting defendant's liability . . . . *Thus, to the extent that the Appellate Division opinion holds that tort law principles apply in all cases in which the word willful is at issue or thereby limits the legal meaning of the word, we do not agree.*

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 506–07 (N.Y. 1994) (emphases added);[4] *see also Innophos, Inc. v. Rhodia, S.A.*, 832 N.Y.S.2d 197, 199 (N.Y. App. Div. 2007), *aff'd* 882 N.E.2d 389 (N.Y. 2008) (recognizing, when assessing whether a fee constitutes a "Tax" for purposes of an indemnification provision, that the "relevant issue here is not whether the [fee] is a tax under New York or Mexican law, but rather whether the [fee] is considered a tax as that term is defined in the parties' agreement").

The Court of Appeals' framing makes sense. Contracting parties are the masters of their own agreement and free to "define their rights and obligations in any way they wish." *Local Union 813, Int'l Bhd. of Teamsters v. Waste Mgmt. of N.Y., LLC*, 469 F. Supp. 2d 80, 87 (E.D.N.Y. 2007). The notion that counterparties would be bound to a definition used in other circumstances, by unrelated parties in unrelated contracts, squarely defies this doctrine. *See Artvale, Inc. v. Rugby Fabrics Corp.*, 232 F. Supp. 814, 820 (S.D.N.Y. 1964) (recognizing in breach of contract dispute that "in drafting th[e] agreement the parties were free to define the [contract provision] in any terms they wished"). Tellingly, DraftKings does not identify a single example of a court

---

[4] The court ultimately affirmed the Appellate Division's conclusion, but this was based on the specific usage of "willful acts" *in the parties' contract* rather than how "willful acts" had been previously defined in other cases and settings. And the *Metro Life Insurance* contract did not expressly define "willful acts" to include contractual misconduct, much less the exact conduct at issue (*i.e.*, the failure to make payments), as the Amended License Agreement does here.

supplanting a contract's express definition of willful misconduct with its own.

Here, of course, we know the parties' use of the words "willful" and "misconduct" was *not* limited to "conduct which is tortious in nature" (Br. at 11) because the exemplar that the Amended License Agreement provides—a "failure to make payments *under th[e] Agreement*"—is by definition *contractual* misconduct. (emphasis added). "Willful misconduct" in the Amended License Agreement *must* be interpreted to "includ[e] failure to make payments under th[e] Agreement" because that is exactly what the parties wrote. Indeed, none of the cases DraftKings relies upon define the words "willful misconduct" (or "willful acts") to include failures to pay under the contract at issue, as the parties did here.

Notably, even where counterparties define a contractual term differently than it is regularly defined outside of their contract—even very differently—it is of no consequence. *Tom Doherty Assocs. Inc. v. Saban Ent. Inc.*, 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994) ("[I]f it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail . . . .") (emphasis omitted) (quoting *Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911)), *aff'd* 60 F.3d 27 (2d Cir. 1995); *see Brown ex rel. Emergent Props. Inc. v. Bldg. Engines, Inc.*, 2022 WL 2532177, at *7 (S.D.N.Y. Apr. 15, 2022) (rejecting argument that contract term was ambiguous because "[t]he Court cannot find an ambiguity solely because the definition chosen by the parties differs from what otherwise might be the commonly recognized definition of the term"), *report and recommendation adopted*, 2022 WL 3274124 (S.D.N.Y. Aug. 11, 2022), *aff'd sub nom. Brown v. Bldg. Engines, Inc.*, 2023 WL 4540565 (2d Cir. July 14, 2023).

On top of all of that, DraftKings is flat wrong that its handpicked definition of willful misconduct amounts to uniformly applied "black-letter" law. *See PNC Bank, N.A. v. Dana Transp.,*

*Inc.*, 2022 WL 3701441, at *7 (S.D.N.Y. Aug. 26, 2022) ("New York law may be inconsistent as to whether an intentional breach, without more, could ever be sufficient to establish willful misconduct resulting in the non-enforcement of an exculpatory clause."), *rev'd on other grounds*, 2024 WL 4662987 (2d Cir. Nov. 4, 2024). This Court's observation in *PNC Bank* about the "inconsistent" application of "willful misconduct" under New York law is yet another reason why the definition must be divined from the parties' Amended License Agreement rather than from DraftKings' submission of different cases that apply different standards.[5]

DraftKings nonetheless insists that, in this case, the Court must take the definition of "willful misconduct" from caselaw rather than from the plain language of the Amended License Agreement because a parade of horribles would ensue from ascribing *any* meaning to the phrase "failure to make payments." According to DraftKings, doing so would "transform every failure to make a payment—even a completely inadvertent failure—into 'willful misconduct.'" Br. at 5. That's just wrong. DraftKings' illustration of an invoice underpaid by $5 supposedly resulting in a commercially absurd exception to the limitation of liability provision is a red herring. *See id.* at 3. DraftKings' liability in that scenario would be $5. The limitation of liability provision would

---

[5] Although DraftKings argues that it is "flatly wrong" that New York courts interpret the phrase "willful misconduct" in varied ways (*see* Br. at 13 & n.6), including applying the phrase to require intentional conduct and nothing more, New York courts have on numerous occasions done just that. *See, e.g.*, *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 200–01 (E.D.N.Y. 2010) (recognizing that "[c]ourts interpreting 'willful misconduct' in exculpation clauses . . . have defined the term as 'intentional' conduct," and "appl[ying] the 'intentional' standard in [the] analysis of plaintiffs' breach of contract claims"); *Sabella v. Scantek Med., Inc.*, 2009 WL 3233703, at *31 (S.D.N.Y. Sept. 25, 2009) (defining "willful misconduct" in the limitation of liability provision of the parties' contract according to its "ordinary meaning"— "[m]isconduct committed voluntarily and intentionally"—where the parties did not define the phrase in the contract); *see also VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 441–42 (S.D.N.Y. 2001) (denying motion to dismiss where contractual liabilities cap contained an exception for "intentional tort or willful misrepresentation" because "[i]t [wa]s surely unclear at th[at] point whether the parties intended 'willful misrepresentation' to be limited to torts").

not matter. If anything, it is DraftKings' assertion—that so long as it is acting to advance its "own economic self-interest," it may willfully breach the contract while retaining its protections under the limitation of liability—which leads to commercially absurd results. *See* Br. at 11–12. *Not paying* will always be in the payor's economic self-interest. So, according to DraftKings, it could intentionally "fail to make" a ███████ royalty payment and then claim the NFLPA Licensors are limited to ███████ in liability (half of what they are owed) because DraftKings' decision to stiff its partner was "motivated by financial self-interest." That is not what the parties' Amended License Agreement provides for, and it is not a commercially reasonable outcome. And, unlike the various outlandish hypotheticals DraftKings trots out,[6] the preceding example comes from real life: DraftKings intentionally short-changing Plaintiffs in defiance of their agreement is *exactly* what the Complaint alleges.

**B. DraftKings' Willful "Failure to Make Payments Under th[e] Agreement" Affords Plaintiffs Full Recovery of Their Damages**

As discussed above, DraftKings asserts that if this Court assigns any meaning to the parenthetical "including failure to make payments under th[e] Agreement," it must restrict that phrase to DraftKings' definition of the singular term "willful misconduct" requiring "conduct which is tortious in nature," and exempting any and all actions DraftKings takes in its economic self-interest, even if done deliberately. By doing so, of course, DraftKings would cap every single "failure to make payments" under the limitation of liability because such failures would *always* be in the non-payor's self-interest, regardless of its other motivations.

---

[6] As for a check that gets lost in the mail (*see* Oct. 28, 2024 Ltr. from O. Snyder (ECF No. 19) at 4), that would not be a "failure to make payments" (singular or plural), let alone an intentional one; it would instead be a failure to deliver the payment to its intended destination.

In addition to being commercially unreasonable, DraftKings' all-or-nothing approach—either the Court defines the phrase "willful misconduct" to include or exclude *every* "failure to make payments," whether "willful" or not—is also illogical. At a minimum, the limitation of liability provision *must* be interpreted to include at least some "failure[s] to make payments" or it ceases to have any meaning at all, thus violating one of the bedrock rules of contract interpretation. *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (finding it impermissible to "by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing").

Here, dictionary definitions—which DraftKings invokes only when expedient (*e.g.*, Br. at 15)—supply the obvious answers. The plain meaning of "willful" is "deliberate, voluntary, or intentional";[7] and the plain meaning of "misconduct" is "improper or wrong behavior."[8] *See also Sabella*, 2009 WL 3233703, at *31 (the "ordinary meaning" of "willful misconduct" is "[m]isconduct committed voluntarily and intentionally"). Such customary application of the words "willful" and "misconduct" accommodates DraftKings' hypotheticals—after all, an *accidental* underpayment or non-payment is not "willful misconduct"—while at the same time giving effect to the parties' inclusion of language regarding DraftKings' "failure to make payments," which Plaintiffs have clearly alleged was intentional. DraftKings' reading of the limitation of liability provision, by contrast, simply reads out the words "failure to make payments under th[e] Agreement." That cannot be right.

---

[7] *Willful*, Dictionary.com, https://www.dictionary.com/browse/willful (last visited Dec. 16, 2024).

[8] *Misconduct*, Dictionary.com, https://www.dictionary.com/browse/misconduct (last visited Dec. 16, 2024).

DraftKings soft-pedals this fatal flaw in its "interpretation" by arguing that the words the parties chose are nothing more than an "afterthought" and "illustrative." Br. at 14–16, 18. This characterization essentially concedes the error: presumably, according to DraftKings, contractual "afterthoughts" (whatever that means) may be freely ignored, which is directly at odds with New York law. Indeed, the caselaw DraftKings cites in support of its position—like its "elephants in mouseholes" analogy—relates to the interpretation of federal *statutes*, not private contracts. *See Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 440 (2022) (applying tools of statutory interpretation to the Medicare and Medicaid Act) (cited at Br. at 18); *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (applying tools of statutory interpretation to the Federal Farm Loan Act) (cited at Br. at 15); *see generally Scenic Am., Inc. v. Dep't of Transp.*, 583 U.S. 936, (2017) (statement of Gorsuch, J., respecting the denial of certiorari) (rejecting the notion that tool of statutory construction "displace the traditional rules of contract interpretation"). Applying interpretive principles of New York contract law, by contrast, there is no question that both the term "including," and parentheticals more generally, help define the metes and bounds of the preceding phrase. *See In re Sarex Corp.*, 509 F.2d 689, 691 (2d Cir. 1975) (recognizing that "including" is commonly construed "as a term of enlargement, not of limitation"); *Reina v. Robert P. Kulchinsky, M.D., P.C.*, 2005 WL 3240581, at *2 (N.Y. Sup. Ct. May 25, 2005) (holding that "the language in parenthesis [in the parties' contract] defines, rather than limits, the term" preceding the parenthetical). Plaintiffs' proffered interpretation of "willful misconduct" encompassing an intentional "failure to make payments under th[e] Agreement" gives effect to each of the provisions' terms; DraftKings' does not.

Of course, even if the parenthetical did serve an entirely "illustrative" purpose, that illustration would still buttress Plaintiffs' reading of the provision. DraftKings' (other) favorite

analogy—a "doctor who instructs a patient to 'avoid fried foods (including fruits and vegetables)'" (Br. at 4, 15–16; Oct. 28, 2024 Ltr. from O. Snyder at 4)—actually proves Plaintiffs' point. Under the Amended License Agreement, the "failure to make payments" (eating fried fruits and vegetables) is a particular species of "misconduct" (eating any fried foods), and the "willful" engagement in that species of misconduct is exempted from the limitation of liability. Unlike DraftKings' out-of-left-field examples,[9] Plaintiffs have directly alleged that DraftKings ate a "fried fruit or vegetable," *i.e.*, that it intentionally failed to make the payments it contractually owed.[10] In other words, even if one were to ignore New York canons of construction and apply DraftKings' interpretive framework, its "willful" "failure to make payments" would still exempt Plaintiffs' damages claim from the limitation of liability provision.

The same holds true as to DraftKings' invocation of the *noscitur a sociis* canon. As a threshold matter, "fraud" and "gross negligence" are causes of action under New York law, while "willful misconduct" is not. In other words, "gross negligence" and "fraud" are terms that are fundamentally different in kind than "willful misconduct." Moreover, despite its own admonition (*see* Br. at 17 (quoting *Popkin v. Sec. Mut. Ins. Co. of New York*, 367 N.Y.S.2d 492, 495 (N.Y. App. Div. 1975))), DraftKings conveniently ignores the closest "company" in which the words "willful misconduct" are found: the parenthetical which directly follows (and "includ[es]") it. And

---

[9] In another hypothetical, DraftKings argues that an NFL rule prohibiting players "from . . . tripping an opponent, including the runner" makes its point because not all runners are opponents. Br. at 3–4. But DraftKings again convolutes what is simple. The Complaint alleges that DraftKings did the *exact thing* ("failure to make payments under th[e] Agreement") that the parenthetical addresses. Putting it in the context of DraftKings' NFL rulebook illustration, Plaintiffs accused DraftKings of tripping the opponent's runner. There is nothing to hypothesize.

[10] Similarly, the three cases DraftKings cites on limitation of liability provisions dealing with consequential damages are susceptible to the same analysis. *See* Br. at 16–17. In each case, a "failure to make payments" (lost profits or revenue, per DraftKings' example) is a type of "misconduct" (damages) that can only be recovered when that misconduct is "willful" (consequential).

that parenthetical modifies "willful misconduct" by giving an example of a kind of "willful misconduct . . . under th[e] Agreement": not paying what is owed.

*    *    *

DraftKings' arguments cannot be squared with the plain language of the Amended License Agreement or bedrock principles of New York contract law. Although the NFLPA Licensors submit that the limitation of liability provision unambiguously conforms to their position, they respectfully submit that adopting DraftKings' strained alternative could only happen if the Court found the language to be ambiguous, and only then after considering parol evidence adduced in discovery. Further still, even accepting, *arguendo*, DraftKings' interpretation, fact questions would abound about whether DraftKings' motives and behavior amount to "willful misconduct" even under DraftKings' caselaw definitions of the term. If, for example, discovery bears out that DraftKings knew it owed payments to Plaintiffs but embarked on a repudiation gambit to try to keep those funds for itself to wrangle further concessions from Plaintiffs, then that would satisfy even the most daunting definition of the term. So too would facts showing that DraftKings entered into the Amended License Agreement with the intention to find a way to terminate it. Every which way, DraftKings' argument that the limitation of liability provision categorically applies to Plaintiffs' allegations as a matter of law must be rejected at this stage.

## II. WHETHER PLAINTIFFS ARE ENTITLED TO CONSEQUENTIAL DAMAGES AS A RESULT OF DRAFTKINGS' BAD FAITH IS A QUESTION OF FACT

DraftKings' argument that the limitation of liability provision bars Plaintiffs' request for consequential damages is another effort to recast what the Complaint actually alleges: "pretextual justifications," "buyers' remorse," "nonsensical" positions, "gamesmanship," willful repudiation, and DraftKings saying one thing to Plaintiffs while representing the opposite to its investors and the court in *Dufoe. See* Compl. ¶¶ 3–4, 49–50, 63, 68. Defendants' mischaracterizations aside, the

Court's task is to assess whether the Complaint contains sufficient facts—crediting Plaintiffs' allegations and drawing all reasonable inferences in their favor—to plausibly state a claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Henry v. Cap. One, N.A.*, 2023 WL 4044107, at *1 (2d Cir. June 16, 2023).

DraftKings does not dispute that the Amended License Agreement's limitation on consequential damages has no application if bad faith is ultimately proven. Nor could it. *See Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1458 (S.D.N.Y. 1986) ("A defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith."); *see also Radiology & Imaging Specialists v. Fujifilm Med. Sys.*, 2021 WL 149027, at *2 (S.D.N.Y. Jan. 15, 2021) (same) (cited at Br. at 20–21). DraftKings instead relies on the purported "high bar" for establishing bad faith to argue that its pretextual termination is not bad *enough*. *See* Br. at 20–21. But whether the bar for bad faith is "high" or not, the question of whether DraftKings' conduct clears it is, by its nature, a fact-based inquiry unsuitable on a motion to dismiss. *See President Container Grp. 11, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 170 (S.D.N.Y. 2020) (denying motion to dismiss plaintiff's request for consequential damages that were barred by limitation of damages clause, finding that "[b]ad faith [] is usually treated as a fact question that cannot be resolved on a Rule 12(b)(6) motion to dismiss"); *see also Perrigo Pharma Int'l Designated Activity Co. v. Mead Johnson & Co. LLC*, 2024 WL 1375947, at *14 (S.D.N.Y. Apr. 1, 2024) ("Determinations as to whether a contractual party has acted in bad faith generally present factual questions inappropriate for resolution on a motion to dismiss.") (citation and internal quotation marks omitted) (cited at Br. at 21–22).

Although DraftKings characterizes the conduct alleged in the Complaint as a "reasonable business decision" and thus "the opposite of bad faith," this assessment is logically incoherent as

well as factually wrong. *See* Br. at 20–21. As an initial matter, just because a business decision is reasonable does not preclude the fact that it may have been undertaken in bad faith—for example, with the knowledge that there was no colorable basis for doing so.[11] Indeed, the Complaint is replete with allegations that DraftKings' failure to live up to its contractual obligations was not the product of an honest mistake with respect to its obligations under the Amended License Agreement, but undertaken with DraftKings' full knowledge that it was breaching it to benefit itself (and thus necessarily harm Plaintiffs). *See* Compl. ¶¶ 18–22, 47–49, 58–68. Among other things, Plaintiffs have included detailed allegations of DraftKings' "nonsensical" positions; "gamesmanship"; and "brazenly pretextual" repudiation (*id.* ¶¶ 3–4, 49–50, 61), and have pointed out that DraftKings' expedient justification for terminating the Amended License Agreement (*i.e.*, "that the NFTs sold on [its] Marketplace are securities") directly contradicts representations DraftKings has made in *Dufoe* and to the SEC. *See id.* ¶¶ 59, 63. Indeed, as Plaintiffs have made clear, this is not even the first time that DraftKings has attempted to terminate the Agreement on false grounds: in 2021, it claimed to be "shuttering [its] business," all the while maintaining an admittedly immensely profitable gaming operation and stressing to the *Dufoe* court that its NFT products are a tiny slice of its enterprise. *See id.* ¶¶ 18–22, 49, 66. As the cherry on top, DraftKings

---

[11] A prior edition of Black's Law Dictionary literally defined "bad faith" as the "neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Bad Faith*, BLACK'S LAW DICTIONARY (2d ed. 1910). That, of course, is exactly what is being alleged here. For the record, Black's current definition of the term—a "dishonesty of belief, purpose or motive"—also exactly describes DraftKings' decision to say one thing to Plaintiffs and this Court, while saying the opposite to its investors and the court in *Dufoe*. *Bad Faith*, BLACK'S LAW DICTIONARY (12th ed. 2024).

itself has explicitly admitted that it acted to advance in its own economic self-interest. Each of these allegations supports Plaintiffs' claims of bad faith.[12]

DraftKings' reference to "a civil lawsuit and regulatory inquiries" motivating its repudiation is similarly unavailing. Br. at 12, 21. For starters, while DraftKings told Plaintiffs (and now tells this Court) that the *Dufoe* opinion and the SEC subpoenas justified terminating the Amended License Agreement, DraftKings categorically denied that its NFTs are functionally securities to the *Dufoe* court and its investors. Compl. ¶¶ 56, 60–63. Moreover, the timing here also fatally undermines DraftKings' position. *Dufoe* was filed before DraftKings signed the Amended License Agreement, the SEC subpoenas were issued before DraftKings signed the Amended License Agreement, and the motion to dismiss in *Dapper* was denied before DraftKings signed the Amended License Agreement. *See* Br. at 7–8. If DraftKings truly believed that it was "materially impracticable" to benefit from the Amended License Agreement, it could not and would not have agreed to it. To the contrary, DraftKings' invocation of occurrences that pre-date the Amended License Agreement as a rationale for terminating it also smacks of bad faith. At this juncture, these facts and allegations suffice to "nudge the assertion that [DraftKings] has acted in bad faith across the line from conceivable to plausible." *President Container Grp. 11, LLC*, 467 F. Supp. 3d at 170 (citations and internal quotation marks omitted).

None of the cases DraftKings puts forth support a different conclusion. Unlike in *Perrigo Pharma* and *Electron Trading LLC*, Plaintiffs have not merely alleged that DraftKings was acting out of self-interest. *See Perrigo Pharma*, 2024 WL 1375947, at *15; *Electron Trading, LLC v.*

---

[12] DraftKings repeatedly—and confusingly—casts Plaintiffs' allegation that DraftKings has experienced "buyers' remorse" as though it was a concession of DraftKings' good faith. Plaintiffs' point is that DraftKings regretted the contract it entered into and tried to contrive an invalid way out of it. That is bad-faith conduct.

*Morgan Stanley & Co. LLC*, 69 N.Y.S.3d 633, 636 (N.Y. App. Div. 2018). Here, Plaintiffs have alleged that DraftKings acted with the conscious intent to deprive Plaintiffs of the benefit of their bargain—DraftKings pocketed for itself substantial sums that were guaranteed to Plaintiffs and did so dishonestly.[13] And Plaintiffs' particularized allegations of DraftKings' knowing and intentional repudiation of the parties' Amended License Agreement satisfies the "compelling demonstration of egregious intentional misbehavior" requirement that was found lacking in *Radiology & Imaging Specialists*. *See* 2021 WL 149027, at *3 (citation and internal quotation marks omitted).

Put simply, accepting Plaintiffs' allegations as true and viewed in the light most favorable to them, they have more than plausibly asserted that DraftKings terminated the Amended License Agreement in bad faith, thereby estopping DraftKings from asserting the contractual limitation on consequential damages.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny DraftKings' Motion for Partial Dismissal of the Complaint.

---

[13] *Perrigo Pharma* is also inapposite for another reason. There, the court also found that plaintiffs' bad-faith allegations were insufficient to void a limitation of liability provision because they "relate[d] only to conduct unconnected to the alleged breach at issue," not the defendant's conduct "in breaching the contract specifically," as is required by law. *See* 2024 WL 1375947, at *14. That is clearly not the circumstance here, where Plaintiffs' bad-faith allegations are directly tethered to DraftKings' anticipatory breach of the Amended License Agreement.

Dated:  December 16, 2024

Respectfully submitted,

**WINSTON & STRAWN LLP**


*/s/ David L. Greenspan*
Jeffrey L. Kessler
David L. Greenspan
George E. Mastoris
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
gmastoris@winston.com

*Counsel for the NFLPA Licensors*